No. 24-1411

# United States Court of Appeals
# for the First Circuit

DAVID BONIFACE; NISSANDERE MARTYR; JUDERS YSEME,
Plaintiffs - Appellees,

v.

JEAN MOROSE VILIENA,
Defendant - Appellant.

On Appeal from a Judgment of the United States District Court
for the District of Massachusetts, Boston

## [Corrected] BRIEF FOR THE DEFENDANT - APPELLANT
## JEAN MOROSE VILIENA

Peter J. Haley (CA1 #21304)
*peter.haley@nelsonmullins.com*
Nelson Mullins Riley & Scarborough LLP
One Financial Center, Suite 3500
Boston, MA 02111
p. (617) 217-4714
f. (617) 217-4710

Dated: August 19, 2024

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

BASIS FOR APPELLATE JURISDICTION ............................................. 1

STATEMENT OF THE ISSUES AND APPLICABLE STANDARD OF
    REVIEW ...................................................................................... 1

    A.    Statement of the Issues ............................................................ 1

    B.    Standard of Review ................................................................. 2

STATEMENT OF THE CASE ................................................................. 3

    *Procedural History* ..................................................................... 3

    *Facts* ......................................................................................... 5

SUMMARY OF ARGUMENT ................................................................. 7

ARGUMENT ......................................................................................... 9

    I.    THERE IS NO SUBJECT MATTER JURISDICTION ......................... 9

        A.    The Origins and Legislative History of the TVPA .................... 10

        B.    The Law of Nations ................................................................. 13

        C.    Federal Question Jurisdiction and the Limits of
            Prescriptive Jurisdiction ......................................................... 15

    II.    THE COURT ERRED IN DENYING THE MOTION FOR
        JUDGMENT AS A MATTER OF LAW .............................................. 21

        A.    No Secondary Liability ............................................................ 21

            1.    The Facts Presented at Trial Would Not Otherwise
                Permit a Jury to Reasonably Find that the Defendant
                was Secondarily Liable ...................................................... 23

B.    No Liability for Attempted Extrajudicial Killing ........................ 25

C.    No State Action ............................................................................ 26

D.    Defendant Had No Control Over the Principal Actor ................ 28

III.    THE COURT ABUSED ITS DISCRETION IN PERMITTING THE TESTIMONY OF ROBERT MAGUIRE AND FAILING TO GRANT A NEW TRIAL ................................................................ 31

IV.    THE COURT ABUSED ITS DISCRETION IN FAILING TO GRANT REMITTITUR ........................................................................ 35

V.    THE TVPA DOES NOT PERMIT THE RECOVERY OF PUNITIVE DAMAGES ........................................................................ 36

CONCLUSION ................................................................................................ 37

CERTIFICATE OF COMPLIANCE ............................................................ 38

CERTIFICATE OF SERVICE ...................................................................... 39

ADDENDUM

# TABLE OF AUTHORITIES

C<small>ASES</small>:

Am. Banana Co. v. United Fruit Co.,
    213 U.S. 347 (1909) ................................................................. 18, 19

Am. Isuzu Motors, Inc. v. Ntsebeza,
    553 U.S. 1028, 128 S.Ct. 2424, 171 L.Ed.2d 225 (2008) ............................... 27

Amoche v. Guarantee Trust Life Ins. Co.,
    556 F.3d 41 (1st Cir. 2009) ........................................................... 2, 10

Appel v. Hayut,
    Civil Action No. 20 Civ. 6265, June 30, 2021, 2021 WL 2689059
    (S.D.N.Y. 2021) ...................................................................... 21, 25

BMW of N. Am., Inc. v. Gore,
    517 U.S. 559 (1996) ...................................................................... 36

Bolchos v. Darrel,
    3 F. Cas. 810 (D.C.S.C. 1795) ........................................................... 11

Boniface v. Viliena,
    338 F. Supp. 3d 50 (D. Mass. 2018) .......................................... 4, 7, 17, 22

Boniface v. Viliena,
    417 F. Supp. 3d 113 (D. Mass. 2019) ..................................................... 4

Buck v. Davis,
    580 U.S. 100, 137 S.Ct. 759, 197 L.Ed.2d 1 (2017) ...................................... 33

Cabello v. Fernandez–Larios,
    402 F.3d 1148 (11th Cir. 2005) .......................................................... 30

CEH, Inc. v. F/V Seafarer,
    70 F.3d 694 (1st Cir. 1995) ............................................................... 3

Central Bank, N.A. v. First Interstate Bank, N.A.,
    511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) .................................. 23

iii

Chowdhury v. Worrldtel Bangladesh Holding, Ltd.,
    746 F.3d 42 (2d Cir. 2014) ............................................................. 17, 26

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ................................. 33

Diefenbach v. Sheridan Transp.,
    229 F.3d 27 (1st Cir. 2000) ............................................................. 3, 31

E. Mountain Platform Tennis v. Sherwin–Williams Co., Inc.,
    40 F.3d 492 (1st Cir. 1994) ............................................................. 36

Estate of Manook v. Research Triangle Institute, Intern.,
    759 F. Supp. 2d 674 (E.D.N.C. 2010) ................................................. 27

Filartiga v. Pena-Irala,
    630 F.2d 876 (2d Cir. 1980) ............................................................. 11

Ford ex rel. Estate of Ford v. Garcia,
    289 F.3d 1283 (11th Cir. 2002) ....................................................... 29

Fresenius Med. Care Holdings, Inc. v. United States,
    763 F.3d 64 (1st Cir. 2014) ............................................................. 3, 21

Galvin v. U.S. Bank, N.A.,
    852 F.3d 146 (1st Cir. 2017) ............................................................. 1

Garcia v. Chapman,
    911 F. Supp. 1222 (S.D. Fla. 2012) ................................................. 24, 30

Halberstam v. Welch,
    705 F.2d 472 (D.C.Cir.1983) ............................................................. 23

Hartford Fire Ins. Co. v. California,
    509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) ........................... *passim*

Holmes v. City of Massillon,
    78 F.3d 1041 (6th Cir. 1996) ............................................................. 35

iv

In re Chiquita Brands Int'l, Inc. Alien Tort Statute and S'holder Derivative Litig.,
    792 F. Supp. 2d 1301 (S.D. Fla. 2011) .............................................................. 33

Jennings v. Jones,
    587 F.3d 430 (1st Cir. 2009) ................................................................ 3, 31, 35

Kadic v. Karadzic,
    70 F.3d 232 (2d Cir. 1995)...................................................................... 13, 26

Kearns v. Keystone Shipping Co.,
    863 F.2d 177 (1st Cir. 1988) ............................................................................ 34

Khedivial Line, S.A.E. v. Seafarers' Int'l Union,
    278 F.2d 49 (C.A.2 1960) ................................................................................ 11

Khulumani v. Barclay Nat. Bank Ltd.,
    504 F.3d 254 (2d Cir. 2007)............................................................................. 26

Kiobel v. Royal Dutch Petroleum Co.,
    569 U.S. 108 (2013) ............................................................................... 4, 16, 17

Kolb v. Goldring, Inc.,
    694 F.2d 869 (1st Cir. 1982) ............................................................................ 36

Kumho Tire Co. v. Carmichael,
    526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ................................. 33

Lauritzen v. Larsen,
    345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953).......................................... 15

Mastafa v. Chevron Corp.,
    759 F. Supp. 2d 297 (S.D.N.Y. 2010) .............................................................. 22

McBee v. Delica Co., Ltd.,
    417 F.3d 107 (1st Cir. 2005) ............................................................................ 20

Mendez-Matos v. Municipality of Guaynabo,
    557 F.3d 36 (1st Cir. 2009) .............................................................................. 36

Merrell Dow Pharmaceuticals Inc. v. Thompson,
    478 U.S. 804, 106 S.Ct. 3229 (1986) .................................................................. 10

Microsoft Corp. v. AT & T Corp.,
    550 U.S. 437, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007) .................................. 17

Montralet v. Murray,
    8 U.S. (4 Cranch) 46 (1807) ......................................................................... 14-15

Moskal v. United States,
    498 U.S. 103 (1990) ........................................................................................ 25

Moxon v. The Fanny,
    17 F. Cas. 942 (D.C.Pa. 1793) ........................................................................ 11

O'Reilly de Camara v. Brooke,
    209 U.S. 45 (1908) .......................................................................................... 11

Perez–Perez v. Popular Leasing Rental, Inc.,
    993 F.2d 281 (1st Cir. 1993) ........................................................................... 35

Philips v. Pitt County Mem'l Hosp.,
    572 F.3d 176 (4th Cir. 2009) ........................................................................... 27

Ramirez v. United States,
    363 F.2d 33 (9th Cir. 1966) ............................................................................. 31

Rimkus v. Islamic Republic of Iran,
    575 F. Supp. 2d 181 (D.D.C. 2008) ................................................................ 36

Rodríguez-Valentin v. Doctors' Center Hospital (Manati), Inc.,
    27 F.4th 14 (1st Cir. 2022) ................................................................. 2-3, 21, 31

Romero v. International Terminal Operating Co.,
    358 U.S. 354 (1959) ........................................................................................ 10

Sinaltrainal v. Coca–Cola Co.,
    578 F.3d 1252 (11th Cir. 2009) ....................................................................... 24

State Farm Mut. Auto. Ins. Co. v. Campbell,
    538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) .................................. 36

Tel-Oren v. Libyan Arab Republic,
    726 F.2d 774 (D.C. Cir. 1984) .................................................................... 11, 12

Trainor v. HEI Hosp., LLC,
    699 F.3d 19 (1st Cir. 2012) ................................................................................ 35

U.S. v. Cafiero,
    342 F. Supp. 2d (D. Mass. 2003) ...................................................................... 18

U.S. v. Tarr,
    589 F.2d 55 (1st Cir. 1978) ................................................................................ 30

Underhill v. Hernandez,
    168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897).............................................. 16

United States v. Aluminum Co. of America,
    148 F.2d 416 (2d Cir. 1945).......................................................................... 17, 18

United States v. Downing,
    753 F.2d 1224 (3rd Cir. 1985) .......................................................................... 33

United States v. Hayes,
    653 F.2d 8 (1st Cir. 1981) .................................................................................. 18

United States v. Joiner,
    429 F.2d 489 (5th Cir. 1970)............................................................................. 31

**CONSTITUTIONAL PROVISIONS:**

U.S. Const., art. I, § 8............................................................................... 10, 14
U.S. Const., art. III, § 2 ................................................................................... 14

**STATUTES:**

28 U.S.C. § 1291 ................................................................................................. 1
28 U.S.C. § 1350 ................................................................................... 1, 4, 10
28 U.S.C. § 1331 ................................................................................... 7, 13

RULES:

Fed. R. Civ. P. 59 ................................................................................ 35

Fed. R. Evid. 702 ................................................................................ 33
Fed. R. Evid. 703 .......................................................................... 33, 34

OTHER AUTHORITIES:

Act of March 3, 1875, 18 Stat. 470 ............................................... 10

H.R. Rep. No. 102-367 (1991) .................................................... 12

J. Story, Commentaries on Conflict of Laws § 38 (1834) .......... 17

Michael T. Morley, The Law of Nations and the Offenses Clause of the
     Constitution: A Defense of Federalism, 112 Yale L. J. 109 (2002)............ 14

Pub. L. No. 102-256, 106 Stat. 73 (1992) .................................. 1, 4

Sen. Rep. No. 102-249 (1991) .................................................... 12

The Alien Tort Statute and the Law of Nations, University of Chicago Law
     Review, Vol. 78, No. 2 (Spring 2011)............................................ 15

The Federalist No. 42 (James Madison) (Clinton Rossiter ed., 1961)...................... 14

## BASIS FOR APPELLATE JURISDICTION

This is an appeal from a judgment entered in the United States District Court for the District of Massachusetts (Appendix ("App.") at 976) and the subsequent Order of the District Court denying the Defendant's Renewed Motion for Judgment as a Matter of Law, for a New Trial and for Remittitur.  (App. at 1042).  The Court has jurisdiction over this appeal in accordance with 28 U.S.C. § 1291.  Galvin v. U.S. Bank, N.A., 852 F.3d 146, 154 (1st Cir. 2017).

## STATEMENT OF THE ISSUES AND
## APPLICABLE STANDARD OF REVIEW

### A.  Statement of the Issues

1.  Whether the District Court had subject matter jurisdiction over this action.

2.  Whether the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, note) (the "TVPA") permits the establishment of secondary liability.

3.  Whether the evidence established at trial was sufficient to permit the jury to reasonably find that the Defendant was secondarily liable.

4.  Whether the TVPA provides a remedy for extra judicial killing.

5.  Whether the evidence established at trial was sufficient to permit the jury to reasonably find a superior and subordinate relationship existed between the Defendant Jean Morose Viliena and Vincent Duclona.

1

6.      Whether the evidence established at trial was sufficient to permit the jury to reasonably find that the Defendant was a state actor, acting under color of foreign law.

7.      Whether the District Court abused its discretion in permitting the jury to hear the expert testimony of Robert Maguire on political violence in Haiti.

8.      Whether the District Court erred in failing to grant Defendant's motion for judgment as a matter of law.

9.      Whether the District Court abused its discretion in failing to grant a new trial.

10.     Whether the District Court abused its discretion in failing to grant Defendant's motion for remittitur.

11.     Whether the TVPA allows for the recovery of punitive damages and whether the punitive damages awarded in this action were excessive.

**B.      <u>Standard of Review</u>**

1.      *De Novo Review; Subject Matter Jurisdiction, Denial of Motion for Judgment as a Matter of Law*

The lack of subject matter jurisdiction is an issue for de novo review.  <u>Amoche v. Guarantee Trust Life Ins. Co.</u>, 556 F.3d 41, 48 (1st Cir. 2009).  Similarly, the Court reviews de novo the issue of the denial of a post-verdict motion for judgment as a matter of law.  <u>Rodríguez-Valentín v. Doctors' Center Hospital (Manati), Inc.</u>,

27 F.4th 14, 20 (1st Cir. 2022) citing Fresenius Med. Care Holdings, Inc. v. United

States, 763 F.3d 64, 67 (1st Cir. 2014).

**2.**    ***Abuse of Discretion; Denial of Motion for New Trial; Remittitur and Allowance of Expert Testimony***

The Court reviews the denial of a motion for a new trial for abuse of

discretion. Id. at 21 citing Jennings v. Jones, 587 F.3d 430, 436 (1st Cir. 2009).  The

Court reviews the denial of a motion for remittitur for abuse of discretion. Id. at  22.

The Court reviews the decision to permit expert testimony for abuse of discretion.

Diefenbach v. Sheridan Transp., 229 F.3d 27, 30 (1st Cir. 2000).

**3.**    ***De Novo Review; Whether Punitive Damages are Available under Statute***

Whether or not the statute permits the recovery of punitive damages is subject

to de novo review. CEH, Inc. v. F/V Seafarer, 70 F.3d 694 (1st Cir. 1995).

## STATEMENT OF THE CASE

***Procedural History***

This action was commenced on March 22, 2017 by three Haitian citizens,

David Boniface, Nissage Martyr[1] and Juders Yseme in the District Court seeking to

recover civil damages for torts allegedly committed in Haiti in the period 2007-2010

by the Defendant Jean Morose Viliena.  The Complaint (App. at 34) sought to

---

[1] On August 31, 2018 the District Court allowed the Plaintiffs to substitute
Nissandere Martyr as a party following the death of his father Nissage Martyr. (App.
at 128).

recover on five (5) separate counts. Counts I, II and III asserted causes of action under the Torture Victim Protection Act ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, note). Count IV asserted a cause of action under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"). Count V asserted a claim for arson under Haitian law.  On August 31, 2018, the District Court issued its Memorandum and Order on Motion to Dismiss and Motion to Substitute Party, (App. at 128) Boniface v. Viliena, 338 F. Supp. 3d 50, 64 (D. Mass. 2018), dismissing Count IV alleging a cause of action under the ATS on the grounds that the Complaint failed to allege with sufficient particularity that the claims touch and concern the territory of the United States, the standard articulated in Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108 (2013).  The Defendant moved for reconsideration and to certify an interlocutory appeal to this Court. (App. at 164).  By Order dated September 30, 2019, the District Court denied the motion for reconsideration and granted the request for interlocutory appeal to this Court. (App. at 199). Boniface v. Viliena, 417 F. Supp. 3d 113 (D. Mass. 2019).  By Judgment dated February 19, 2020, this Court denied the Defendant's petition for interlocutory review. [Case No. 19-8027].

By Order dated February 7, 2023, the District Court denied the Defendant's Motion for Summary Judgment and allowed Plaintiff's Motion for Partial Summary Judgment striking the Defendant's affirmative defense that the Plaintiff's had failed

to exhaust their administrative remedies in Haiti as required by the TVPA.  (App. at 231).  The District Court commenced a jury trial on March 13, 2023.  (App. at 302). The Defendant moved for the entry of a directed verdict at the close of the Plaintiff's case.  (App. at 585).  The jury returned a verdict on March 21, 2023 finding the Defendant liable to the Plaintiffs under the Torture Victim Protection Act and not liable for arson under the law of Haiti.  (App. at 951).  The Jury returned a verdict in the amount of $1,750,000 in actual damages for David Boniface, $1,250,000 in actual damages to Nissandere Martyr and $1,500,000 in actual damages to Juders Yseme.  Id.  The jury awarded $11,000,000 in punitive damages.  Id.  The District Court entered Judgment on April 12, 2023. (App. at 976).  The Defendant filed his Renewed Motion for Judgment as a Matter of Law, for a New Trial and for Remittitur on April 18, 2023 (the "Motion"). (App. at 977).  By Order dated April 8, 2024, the District Court denied the Motion.  (App. at 1042).  The Defendant filed a Notice of Appeal on April 23, 2024. (App. at 1075) .

### *Facts*

David Boniface, Nissage Martyr and Juders Yseme are each Haitian citizens residing in Haiti and prior to the trial of this action had never been to the United States. (App. at 325, l. 17; 327, l. 9).  Viliena was a Haitian citizen who moved to the United States in July, 2008.  (App. at 327, l. 21).  None of the Plaintiffs ever had direct communications with Viliena while he was in the United States. (App. at 327,

l. 21).  In June, 2007 Viliena was elected Mayor of the town of Les Irois, Haiti,

where Viliena, Boniface, Martyr and Yseme each lived. (App. at 326, l. 13).  On July

27, 2007 Viliena encountered a resident on the streets of Les Irois who had put trash

in the street. Viliena and the resident "Ms. Ostanie" had a dispute over her actions

(App. at 627, l. 9-673, l. 1) and appeared before a local judge, Judge Bell, to discuss

the matter. (App. at 500, l. 14-18).  David Boniface, a self-described human rights

advocate,  also appeared at Judge Bell's house that morning. (App. at 385, l. 7).

Later that evening, a group of people appeared at the Boniface residence.  David

Boniface was not present at the house when the group arrived, but his brother

Eclesiaste Boniface, who was present, was killed that evening. (App. at 504, l. 9; 389,

l. 5- 390, l. 1).  At trial, the jury heard evidence that Hautefort Bajon shot Eclesiaste

Boniface (App. at 528, l. 18) from one witness, consistent with the facts alleged in

the Complaint in this action, and from another witness, Osephita LeBon, that Viliena

shot Eclesiaste Boniface. (App. at 506, l. 5).

    Ten months later in April, 2008, the jury heard evidence of a disturbance at the

radio station in Les Irois. (App. at 420, l. 19-21).  During the radio station incident a

crowd outside the station created a disturbance and then entered the station, during

the incident Juders Yseme testified he was beaten by Viliena and that subsequently as

he fled the station he was shot by Vileme Duclona on the instruction of Viliena.

(App. at 428, l. 1-2).  The jury also heard evidence that Nissage Martyr was shot  in

6

the leg by Vileme Duclona and also beaten by Viliena. (App. at 425, l. 15; 425, l. 24-426, l. 3). David Boniface was not a party or witness to the April, 2008 events. (App. at 417, l. 10).

Viliena was the subject of a criminal proceeding in Haiti and found not guilty there. (App. at 640, l. 6). The Plaintiffs each had judgment entered in their favor for civil damages in Haiti, David Boniface in the amount of $17,496, Nissage Martyr in the amount of $15,905 and Juders Yseme in the amount of $14,315. (App. at 640, l. 19).

## SUMMARY OF ARGUMENT

The sole basis for assertion of jurisdiction in this matter is federal question jurisdiction under 28 U.S.C. § 1331. The District Court has interpreted this statutory license without limit, leading to the conclusion that while the facts of this matter do not touch or concern the United States, and accordingly the claims under the Alien Tort Statute must be dismissed, the fact that Congress has enacted a law providing for civil recoveries between citizens of a foreign nation for acts which took place wholly within that nation and "do not touch or concern the United States," Boniface v. Viliena, 338 F. Supp. 3d 50, 63, creates jurisdiction in the District Court without limit. The legislative history of the Torture Victim Protection Act indicates that it was meant to further define specific violations of the Law of Nations and to apply the rights arising under the Alien Tort Statute to United States citizens, it was not meant

to, nor can it be employed to, adjudicate civil claims between citizens of a foreign country for acts which took place in that foreign country.  The District Court has elided the necessary core analysis of whether the assertion of jurisdiction over the claims asserted in this action falls within the bounds of the Constitution itself.  It does not.

The District Court erred in denying Viliena's motion for a new trial and in doing so grafted on to the statutory limits of the TVPA the concept of secondary liability for acts of another, recoveries for attempted extrajudicial killing and the award of punitive damages, none of which are provided for by the TVPA.  The District Court is bound by the terms of the statute itself and the existence of other District Court opinions which exceed the explicit bounds of the statutory language do not provide support for the District Court's unilateral expansion of the statutory terms.  The District Court also erred in finding the presence of the necessary state action in the absence of any reliable testimony establishing the facts that would support that finding.

The District Court abused its discretion in permitting the use of the expert testimony of Robert Maguire relating to the practices of various political parties within other parts of Haiti and their group tendencies towards violence.  This testimony offered by Mr. Maguire as a social scientist sought to impute to Viliena responsibility for actions based on his alleged membership in a political party.  Mr.

Maguire's testimony failed to meet the standard for admissibility under Rule 702 in that it was not sufficiently tied to the facts of the case. The Court abused its discretion in allowing the testimony and subsequently relied wrongly on the facts adduced from Mr. Maguire to support its Order denying Viliena's Motion for Judgment as a Matter of Law. (App. at 1059).

The District Court abused its discretion in failing to grant Viliena's motion for remittitur given the absence of any evidence offered by the Plaintiffs at trial to establish damages.

## ARGUMENT

## I.     THERE IS NO SUBJECT MATTER JURISDICTION.

The establishment of federal question jurisdiction must rest on something more than a tautology; there is a federal statute, jurisdiction, therefore, exists.  The Supreme Court has recognized these limits:

> We have consistently emphasized that, in exploring the outer reaches of § 1331, determinations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system. "If the history of the interpretation of judiciary legislation teaches us anything, it teaches the duty to reject treating such statutes as a wooden set of self-sufficient words. . . . The Act of 1875 is broadly phrased, but it has been continuously construed and limited in the light of the history that produced it, the demands of reason and coherence, and the dictates of sound judicial policy which have emerged from the Act's function as a provision in the mosaic of federal judiciary legislation."

Merrell Dow Pharmaceuticals Inc. v. Thompson, 478 U.S. 804, 810, 106 S.Ct. 3229, 3233 (1986) quoting Romero v. International Terminal Operating Co., 358 U.S. 354 379 (1959). Any close examination of the TVPA and the facts of this matter belie the existence of subject matter jurisdiction. To otherwise validate the District Court's construction of TVPA jurisdiction is to give license to universal jurisdiction in the courts of the United States to the adjudication of claims between foreign citizens for actions in foreign countries that do not touch or concern the United States. The Court reviews these issues de novo. Amoche v. Guarantee Trust Life Ins. Co., 556 F.3d 41, 48 (1st Cir. 2009).

    **A.**    **The Origins and Legislative History of the TVPA**

    The TVPA enacted as a note to the ATS has its origins in the ATS and its modern usage in the federal courts. The ATS enacted in 1789 states in full: "[T]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The ATS is a jurisdictional statute enacted to make all actionable tort claims predicated on the Law of Nations, as defined by Article I, Section 8, Clause 10 of the United States Constitution, cognizable in federal courts. At the time of enactment of the ATS, there was no federal question jurisdiction. Act of March 3, 1875, 18 Stat. 470.

The ATS was invoked twice in the late 18th century, but then only once more over the next 167 years. See Moxon v. The Fanny, 17 F. Cas. 942 (D.C.Pa. 1793); Bolchos v. Darrel, 3 F. Cas. 810 (D.C.S.C. 1795); O'Reilly de Camara v. Brooke, 209 U.S. 45 (1908); Khedivial Line, S.A.E. v. Seafarers' Int'l Union, 278 F.2d 49, 51–52 (C.A.2 1960) (*per curiam*).  The ATS gained new life in the courts in 1980. In Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir. 1980) a Paraguayan family, resident in the United States, sought to use the ATS to sue a former Paraguayan police inspector-general, also resident in the United States, for torturing and killing a member of their family in Paraguay.  Reversing the decision of the lower court, the Second Circuit held that the ATS provided a legitimate source of subject matter jurisdiction for the claim.  Following Filartiga, in Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C. Cir. 1984) the DC Circuit affirmed the dismissal of a case brought by the survivors of an armed attack on a civilian bus in Israel alleging that the attack had been carried out by the foreign defendants.  Although affirming the lower court dismissal, the three members of the panel, each wrote separately to do so and took markedly different views of Filartiga and its progeny.  Judge Bork in his concurring opinion notably took the position that the jurisdictional grant afforded by the ATS did not create any cause of action and observed that "it is essential that there be an explicit grant of a cause of action before a private plaintiff be allowed to enforce principles of international law in a federal tribunal." 726 F.2d at 801.

Congress responded to the concerns articulated in Tel-Oren by passing the

TVPA in 1991.  See H.R. Rep. No. 102-367, at 86 (1991) (explaining that purpose of

the statute is to provide "a clear and specific remedy, not limited to aliens, for torture

and extrajudicial killing"). It explicitly did so to address Judge Bork's view that the

ATS did not provide a right of action to torture victims.  The House Report on the

TVPA states:

> Official torture and summary executions merit special attention in a
> statute expressly addressed to those practices. At the same time, claims
> based on torture or summary executions do not exhaust the list of
> actions that may appropriately be covered by section 1350. That statute
> should remain intact to permit suits based on other norms that already
> exist or may ripen in the future into rules of customary international
> law.

H.R. Rep. No. 102-367, at 86 (1991) (emphasis added).  The Senate Report contains

similar language:

> The TVPA would provide [an explicit] grant [of a cause of action to
> victims of torture] and would also enhance the remedy already available
> under section 1350 in an important respect: while the **Alien Tort
> Claims Act provides a remedy to aliens only, the TVPA would
> extend a civil remedy also to U.S. citizens** who may have been
> tortured abroad. Official torture and summary executions merit special
> attention in a statute expressly addressed to those practices. At the same
> time, claims based on torture or summary execution do not exhaust the
> list of actions that may appropriately be covered by section 1350.
> Consequently, that statute should remain intact.

Sen. Rep. No. 102-249, at 3 (1991) [emphasis added].

The legislative history of the TVPA indicates that it was meant to further

define specific violations of the Law of Nations as articulated by Judge Bork and to

12

apply the rights arising under the ATS to United States citizens. The TVPA contains no jurisdictional grant and was not intended to expand the jurisdictional reach of the ATS. To construe the statute to have expanded the jurisdictional limits of the ATS is inconsistent with the inherent constitutional limits embodied by the Law of Nations.

The reliance by the District Court on federal question jurisdiction lacks the required analysis of whether the assertion of jurisdiction over the TVPA claims falls within the bounds of the Constitution itself. In Kadic v. Karadzic, 70 F.3d 232 (2d Cir. 1995), the Second Circuit observed that some courts had determined that Section 1331 provided an independent basis for claims alleging violations of international law, but observed that "whether or not that is so is an issue of some uncertainty that need not be decided in this case." Id. at 246. The courts that resolved this uncertainty have done so with a *res ipsa* form of analysis, § 1331 provides jurisdiction over questions involving federal statutes, the TVPA is a federal statute. This analysis does not address the question of whether the legislative assertion of extraterritorial jurisdiction over disputes that exceed the limits of the Law of Nations also fall outside the limits of the Constitution.

## B.    The Law of Nations

To the extent the TVPA can be read to authorize jurisdiction over torts committed by foreign citizens on foreign soil that do not touch or concern the United States, its constitutional support must be found within those provisions which

13

authorize Congress to "define and punish . . . Offenses against the Law of Nations."

U.S. Const., art. I, section 8.  The Law of Nations clause within the Constitution was

one of the "class of powers lodged in the general government . . . which regulate the

intercourse with foreign nations."  The Federalist No. 42 (James Madison) at 264

(Clinton Rossiter ed., 1961).  This clause was intended to regulate the conduct of

independent states towards each other.  There is nothing within the clause or its

historical understanding that would suggest its applicability to the wide-ranging

exercise of the civil jurisdiction outside the United States with respect to conduct that

does not touch or concern the United States.  The Law of Nations clause codified the

law of nations as it was known in 1787-1789, referring to the rights of independent

sovereign states to punish offenses against other sovereign states pursuant to the then

recognized rules of man invested by natural law and thought to be unchanging and

immutable. There is nothing within the clause or its historical antecedents to suggest

that it was meant to permit Congress to create forums for the exercise of civil

jurisdiction governing events unrelated to the United States. See, Michael T. Morley,

Note,  The Law of Nations and the Offenses Clause of the Constitution: A Defense of

Federalism, 112 Yale L. J. 109, 135-136 (2002).

The authorization of federal jurisdiction over controversies between a "State,

or the Citizens thereof, and foreign States, Citizen or Subjects" U.S. Const. Art. III,

§ 2, cl. 1, did not encompass cases between two aliens. See Montralet v. Murray, 8

U.S. (4 Cranch) 46 (1807). Claims between two foreign citizens that do not

otherwise touch or concern the United States fall outside the limits of the Law of

Nations and the limits of the Constitution. See The Alien Tort Statute and the Law of

Nations, University of Chicago Law Review, Vol. 78, No. 2 (Spring 2011) at 529.

### C.    Federal Question Jurisdiction and the Limits of Prescriptive Jurisdiction

The limits of the Court's jurisdictional power are logically most often

contested in the framework of a motion to dismiss for lack of subject matter

jurisdiction. In his dissent in Hartford Fire Ins. Co. v. California, 509 U.S. 764, 113

S.Ct. 2891, 125 L.Ed.2d 612 (1993), Justice Scalia observed that this construct

misses the point, quoting Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed.

1254 (1953), he observed that:

> As frequently happens, a contention that there is some barrier to
> granting plaintiff's claim is cast in terms of an exception to jurisdiction
> of subject matter. A cause of action under our law was asserted here,
> and the court had power to determine whether it was or was not well
> founded in law and in fact.

345 U.S. at 575, 73 S.Ct. at 924. Hartford, 509 U.S. at 812. The dissent accepts the

presumption that federal question jurisdiction can be universally employed in this

manner. In his analysis, however, Justice Scalia notes that answering this question,

while it changes the problem set from one about jurisdiction (Rule 12(b)(1)) to one

about the substantive scope of the legislation (Rule 12(b)(6)), still leaves the Court

with two questions to answer; 1) does the statute have extraterritorial reach, known as

"legislative jurisdiction," Id. at 814; and 2) if that the presumption against the

extraterritorial scope of the statute is overcome, is the statute being construed in a

manner that would be violative of the law of nations, because of the well-established

presumption that "an act of congress ought never to be construed to violate the law

of nations if any other possible construction remains." Id. at 815.

In Hartford, interpreting the scope of the Sherman Act, the dissent observes

that "this and other courts have frequently recognized that, even where the

presumption against extraterritoriality does not apply, statutes should not be

interpreted to regulate foreign persons or conduct if that regulation would conflict

with principles of international law." Id. The dissent notes that international law, or

the law of nations, contains limitations on a nation's exercise of its jurisdiction to

prescribe. See, Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456

(1897) ("Every sovereign state is bound to respect the independence of every other

sovereign state, and the courts of one country will not sit in judgment on the acts of

the government of another, done within its own territory.")

In Kiobel v. Royal Dutch Petroleum Co., the court addressed the first question

posited in the Hartford dissent, employing a presumption against the extraterritorial

reach of any statute, the Court concluded that a "presumption against

extraterritoriality applies to claims under the Alien Tort Statute, and that nothing in

the statute rebuts the presumption." 569 U.S. 108, 124 (2013). The legislative

16

history of the TVPA evinces an interest in providing a remedy in the form of a civil action for torture that may be committed abroad and several courts, including the District Court here, have noted its intent to extend beyond the territory of the United States, see Chowdhury v. Worrldtel Bangladesh Holding, Ltd., 746 F.3d 42, 51 (2d Cir. 2014); Boniface v. Viliena, 338 F. Supp. 3d 50, 64 (D. Mass. 2018).

The remaining issue though is, assuming an intent to apply the statute extraterritorially, would the exercise of jurisdiction over conduct occurring wholly within a foreign country between foreign citizens that does not "touch and concern" the United States offend the traditional notions of comity imbedded within international law.  In United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir. 1945), a Sherman Act decision, the court cautioned that "we are not to read general words, such as those in [the Sherman Act] without regard to the limitations customarily observed by nations upon the exercise of their powers; limitations which generally correspond to those fixed by the 'Conflict of Laws.'" Id. at 443. "United States law governs domestically but does not rule the world," Kiobel, 569 U.S. at 115, quoting Microsoft Corp. v. AT & T Corp., 550 U.S. 437, 454, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007).

The comity at issue here is the comity of nations, "the respect sovereign nations afford each other by limiting the reach of their laws." Hartford at 817 citing J. Story, Commentaries on Conflict of Laws § 38 (1834).  Justice Holmes early on

17

observed that "the general and almost universal rule is that the character of an act as lawful or unlawful must be determined wholly by the law of the country where the act is done." <u>Am. Banana Co. v. United Fruit Co.</u>, 213 U.S. 347, 356 (1909). A rule that would authorize a nation to treat an actor "according to its own notions rather than those of the place where he did the acts, not only would be unjust, but would be an interference with the authority of another sovereign, contrary to the comity of nations, which the other state concerned justly might resent." <u>Id</u>. The First Circuit has, in the context of exercising jurisdiction to enforce criminal laws, been wary of the use of prescriptive jurisdiction abroad, endorsing the view that the courts should not "impute to Congress an intent to punish all whom its courts can catch, for conduct which has no consequences within the United States." <u>United States v. Hayes</u>, 653 F.2d 8, 15 (1st Cir. 1981) <u>quoting</u> <u>United States v. Aluminum Co. of America</u>, at 443. <u>See</u> <u>also</u> <u>U.S. v. Cafiero</u>, 342 F. Supp. 2d 49 (D. Mass. 2003).

In <u>Hartford</u>, Justice Scalia reviewed the Restatement factors that should be weighed in making the decision to exercise prescriptive jurisdiction:

> Under the Restatement, a nation having some "basis" for jurisdiction to prescribe law should nonetheless refrain from exercising that jurisdiction "with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable." Restatement (Third) § 403(1). The "reasonableness" inquiry turns on a number of factors including, but not limited to: "the extent to which the activity takes place within the territory [of the regulating state]," <u>id</u>., § 403(2)(a); "the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the *819 activity to be regulated," <u>id</u>.,

18

§ 403(2)(b); "the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted," id., § 403(2)(c); "the extent to which another state may have an interest in regulating the activity," id., § 403(2)(g); and "the likelihood of conflict with regulation by another state," id., § 403(2)(h).

Hartford at 818-819.

A review of these factors in this matter indicates the exercise of prescriptive jurisdiction would be inconsistent with the traditional notions of comity between nations. The incident complained of here took place in Haiti, between Haitians and, as the District Court has already found and the evidence at trial confirmed, did not touch and concern the United States. The interests at issue here are the interests of Haiti and not the United States. The Plaintiffs asserted at trial that Viliena was acting in his capacity as mayor of a town in Haiti when he allegedly engaged in the tortious conduct that harmed other Haitians. The comity analysis is enhanced by projecting the response of the United States and its citizens in a scenario in which Haitian courts attempted to adjudicate disputes between a United States citizen and local police in the United States. The United States would undoubtedly find that such an action within Haiti would be "interference with the authority of another sovereign, contrary to the comity of nations." Am. Banana Co. v. United Fruit Co., at 356. This civil action is no different, it is an action inconsistent with the traditional notions of comity

between nations and, as such, inconsistent with the law of nations and the statutory intent and constitutional limits of the TVPA.

The use of the concept of "comity" in this analysis is employed in service of answering the question of whether the use of the TVPA in matters which do not touch and concern the United States is consistent with the limitations of the Law of Nations embodied in the Constitution and not the discretionary and deferential notions of comity that are at play in matters in which the court may have subject matter jurisdiction, but elect, as a matter of comity, not to exercise that jurisdiction. See, McBee v. Delica Co., Ltd., 417 F.3d 107, 120 (1st Cir. 2005). This Court in McBee and the Supreme Court in Hartford were both addressing the extraterritorial application of statutes that addressed actions that had impact on the United States and its citizens. The analysis in this case is different, the Court is asked to determine if the exercise of extraterritorial jurisdiction **in a matter in which the United States has no interest** is consistent with the Constitutional limitations embodied by the Law of Nations. To argue otherwise is to embrace the idea that the authority of Congress to legislate activity on foreign soil that does not touch or concern the United States is without any limit whatsoever. That idea is entirely at odds with the limitations embodied by the Law of Nations and explicitly adopted within the Constitution.

20

II.     **THE COURT ERRED IN DENYING THE MOTION FOR JUDGMENT AS A MATTER OF LAW.**

In his Renewed Motion for Judgment as a Matter of Law Viliena addressed the jury's entry of a verdict that exceeded the express statutory scope of the TVPA, issues previously also addressed with the District Court in the context of the Motion to Dismiss and the jury instructions.  While the District Court found support for its application of the TVPA beyond the express statutory language in the decisions of other district courts applying a similar reading, and observed that Viliena's arguments were reliant only upon the plain text of the statute itself, Boniface, 338 F. Supp. 3d at 67, another district court reached a contrary result in addressing the availability of relief for attempted extrajudicial killing, disagreeing that the plain language of the statute itself constituted insufficient support for the dismissal of such claims.  Appel v. Hayut, Civil Action No. 20 Civ. 6265, June 30, 2021, 2021 WL 2689059*9 (S.D.N.Y. 2021).  That court's construction, that the Court is limited by the express language of the statute, is the interpretation that should govern.  This Court reviews these issues de novo.  Rodríguez-Valentin v. Doctors' Center Hospital (Manati), Inc., 27 F.4th 14, 20 (1st Cir. 2022) citing Fresenius Med. Care Holdings, Inc. v. United States, 763 F.3d 64, 67 (1st Cir. 2014).

A.     **No Secondary Liability**

During the April, 2008 attack at the radio stations, the testimony provided at trial indicated that Vileme Duclona was the shooter. (App. at 428, l. 9-10).  Similarly

with respect to the death of Eclesiaste Boniface, one witness, of the two who testified

to the shooting, testified that Hautefort Bajon was the shooter.  (App. at 528, l. 18).

The District Court instructed the jury on aiding and abetting as follows:

> Next, Defendant Viliena may be found liable if you find by a
> preponderance of the evidence that he aided and abetted others in the
> alleged -- in the alleged wrongful act committed against Eclesiaste
> Boniface, Nissage Martyr or Plaintiffs Juders Ysemé and David
> Boniface. To hold Defendant Viliena liable under theory of aiding and
> abetting, plaintiffs must prove by a preponderance of the evidence as to
> each claim
>
> 1.    That one or more of the alleged wrongful acts was committed
> 2.    That Defendant Viliena committed or gave substantial assistance
>       to the person or persons who committed or caused one or more of
>       the alleged wrongful acts; and
> 3.    That the Defendant Viliena knew that his actions would assist in
>       the illegal or wrongful activity at the time he provided the
>       assistance.
>
> If you find that Defendant Viliena is liable for aiding and betting [sic],
> then he is liable for all the wrongful acts that were a natural and
> foreseeable result of the activity he helped to undertake.

(App. at 864, l. 8 – 865, l. 1).  This instruction, as the District Court noted in its Order

denying the Motion for Judgment as a Matter of Law (App. at 1056), was consistent

with the District Court's decision on the Motion to Dismiss.  See, Boniface, 338 F.

Supp. 3d at 67.  There is, however, nothing in the language of the TVPA that permits

the establishment of secondary liability.  In Mastafa v. Chevron Corp., 759 F. Supp.

2d 297, 300 (S.D.N.Y. 2010), the Court noted that:

> [T]he TVPA claims must fail because the TVPA does not permit
> aiding-and-abetting liability. The plain language of the TVPA limits
> liability to those "individual[s] . . . who subject[ ] [other] individual[s]
> to torture." 28 U.S.C. § 1350. It does not extend liability to parties who
> provide aid to individuals who commit acts of torture.

Id. The Supreme Court has adopted a default rule that provides that absent express

statutory provision, secondary liability cannot be imposed on others.  Id. citing

Central Bank, N.A. v. First Interstate Bank, N.A., 511 U.S. 164, 182, 114 S.Ct. 1439,

128 L.Ed.2d 119 (1994) ("[W]hen Congress enacts a statute under which a person

may sue and recover damages from a private defendant for the defendant's violation

of some statutory norm, there is no general presumption that the plaintiff may also

sue aiders and abettors.").  The TVPA contains no express statutory language

imposing liability on aiders and abettors.

**1.    The Facts Presented at Trial Would Not Otherwise Permit a Jury to Reasonably Find that the Defendant was Secondarily Liable.**

Aiding and abetting liability requires a showing of "knowing substantial

assistance" to the person or persons who committed the wrongful act.  Halberstam v.

Welch, 705 F.2d 472 (D.C.Cir.1983).  There were no facts presented to the jury from

which it could reasonably find that the Defendant had the requisite knowledge of the

act and provided substantial assistance.  The Defendant had no connection to the

victims, who were both unaffiliated with any political party nor advocating any

political cause.  There was no evidence that either the Defendant or Duclona engaged in any planning with respect to the event.

With respect to the elements of conspiracy the Court instructed the jury that a conspiracy requires:

1.    That two or more persons agreed to commit a wrongful act;

2.    That Defendant Viliena joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it; and

3.    That one or more of the alleged wrongful acts was committed by someone who was a member of the conspiracy and acting in furtherance of the conspiracy.

(App. at 865 l.10-17).  There was no evidence as to any of these elements and indeed in closing Plaintiffs' counsel acknowledged the same asserting not that the Defendant was engaged in a political action or vendetta but that he had engaged in the "the conduct of a petty tyrant who takes something that is not a threat at all but blows it out of proportion and overreacts." (App. at 935, l. 24- 936, l. 1).  A conspiracy requires that the evidence provided would allow the jury to establish when and where the parties to the conspiracy reached agreement and the nature of the agreement.  See, Garcia v. Chapman, 911 F. Supp. 1222, 1237 (S.D. Fla. 2012) citing Sinaltrainal v. Coca–Cola Co., 578 F.3d 1252, 1268 (11th Cir. 2009) (plaintiffs failed to allege 'when or with whom the [management] entered into a conspiracy to arrest, detain and harm the plaintiffs, failed to define the "scope of the conspiracy and its participants,

and did not allege that the treatment the plaintiffs received at the hands of the local police and in prison was within the scope of the conspiracy.)  There was no evidence presented from which a jury could reasonably establish that a conspiracy existed.

### B.    <u>No Liability for Attempted Extrajudicial Killing</u>

The radio station attack in April, 2008, resulted in the shooting, but not death, of Juders Yseme and Nissage Martyr.  The District Court instructed the jury that

> Beyond direct participation, you may also find Defendant Viliena responsible for the extrajudicial killing of Eclesiaste Boniface, the attempted extrajudicial killing and torture of Nissage Martyr and Juders Ysemé, and arson under one or more of the four additional theories of liability.

(App. at 860, l. 8-12).

The plain language of the TVPA does not contemplate an "attempted" extrajudicial killing as a recoverable offense. <u>See</u>, <u>Moskal v. United States</u>, 498 U.S. 103, 108 (1990) (in determining the meaning of a statutory provision, courts "look first to its language, giving the words used their ordinary meaning"). <u>See also</u>, <u>Appel v. Hayut, et al.</u>, Civil Action No. 20 Civ. 6265 (JPC), June 30, 2021, 2021 WL 2689059 (S.D.N.Y. 2021).  The District Court is limited by the plain language of the statute and its reliance on other interpretations which exceed the express authority of the statute is misplaced.

C.    **No State Action**

The Plaintiffs theory of recovery as presented to the jury in their opening was focused on a scheme of political dominance carried out against members of a competing political party, OPL, the Struggling People's Party. The evidence presented at trial, however, supported no part of this theory. The evidence presented at trial established that none of the Plaintiffs was a member of OPL at the time of the alleged incidents and there is no evidence whatsoever that they had any control or dominance over the organization that would allow a reasonable jury to conclude that the Defendant acted in furtherance of a political scheme. (Yseme, App. at 461, l. 19; Boniface, App. at 406, l. 20). Indeed at closing, the Defendant was characterized not as a political actor but as a thin-skinned and petty person who had overreacted. Whether or not that theory is a viable one, it is not one in which a reasonable jury could have found that the Defendant was a state actor.

To determine whether a defendant acted under color of foreign law, the Court looks to "principles of agency law and to jurisprudence under 42 U.S.C. § 1983." Chowdhury v. Worrldtel Bangladesh Holding, Ltd., 746 F.3d 42, 52 (2d Cir. 2014) citing Kadic v. Karadzic, 70 F.3d 232, 245 (2d Cir. 1995). Under those principles, "[f]or purposes of the TVPA, an individual acts under color of law . . . when he acts together with state officials or with significant state aid." Id. at 52-53, citing Khulumani v. Barclay Nat. Bank Ltd., 504 F.3d 254, 260 (2d Cir. 2007) (per curiam)

(internal quotation marks omitted), <u>aff'd for want of a quorum sub nom</u>. <u>Am. Isuzu Motors, Inc. v. Ntsebeza</u>, 553 U.S. 1028, 128 S.Ct. 2424, 171 L.Ed.2d 225 (2008). "[T]o state a claim under the TVPA, [plaintiff] must adequately allege that the defendants possessed power under [foreign] law, and that the offending actions . . . derived from an exercise of that power, or that defendants could not have undertaken their culpable actions absent such power." <u>Id</u>.

"[P]rivate activity will generally not be deemed 'state action' unless the state has so dominated such activity as to convert it to state action. . . ." <u>Estate of Manook v. Research Triangle Institute, Intern.</u>,759 F. Supp. 2d 674, 679 (E.D.N.C. 2010) <u>quoting</u> <u>Philips v. Pitt County Mem'l Hosp.</u>, 572 F.3d 176, 181 (4th Cir. 2009) <u>Id</u>. at 181. The factors to be considered include whether the actions "resulted from the state's coercive power, whether the state provided significant encouragement, either overt of covert, whether the private actor operated as a willful participant in joint activity with the state, whether the private actor is controlled by an agency of the state, whether the private actor was delegated a public function, and the degree of public entwinement between the state and the private actor." <u>Id</u>. at 679-680. The Court's instructions to the jury provided that:

> Acting "under color of law" means that a person is acting or purporting to act in the performance of his official duties. Holding political office by itself is not necessarily enough to establish that. The action must be cloaked with the authority of the government. A person can act under

"color of law" even when his actions overstep, or constitute an abuse of, his legal authority.

(App. at p. 856, l. 23- p. 857, l. 4).

The evidence presented at trial established that the Defendant was newly sworn into office at the time of the killing of Eclesiaste Boniface and as with the radio station attack the event took place amid a large group of people. With respect to both acts, there was no evidence presented from which a jury could reasonably find that the actions resulted from some exercise of state power. No jury could reasonably conclude that the Defendant was a state actor with respect to the actions complained of or that the acts could not have been accomplished absent the exercise of such power. Both incidents involved a mob of people and there was no evidence presented that the assemblages were part of some state action. There was no use of state force and no evidence whatsoever that the color of law of the Republic of Haiti played any material part. As the Court acknowledged in its instructions, the fact that the Defendant served as Mayor did not convert every "petty" action or overreaction he took into an act under the color of law. Id. The TVPA has an extraordinary reach, but it is a reach expressly limited by the bounds of the acts of other governments, and does not encompass domestic crimes committed within a foreign nation.

### D.    Defendant Had No Control Over the Principal Actor

The evidence presented at trial viewed in the light most favorable to the Plaintiffs established that Vileme Duclona was the shooter involved in the attack on

the radio station in April, 2008.  To find the Defendant liable the jury must have

found that the Defendant had the ability to control the alleged third party actors. See,

Ford ex rel. Estate of Ford v. Garcia, 289 F.3d 1283, 1289 (11th Cir. 2002).  The

Court's instruction to the jury on issue of directing or ordering was as follows:

> 1.  That a superior-subordinate relationship existed between Defendant Viliena and the person or persons who committed the wrongful acts such that the Defendant had the authority to give that person or persons an order;
>
> 2.  That Defendant gave a direction or an order, which had a substantial effect on the commission of the wrongful acts; and
>
> 3.  That Defendant knew, or, in light of the circumstances at the time, should have known of the substantial likelihood that the wrongful acts would be committed following his direction or order.

(App. at 861, l. 17 – 862, l. 2).

With respect to the first element the Court further instructed the jury as

follows:

> The first element requires the existence of a superior-subordinate relationship between Defendant Viliena and the person or persons who committed the wrongful acts. To establish this element, Plaintiffs must prove, by a preponderance of the evidence, that Defendant Viliena was in a position of authority that could compel another to commit the wrongful acts at Defendant's direction or order.  Plaintiffs are not required to prove the existence of a formal superior-subordinate relationship between the Defendant and the person or persons who committed the wrongful acts.  The superior-subordinate relationship may be informal or of a temporary nature.  To determine whether such a relationship existed in this case, you should consider the circumstances

29

and the perception of the relationship from the perspective of the person
receiving the direction or order.

(App. at 862, l. 3-17).

"To determine whether such a relationship existed in this case, you should
consider the circumstances and the perception of the relationship from the
perspective of the person receiving the direction or order." Id.  There was no
testimony or evidence regarding the relationship between the Defendant and Vileme
Duclona, beyond the Defendant's acknowledgment that he knew Duclona as
someone who lived in Les Irois and the testimony of the Plaintiffs that Duclona was
often seen in the presence of the Defendant and as such was regarded by them as part
of the Defendant's "crew."

Other than the testimony that Mr. Duclona was sometimes seen in the vicinity
of the Defendant there was no evidence from which the jury could find that the
Defendant had the ability to control or direct the actions of Mr. Duclona or that the
Defendant otherwise took actions consistent with the requirements to establish
solicitation, conspiracy or aiding and abetting liability. Cabello v. Fernandez–Larios,
402 F.3d 1148 (11th Cir. 2005); Garcia v. Chapman, 911 F. Supp. 1222, 1237 citing
In re Chiquita Brands Int'l, Inc. Alien Tort Statute and S'holder Derivative Litig.,
792 F. Supp. 2d 1301, 1343-44 (S.D. Fla. 2011).

Mere association between the principal and those accused of aiding and
abetting is not sufficient to establish guilt,  U.S. v. Tarr, 589 F.2d 55 (1st Cir. 1978)

citing Ramirez v. United States, 363 F.2d 33, 34 (9th Cir. 1966); United States v. Joiner, 429 F.2d 489, 493 (5th Cir. 1970); nor is mere presence at the scene and knowledge that a crime was to be committed sufficient to establish aiding and abetting. Id. There was no evidence presented to the jury from which it could reasonably find that a superior/subordinate relationship existed between the Defendant and the shooter Duclona or that the actions of Duclona resulted from any direction or order initiated by the Defendant.

## III. THE COURT ABUSED ITS DISCRETION IN PERMITTING THE TESTIMONY OF ROBERT MAGUIRE AND FAILING TO GRANT A NEW TRIAL.

Prior to its decision on summary judgment issued on February 7, 2023 (App. at 231), one of the issues before the District Court was whether or not the Plaintiffs had fulfilled the TVPA requirement of establishing that they had adequately exhausted remedies available to them in Haiti. The District Court determined that they had done so and issued partial summary judgment in their favor. (App. at 231, 243-251). Viliena objected to Maguire's testimony in whole following the entry of the summary judgment decision. (App. at 255). The Court reviews the denial of a motion for a new trial for abuse of discretion. Rodríguez-Valentin v. Doctors' Center Hospital (Manati), Inc., 27 F.4th 14, 21 (1st Cir. 2022) citing Jennings v. Jones, 587 F.3d 430, 436 (1st Cir. 2009) and the decision to permit expert testimony for abuse of discretion. Diefenbach v. Sheridan Transp., 229 F.3d 27, 30 (1st Cir. 2000).

Robert Maguire holds a doctoral degree in geography. (App. at 360, l. 8-9). He last visited the general region of Haiti in which Les Irois was located in 1999. (App. at 358, l. 25).  He has never been to Les Irois. (App. at 359, l. 3).  Maguire's testimony about the connections between the Modereh political party and the Korega organization was based upon things he read in the newspaper (App. At 359, l. 4-8), things the Plaintiffs said (App. at 359, l. 11) and things he read in government reports.  (App at 359, l. 13).  Maguire had no personal knowledge of the facts that he testified to and the scope of his testimony was presented to link the alleged violence of the Korega organization to the political party Modereh to which Viliena belonged. Maguire had no knowledge of any such linkage and no basis on which to provide that testimony, which was based on unidentified "information sources." (App. at 355, l. 14).  Ultimately, the Court permitted Maguire to testify that:

> Q.   And what conclusions, from your review of those materials, what conclusions did you draw about KOREGA's operations in Les Irois in the 2007 to 2009 period?
>
> MR. HALEY: Objection.
>
> THE COURT: Overruled.
>
> A.   My conclusions were essentially what I learned about KOREGA and what it was doing were remarkably similar to what I knew and experienced and witnessed of what other community-based armed groups did in Haiti, so it was very, a kind of a traditionally similar approach, using a method such as arson and surrogate killings and beatings and threats and intimidation.

(App. at 358, l. 1-12). In essence, Maguire testifies that other groups in Haiti engaged in violence and based upon what he read in the newspaper and the depositions of the Plaintiffs that he believes that must have been the case here. This testimony was incalculably harmful and unduly prejudicial to Viliena. It had no place before the jury. In an analogous context, Justice Roberts observed that "Our law punishes people for what they do, not who they are." Buck v. Davis, 580 U.S. 100, 123, 137 S.Ct. 759, 778, 197 L.Ed.2d 1 (2017). Viliena was held liable because he belonged to a certain political party in Haiti that Maguire, based on no reliable evidence, testified engaged in violence generally.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Federal Rules of Evidence and the standards set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Daubert standards apply equally to non-scientific evidence. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Rule 702 requires that the proffered evidence must help the jury to understand the evidence or determine a fact in issue. Fed. R. Evid. 702(a). ("An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute" Daubert at 591 quoting United States v. Downing, 753 F.2d 1224, 1242 (3rd Cir. 1985). Mr. Maguire's testimony does not meet this

standard. Instead, Mr. Maguire's testimony seeks to establish a link between membership in a political class and the likelihood that the Defendant carried out specific alleged acts of violence. This testimony differs not all from testimony that a person who is a resident of an area with a high crime rate was more likely to have committed a crime. It is as odious as it is wrong to have allowed it before the jury. It is not evidence that any Court would allow if extended to a political party in the United States, e.g., members of a group known as the "Proud Boys" have engaged in violence and are known to favor the Republican party, therefore, a member of the Republican party is more likely to have engaged in violent acts. The fact that the activity took place in Haiti should not permit the Court to otherwise excuse its use. It does not aid the jury in resolving the question before it, it should not have been admitted.

Further, while reliance on hearsay evidence by an expert may be allowable if it otherwise comports with the requirements of Rule 703 that the evidence be of the type that experts in the particular field would reasonably rely on, Fed. R. Evid. 703, the evidence relied upon by Maguire, newspaper reports, unidentified information "sources," lacks the necessary support or indicia of reliability.

The district court has the power and duty to order a new trial whenever, in its judgment, "the action is required in order to prevent injustice." Kearns v. Keystone Shipping Co., 863 F.2d 177, 181 (1st Cir. 1988). While this Court's review is limited

to abuse of discretion and that standard requires the Court to hold "a definite and firm conviction . . . that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors," Jennings v. Jones, 587 F.3d 430, 437 (1st Cir. 2009) quoting Holmes v. City of Massillon, 78 F.3d 1041, 1045 (6th Cir. 1996), that standard has been met here.

## IV.    THE COURT ABUSED ITS DISCRETION IN FAILING TO GRANT REMITTITUR.

In the context for a motion for new trial under Fed. R. Civ. P. 59(a) the Court may remit a jury's damage award if it exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it.  Trainor v. HEI Hosp., LLC, 699 F.3d 19, 29 (1st Cir. 2012); Perez–Perez v. Popular Leasing Rental, Inc., 993 F.2d 281, 283 (1st Cir. 1993).

The Plaintiff David Boniface recovered $17,496 in Haiti, Nissage Martyr recovered $15,905 and Juders Yseme recovered $14,315 for their claims in Haiti. (App. at 814, l. 5-10).  David Boniface and Juders Yseme both testified to minimal wages (Yseme, App. 475, l. 23- 476, l. 1; Boniface, App. 404, l. 2-4; 327, l. 24) prior to the events set forth in the Complaint.  The Plaintiffs made no attempt to offer medical costs, estimation of medical costs or any other indicia of damages.  Other than emotion and sympathy there was no basis whatsoever for the award of these amounts and they lack any basis in the evidence presented to the jury. The Plaintiffs presented expert testimony on the uncollectability of judgments entered in actions of

this type, improperly imploring the jury to enter a judgment in a totemic amount, not aimed at compensating the Plaintiffs, but at sending a message.  (App. at 809, l. 10-14; 810, l. 7).

Remittitur is appropriate when an award exceeds "any rational appraisal or estimate of the damages" that could be based upon the evidence before the jury.  E. Mountain Platform Tennis v. Sherwin–Williams Co., Inc., 40 F.3d 492, 502 (1st Cir. 1994) quoting Kolb v. Goldring, Inc., 694 F.2d 869, 872 (1st Cir. 1982).  There was no evidence before the jury on any calculable damages and the amounts awarded out of notions of sympathy or message sending far exceed any rational calculation.

## V.     THE TVPA DOES NOT PERMIT THE RECOVERY OF PUNITIVE DAMAGES.

The TVPA does not provide for the recovery of punitive damages and absent an express provision for such recovery, punitive damages are not appropriate. Rimkus v. Islamic Republic of Iran, 575 F. Supp. 2d 181 (D.D.C. 2008).

Punitive damage awards are limited by the Due Process Clause of the Fourteenth Amendment, prohibiting "grossly excessive" awards. Mendez-Matos v. Municipality of Guaynabo, 557 F.3d 36, 47 (1st Cir. 2009) citing State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416–17, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003); BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 568 (1996). The $11 million awarded to the Plaintiffs in this action serves no deterrent effect, is grossly excessive

and stands only as a symbolic gesture devoid of any recognizable or legitimate

judicial purpose.

## CONCLUSION

For the reasons set forth above, the Appellant prays that the Court reverse the

Orders of the District Court, dismiss this action for lack of subject matter jurisdiction

and, alternatively, allow the Appellant's Motion for Judgment as a Matter of Law,

New Trial and Remittitur.

Respectfully submitted,

Jean Morose Viliena,

By his attorney,

*/s/ Peter J. Haley*
Peter J. Haley (CA1 #21304)
*peter.haley@nelsonmullins.com*
Nelson Mullins Riley & Scarborough LLP
One Financial Center
Boston, MA 02111
p. (617) 217-4714
f. (617) 217-4710

Dated: August 19, 2024

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) excluding the parts of the document exempted by Fed. R. App. P. 32(f) because this document contains 9,456 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-face requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in proportionally spaced typeface using Microsoft Word 2016 in Times New Roman text at a 14-point font size.

*/s/ Peter J. Haley*

Peter J. Haley (CA1 #21304)
*peter.haley@nelsonmullins.com*
Nelson Mullins Riley & Scarborough LLP
One Financial Center
Boston, MA 02111
p. (617) 217-4714
f. (617) 217-4710

Dated: August 19, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on this August 9, 2024, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system.  I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Carmen K. Cheung
Elzbieta T. Matthews
Daniel McLaughlin
Direct: 415-544-0444
Fax: 415-544-0456
Center for Justice and Accountability
268 Bush Street, Suite 3432
San Francisco, CA 94104

Diana Li Kim
Direct: 202-887-8738
Fax: 650-494-0792
Morrison & Foerster
755 Page Mill Road
Palo Alto, CA 94304-0000

Bonnie Lau
Direct: 415-268-6511
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482

Tony K. Lu
Philip Aloysius O'Connell, Jr.
Direct: 617-235-6817
Fax: 617-235-6899
Dentons US LLP
1 Beacon Street, Suite 25300
Boston, MA 02108-3107

Brian R. Matsui
Direct: 202-887-8784
Fax: 202-887-0673
Morrison & Foerster LLP
2100 L St NW, Suite 900
Washington, DC 20037

Sarah Jane Vandervalk
Direct: 858-314-7665
Morrison & Foerster, LLP
12531 High Bluff Drive, Suite 100
San Diego, CA 92130-2040

Vanshika Vij
Direct: 202-887-1558
Fax: 202-887-0763
Morrison & Foerster LLP
2100 L St NW, Suite 900
Washington, DC 20037

_/s/ Peter J. Haley_
Peter J. Haley (CA1 #21304)
*peter.haley@nelsonmullins.com*
Nelson Mullins Riley & Scarborough LLP
One Financial Center
Boston, MA 02111
p. (617) 217-4714
f. (617) 217-4710

Dated: August 19, 2024

# ADDENDUM

# ADDENDUM
## TABLE OF CONTENTS

Addendum 1 - <u>Boniface v. Viliena</u>, 338 F. Supp. 3d 50 (D. Mass. 2018)........... Add. 1

Addendum 2 - <u>Boniface v. Viliena</u>, 417 F. Supp. 3d 113 (D. Mass. 2019)....................................................................................... Add. 20

Addendum 3 - Judgment dated February 19, 2020, US Court of Appeals for the First Circuit, Case No. 19-8027.................................................... Add. 30

Addendum 4 - Docket No. 273, Memorandum and Order dated April 8, 2024 (Denying Motion Judgment as a Matter of Law and for New Trial) ................................................................................... Add. 31

Addendum 5 - Docket No. 260, Judgment in a Civil Case dated April 12, 2023 ................................................................................... Add. 64

338 F.Supp.3d 50
United States District Court, D. Massachusetts.

David BONIFACE, Nissage Martyr,
and Juders Ysemé, Plaintiffs,
v.
Jean Morose VILIENA, Defendant.

Civil Action No. 17-cv-10477-ADB
|
Signed 08/31/2018

**Synopsis**
**Background:** Residents of city in Haiti brought action against
city's mayor, alleging human rights abuses in violation of the
Alien Tort Statute (ATS) and Torture Victim Protection Act
(TVPA). Mayor moved to dismiss and residents moved to
substitute party.

**Holdings:** The District Court, Allison D. Burroughs, J., held
that:

[1] district court lacked subject matter jurisdiction over ATS
claims;

[2] mayor failed to establish affirmative defense of non-
exhaustion of remedies;

[3] residents' allegations taken together were sufficient to
satisfy definition of "torture" under TVPA;

[4] residents alleged that mayor acted under color of law, as
required to state claim under TVPA;

[5] abstention was not warranted; and

[6] adult son of deceased resident was resident's legal
successor or representative.

Mayor's motion granted in part and denied in part, and
residents' motion granted.

**Procedural Posture(s):** Motion to Dismiss for Lack of
Subject Matter Jurisdiction; Motion to Dismiss for Failure to
State a Claim; Other; Motion for Substitution of Party.

West Headnotes (41)

**[1]**    **Federal Courts**  ⟜  **Pleadings and motions**

When evaluating a motion to dismiss for lack
of subject matter jurisdiction at the pleading
stage, granting such a motion is appropriate only
when the facts alleged in the complaint, taken as
true, do not justify the exercise of subject matter
jurisdiction. Fed. R. Civ. P. 12(b)(1).

1 Case that cites this headnote

**[2]**    **Federal Courts**  ⟜  **Evidence; Affidavits**

**Summary Judgment**  ⟜  **Motion to dismiss**

While the court generally may not consider
materials outside the pleadings on a motion
to dismiss for failure to state a claim, it may
consider such materials on a motion to dismiss
for lack of subject matter jurisdiction, and
attaching exhibits to a motion to dismiss for lack
of subject matter jurisdiction does not convert it
to a motion for summary judgment. Fed. R. Civ.
P. 12(b)(1), 12(b)(6).

1 Case that cites this headnote

**[3]**    **Federal Civil Procedure**  ⟜  **Insufficiency in
general**

**Federal Civil Procedure**  ⟜  **Matters deemed
admitted; acceptance as true of allegations in
complaint**

Assessing the plausibility of a claim, on a
motion to dismiss for failure to state a claim,
is a two-step process: (1) the court must
sift through the averments in the complaint,
separating conclusory legal allegations, which
may be disregarded, from allegations of fact,
which must be credited; and (2) the court
must consider whether the winnowed residue of
factual allegations gives rise to a plausible claim
to relief. Fed. R. Civ. P. 12(b)(6).

**[4]**    **Federal Civil Procedure**  ⟜  **Insufficiency in
general**

Add. 1

Boniface v. Viliena, 338 F.Supp.3d 50 (2018)

On a motion to dismiss for failure to state a claim, if the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal. Fed. R. Civ. P. 12(b)(6).

**[5]    Federal Civil Procedure** 🗝 Time of determination; reserving decision

**Federal Courts** 🗝 Necessity of Objection; Power and Duty of Court

When a court is confronted with motions to dismiss for both lack of subject matter jurisdiction and for failure to state a claim, it ordinarily ought to decide the former before broaching the latter, because if the court lacks subject matter jurisdiction, assessment of the merits becomes a matter of purely academic interest. Fed. R. Civ. P. 12(b)(1), 12(b)(6).

**[6]    Aliens, Immigration, and Citizenship** 🗝 Actions

In evaluating whether the presumption against extraterritoriality has been displaced in an action under the Alien Tort Statute (ATS), first, a court must evaluate a plaintiff's specific claim to determine what contacts with or connections to the United States are relevant. 28 U.S.C.A. § 1350.

**[7]    Aliens, Immigration, and Citizenship** 🗝 Actions

In evaluating whether the presumption against extraterritoriality has been displaced in an action under the Alien Tort Statute (ATS), where some relevant conduct occurs domestically the sufficiency question, of whether the claims touch and concern the United States with sufficient force or to the degree necessary to warrant displacement, will only be answered in the affirmative if enough relevant conduct occurred within the United States. 28 U.S.C.A. § 1350.

**[8]    Aliens, Immigration, and Citizenship** 🗝 Alien Tort Claims

The inquiry, in evaluating whether the presumption against extraterritoriality has been displaced in an action under the Alien Tort Statute (ATS), of whether the plaintiff's claims touch and concern the United States with sufficient force or to the degree necessary to warrant displacement, may extend to the place of decision-making. 28 U.S.C.A. § 1350.

**[9]    Aliens, Immigration, and Citizenship** 🗝 Actions

Haitian city residents' complaint did not demonstrate that Alien Tort Statute (ATS) claims had a sufficient connection to United States to overcome presumption against extraterritorial jurisdiction, and thus district court lacked subject matter jurisdiction over ATS claims against city's mayor, arising from human rights abuses, even though residents alleged, inter alia, that mayor continued to hold office and coordinate his return to city and the campaign of persecution against his enemies after he fled to United States; incidents that gave rise to claims, including assault of residents, all occurred while mayor was in Haiti, and residents did not point to specific activities that mayor engaged in while in United States that violated international law. 28 U.S.C.A. § 1350.

More cases on this issue

**[10]    Federal Courts** 🗝 Timeliness issues

Subject matter jurisdiction is an issue that can be raised at any time.

**[11]    Aliens, Immigration, and Citizenship** 🗝 Torture victim protection

**Federal Courts** 🗝 Tort claims

The Torture Victim Protection Act (TVPA) creates a cause of action, but unlike the Alien Tort Statute (ATS), it does not provide for federal jurisdiction. 28 U.S.C.A. § 1350.

Add. 2

**[12]**   **Aliens, Immigration, and Citizenship** 🔑 Torture victim protection

**Federal Courts** 🔑 Tort claims

Federal jurisdiction over Torture Victim Protection Act (TVPA) claims is conferred by both the Alien Tort Statute (ATS) and general federal question jurisdiction. 28 U.S.C.A. §§ 1331, 1350.

**[13]**   **Aliens, Immigration, and Citizenship** 🔑 Torture victim protection

**Federal Courts** 🔑 Tort claims

District court had subject matter jurisdiction over Haitian city residents' claims under the Torture Victim Protection Act (TVPA) against city's mayor through the statute governing federal question jurisdiction. 28 U.S.C.A. §§ 1331, 1350.

**[14]**   **Aliens, Immigration, and Citizenship** 🔑 Torture victim protection

The Torture Victim Protection Act (TVPA) exhaustion requirement is an affirmative defense, requiring the defendant to bear the burden of proof, a burden which is substantial. 28 U.S.C.A. § 1350.

**[15]**   **Aliens, Immigration, and Citizenship** 🔑 Torture victim protection

The exhaustion requirement of the Torture Victim Protection Act (TVPA) is informed by general principles of international law, which provide that the defendant has the burden of raising the nonexhaustion of remedies as an affirmative defense, and must show that domestic remedies exist that the plaintiff did not use; once the defendant makes a showing of remedies abroad which have not been exhausted, the burden shifts to the plaintiff to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile. 28 U.S.C.A. § 1350.

**[16]**   **Aliens, Immigration, and Citizenship** 🔑 Torture victim protection

In asserting nonexhaustion of remedies as an affirmative defense in claims under the Torture Victims Protection Act (TVPA), the defendant must prove the existence of specific domestic remedies that should have been utilized. 28 U.S.C.A. § 1350.

1 Case that cites this headnote

**[17]**   **Federal Civil Procedure** 🔑 Affirmative Defenses, Raising by Motion to Dismiss

Under the Federal Rules of Civil Procedure, an affirmative defense may be raised in a motion to dismiss an action for failure to state a claim; however, for dismissal to be allowed on the basis of an affirmative defense, the facts establishing the defense must be clear on the face of the plaintiff's pleadings, and the complaint, along with any other documents that may be properly reviewed on a motion to dismiss for failure to state a claim, must leave no doubt that the plaintiff's action is barred by the asserted defense. Fed. R. Civ. P. 12(b)(6).

1 Case that cites this headnote

**[18]**   **Federal Civil Procedure** 🔑 Matters considered in general

**Summary Judgment** 🔑 Motion to dismiss

When evaluating a motion to dismiss for failure to state a claim, the district court may properly consider only facts and documents that are part of or incorporated into the complaint; if matters outside the pleadings are considered, the motion must be decided under the more stringent standards applicable to a motion for summary judgment. Fed. R. Civ. P. 12(b)(6), 56.

1 Case that cites this headnote

**[19]**   **Federal Civil Procedure** 🔑 Matters considered in general

Add. 3

Boniface v. Viliena, 338 F.Supp.3d 50 (2018)

**Summary Judgment** 👈 Motion to dismiss

The exception for documents accepted as authentic by all parties to Rule that upon consideration of documents outside of the pleadings, the district court must decide a motion to dismiss for failure to state a claim under the standards applicable to a motion for summary judgment, only applies when the complaint's factual allegations are expressly linked to, and admittedly dependent upon, that document. Fed. R. Civ. P. 12(b)(6), 56.

**[20]    Federal Civil Procedure** 👈 Affidavits

District court was unable to consider plaintiffs' attorney's affidavit, in determining whether plaintiffs exhausted their available legal remedies in Haiti, for purposes of motion to dismiss for failure to state a claim in an action brought under the Torture Victim Protection Act (TVPA); affidavit was not referenced at all in the complaint, affidavit was filed months after complaint in response to request from the district court, complaint in no way relied on affidavit, and facts alleged in complaint were not linked to, or dependent on, affidavit's contents. 28 U.S.C.A. § 1350; Fed. R. Civ. P. 12(b)(6).

More cases on this issue

**[21]    Aliens, Immigration, and Citizenship** 👈 Torture victim protection

Mayor of Haitian city did not meet his burden of proving that city residents failed to exhaust adequate and available legal remedies in Haiti, as required to establish affirmative defense of non-exhaustion of remedies for purposes of claims brought under Torture Victim Protection Act (TVPA), even if district court were able to consider residents' attorney's affidavit which stated, inter alia, that residents' right to file civil complaint was recognized in Haitian legal proceedings; complaint contained detailed allegations concerning purported dysfunction of Haitian justice system, including descriptions of events in which individuals were targeted with violence for participating in court proceedings, and complaint asserted that mayor

exerted political influence in Haiti to avoid accountability for his actions before fleeing to United States. 28 U.S.C.A. § 1350.

**[22]    Aliens, Immigration, and Citizenship** 👈 Torture victim protection

The Torture Victim Protection Act (TVPA) contemplates liability against officers who do not personally execute the alleged torture or extrajudicial killing. 28 U.S.C.A. § 1350.

1 Case that cites this headnote

**[23]    Aliens, Immigration, and Citizenship** 👈 Torture victim protection

Congress is understood to legislate against a background of common-law adjudicatory principles, and since domestic law sets the standards for the Torture Victim Protection Act (TVPA), secondary or indirect theories of liability recognized by United States law are available for claims brought under the TVPA. 28 U.S.C.A. § 1350.

**[24]    Aliens, Immigration, and Citizenship** 👈 Torture victim protection

In determining whether conduct satisfies the definition of "torture" under the Torture Victim Protection Act (TVPA), the critical issue is the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim; the more intense, lasting, or heinous the agony, the more likely it is to be torture. 28 U.S.C.A. § 1350.

1 Case that cites this headnote

**[25]    Aliens, Immigration, and Citizenship** 👈 Torture victim protection

Torture, under the Torture Victim Protection Act (TVPA), does not automatically result whenever individuals in official custody are subjected even to direct physical assault. 28 U.S.C.A. § 1350.

1 Case that cites this headnote

Add. 4

Boniface v. Viliena, 338 F.Supp.3d 50 (2018)

**[26]    Aliens, Immigration, and
Citizenship** 🔑 Torture victim protection

Not all police brutality, not every instance of
excessive force used against prisoners, is torture
under the Torture Victim Protection Act (TVPA).
28 U.S.C.A. § 1350.

**[27]    Aliens, Immigration, and
Citizenship** 🔑 Torture victim protection

Haitian city residents' allegations taken together,
consisting of severe beatings by multiple
individuals at once, threats of imminent death,
and gunshot wounds causing painful, permanent
injuries, were sufficient to satisfy the definition
of "torture" under Torture Victim Protection Act
(TVPA), for purposes of TVPA claim against
city's mayor. 28 U.S.C.A. § 1350.

2 Cases that cite this headnote

**[28]    Aliens, Immigration, and
Citizenship** 🔑 Torture victim protection

For purposes of the Torture Victim Protection
Act (TVPA), an individual acts under color of
law when he acts together with state officials or
with significant state aid. 28 U.S.C.A. § 1350.

**[29]    Aliens, Immigration, and
Citizenship** 🔑 Torture victim protection

Haitian city residents sufficiently alleged that
during purported violent incidents city's mayor
was acting in his official capacity as mayor,
and used resources available to him through
that office, to target individuals he believed
to be threat to his ability to remain in office,
so as to act under color of law, as required
to state claim against mayor under Torture
Victim Protection Act (TVPA), even though
mayor argued that incidents related more to his
advocacy for Haitian political party than to acts
taken as mayor; complaint made clear that during
incidents mayor brought along members of his
mayoral staff and instructed them to engage
in violent acts, and each of the incidents were

related to mayor's duties as mayor. 28 U.S.C.A.
§ 1350.

**[30]    Federal Courts** 🔑 Pendency and Scope of
Prior Proceedings; First-Filed Rule

In exceptional circumstances, a district court
may exercise its inherent power to dismiss or
stay an action based on the pendency of a related
proceeding in a foreign jurisdiction.

**[31]    Federal Courts** 🔑 Federal-Foreign Relations
and Questions of Foreign Law; International
Abstention and Comity

The mere existence of parallel foreign
proceedings does not negate the district courts'
virtually unflagging obligation to exercise the
jurisdiction given them.

**[32]    Federal Courts** 🔑 Federal-Foreign Relations
and Questions of Foreign Law; International
Abstention and Comity

A district court should not abstain in deference
to a previously filed foreign proceeding under
circumstances that routinely exist in connection
with parallel litigation, but should rather reserve
abstention for situations in which additional
circumstances outweigh the district court's
general obligation to exercise its jurisdiction.

**[33]    Aliens, Immigration, and
Citizenship** 🔑 Torture victim protection

**Federal Courts** 🔑 Aliens, immigration, and
citizenship

**Federal Courts** 🔑 Particular cases, contexts,
and questions

Defendant did not explain what exceptional
circumstances were present that warranted
abstention, nor was the district court aware of
any, and thus abstention was not warranted in
action under the Torture Victim Protection Act
(TVPA), even though there may have been some
parallel litigation in a foreign jurisdiction that

Add. 5

had occurred or was ongoing. 28 U.S.C.A. § 1350.

**[34]    Federal Civil Procedure 🔑 Death in general**

The language of the Rule governing substitution of parties if a party dies and the claim is not extinguished is permissive. Fed. R. Civ. P. 25(a)(1).

1 Case that cites this headnote

**[35]    Federal Civil Procedure 🔑 Death in general**

The decision whether to substitute parties if a party dies and the claim is not extinguished lies within the discretion of the trial judge, and he or she may refuse to substitute parties in an action even if one of the parties so moves. Fed. R. Civ. P. 25(a)(1).

2 Cases that cite this headnote

**[36]    Federal Civil Procedure 🔑 Time for Substitution**

Only service of a statement noting death to decedent's representative or successor starts the limitations period under the Rule governing substitution of parties. Fed. R. Civ. P. 25(a)(1).

1 Case that cites this headnote

**[37]    Federal Civil Procedure 🔑 Time for Substitution**

Deceased plaintiff's adult son was never served with the notice of plaintiff's death in a manner that satisfied the Rule governing service of summons, and thus the 90-day period to file a motion to substitute plaintiffs had not yet commenced when the motion was filed. Fed. R. Civ. P. 4, 25(a)(1).

More cases on this issue

**[38]    Federal Civil Procedure 🔑 Persons to be substituted**

The proper parties for substitution are the successors or representatives of the deceased party. Fed. R. Civ. P. 25(a)(1).

2 Cases that cite this headnote

**[39]    Federal Civil Procedure 🔑 Proceedings for substitution**

For purposes of the Rule governing substitution of parties if a party dies and the claim is not extinguished, the burden is on the moving party to demonstrate that the claims asserted survived the death of the plaintiff. Fed. R. Civ. P. 25(a)(1).

**[40]    Federal Civil Procedure 🔑 Persons to be substituted**

A person may be a successor under the Rule governing substitution of parties if he or she is: (1) the primary beneficiary of an already distributed estate; (2) named in a will as the executor of the decedent's estate, even if the will is not probated; or (3) the primary beneficiary of an unprobated intestate estate which need not be probated. Fed. R. Civ. P. 25(a)(1).

1 Case that cites this headnote

**[41]    Federal Civil Procedure 🔑 Persons to be substituted**

Adult son of deceased plaintiff, who was a Haitian city resident, was plaintiff's legal successor or representative, for purposes of motion to substitute party; other plaintiffs submitted their attorney's declaration which explained Haitian law concerning survival of a decedent's legal claim and then went on to state that by operation of Haitian law, upon plaintiff's death, his adult son became his heir and successor-in-interest with the right to assume his father's pending claims, and plaintiffs submitted order of Massachusetts Probate and Family Court appointing son the plaintiff's personal representative for purposes of Massachusetts Uniform Probate Code. Mass. Gen. Laws Ann. ch. 190B; Fed. R. Civ. P. 25(a)(1).

More cases on this issue

Add. 6

Boniface v. Viliena, 338 F.Supp.3d 50 (2018)

**Attorneys and Law Firms**

**\*55**  Bonnie Lau, Pro Hac Vice, Dentons U.S. LLP, Carmen K. Cheung, Pro Hac Vice, Daniel McLaughlin, Pro Hac Vice, Laura Kathleen Roberts, Pro Hac Vice, Law Offices of Ellyn Moscowitz, Scott A. Gilmore, Pro Hac Vice, Hill, Farrer & Burrill LLP, San Francisco, CA, Philip A. O'Connell, Jr., Tony K. Lu, Dentons US LLP, Boston, MA, for Plaintiffs.

Patrick T. Uiterwyk, Peter J. Haley, Nelson Mullins Riley & Scarborough LLP, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER ON MOTION TO DISMISS AND MOTION TO SUBSTITUTE PARTY

ALLISON D. BURROUGHS, U.S. DISTRICT JUDGE

Plaintiffs David Boniface, Nissage Martyr, and Juders Ysemé, residents of Les **\*56**  Irois, Haiti, allege that Defendant, as the mayor of Les Irois and the leader of a political party opposed to the party that Plaintiffs support, committed human rights abuses in violation of the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and the Torture Victim Protection Act ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992), 28 U.S.C. § 1350 (codified at note). Now before the Court are Defendant's motion to dismiss [ECF No. 46] and Plaintiffs' motion to substitute Nissandère Martyr as plaintiff in place of Nissage Martyr [ECF No. 29]. For the reasons set forth below, the motion to dismiss is granted in part and denied in part, and the motion to substitute is granted.

## I. BACKGROUND

The following facts are drawn from the complaint, the allegations of which are taken as true for purposes of evaluating the motion to dismiss. Ruivo v. Wells Fargo Bank, 766 F.3d 87, 90 (1st Cir. 2014).

Defendant Jean Morose Viliena is a citizen of Haiti and a lawful permanent resident of the United States. He currently resides in or around Malden, Massachusetts, and is or was employed as a school bus driver in Massachusetts. The Plaintiffs, David Boniface, Nissage Martyr, and Juders Ysemé, are citizens of Haiti who reside (or resided) in the town of Les Irois, Haiti. Boniface and Martyr are supporters of a political party in Les Irois, the Struggling People's Party, which opposes the party with which Defendant is affiliated, the Haitian Democratic and Reform Movement ("MODEREH").

On February 29, 2004, former Haitian President Jean-Bertrand Aristide was overthrown in a violent coup d'état. The 2004 coup left a power vacuum in Haiti, and in its aftermath, a large array of political parties—at least 70 nationwide —competed for popular support. Since the 2004 coup, government institutions have remained weak and unable to reestablish the rule of law. Plaintiffs assert that the Haitian National Police is chronically undertrained and underfunded, and suffers from corruption and brutality, and that Haiti's justice system is dysfunctional, with widespread corruption, politicization, and a lack of training and resources.

Plaintiffs represent that, in the absence of stable security forces and judicial accountability, political parties and rival government officials have used informal armed groups to gain and exercise power. They assert that armed groups aligned with political parties regularly engage in violence against political opponents, journalists, and human rights advocates.

In December 2006, Defendant ran for mayor of Les Irois as a candidate for the MODEREH party. Defendant's main rival in the election was a candidate from the Struggling People's Party. Defendant won the election, and he held the office of Mayor until approximately February 2010. Plaintiffs assert that, as a candidate and as Mayor, Defendant was backed by a powerful political machine known as KOREGA, which exerts control over politics in the southwestern region of Haiti, including Les Irois, through a system of patronage, threats, and violence. Plaintiffs assert that KOREGA engaged in voter fraud, intimidation, and violence to ensure that Defendant was elected mayor. Once Defendant was elected Mayor, Plaintiffs contend that he became the head of the Les Irois branch of KOREGA and exercised control over the KOREGA militia's operations in Les Irois, using violence to accomplish his political ends. Plaintiffs assert that the KOREGA militia operated as an extension of Mayor Viliena's office in Les Irois. At all relevant times, Defendant personally supervised his mayoral staff and security detail.

**\*57**  Defendant fled to the Boston area in or around January 2009 following the opening of a criminal investigation into his human rights abuses and those of his associates. Plaintiffs assert that, throughout 2009, Defendant continued to serve as mayor of Les Irois and exercise control over the KOREGA militia from Massachusetts. They further assert that Defendant continued to work closely with his

Add. 7

Boniface v. Viliena, 338 F.Supp.3d 50 (2018)

associates in Les Irois to coordinate and implement the continued repression of perceived political opponents, and that Defendant made trips to Haiti in support of this goal.

On or around August 27, 2012, Defendant was appointed by former Haitian President Michel Martelly to serve as the "Interim Executive Agent" for Les Irois. Through this position, he continued to exercise the functions of Mayor of Les Irois from Massachusetts. Plaintiffs believe that his term as Interim Executive Agent expired in or around October 2015. He no longer holds public office in Haiti.

### A. Death of Eclesiaste Boniface, July 27, 2007

On the morning of July 27, 2007, Defendant was accompanying a sanitation crew through the streets of Les Irois when he got into a dispute with a resident, Ostanie Mersier, about the disposal of garbage. After Defendant hit Mersier on the head with his gun, she left to file an incident report with the local Justice of the Peace, Judge Saint Bell, and Defendant followed her to demand her arrest.

As a trial monitor for a local human rights organization, Plaintiff Boniface came to observe the proceedings before Judge Bell. Boniface also spoke on Mersier's behalf and accused Defendant of abusing his authority by assaulting Mersier. As Boniface was leaving, he encountered Defendant, along with members of the KOREGA militia, members of the mayoral staff, and two of Judge Bell's cousins. They surrounded Boniface and threatened him with violence, but a group of bystanders intervened and escorted Boniface to Plaintiff Martyr's home. Defendant and his associates followed Boniface and continued to threaten and attempt to hit Boniface until Defendant instructed his associates to let him go, because they would "take care of him later."

That evening, Defendant and an associate from the KOREGA militia appeared near Boniface's home. They ordered the residents in the area to remain behind closed doors and announced that later that night, the paramilitaries would appear and show no mercy. Later that evening, Defendant led a group of approximately twelve men from the KOREGA militia, armed with firearms, machetes, clubs, and picks, to Boniface's home. The group included members of the mayoral staff and Judge Bell's cousins. At that time, David Boniface was not at home, but was attending church. His younger brother, 23-year-old Eclesiaste Boniface, answered the door, and Defendant personally supervised as his associates dragged Eclesiaste into a crowd of about thirty bystanders. Eclesiaste pleaded with the crowd, saying that he

was uninvolved and had no problems with anyone. Despite his pleas, Defendant's associates lunged at Eclesiaste with a machete, and then one of them fired his gun, killing Eclesiaste. Neighbors ran to David Boniface's church to warn him that Eclesiaste had been killed and that Defendant and the KOREGA militia were now looking for him. The church pastor sheltered Boniface overnight.

### B. Assault on Martyr and Ysemé, April 8, 2008

In or around March 2008, a committee of local journalists and activists founded a community radio station in Les Irois called **\*58** New Vision Radio, which was to be the first local radio station in the town. Radio serves as a primary news source in Haiti due to high rates of illiteracy. The radio station was financed and operated with support from two Struggling People's Party politicians. It rented a room from Plaintiff Martyr and operated out of his home. Throughout March and early April 2008, station volunteers ran test broadcasts to determine the reach of the signal. Plaintiff Ysemé, who was in high school at the time, enjoyed spending time at the station before and after class, though he was not employed by the station.

Defendant was opposed to the radio station, and on the day the station launched, in late March of 2008, Defendant called in to the station and declared his intent to shut the station down. On or about March 27, 2008, a group of government officials visited Les Irois to mediate the dispute between Defendant and supporters of the radio station. The delegation included the prosecutor from a neighboring city, as well as Haitian National Police and officers from the United Nations Stabilization Mission in Haiti. After the meeting, the officials instructed Defendant not to shut the radio station down, and he agreed.

On or about April 8, 2008, Defendant met a group of approximately 30 KOREGA militia members near Martyr's residence. Defendant distributed firearms to the militia members, some of whom also carried machetes, picks, and sledge hammers. Defendant's associates began firing in the air as they walked toward Martyr's house. Martyr and Ysemé were sitting on the front porch. Hearing the gunshots, Ysemé ran through the house to the backyard. Martyr started to get up from the porch to go inside, seeking to protect his wife and daughters who were inside.

Defendant grabbed Martyr and dragged him down the hallway. Defendant pointed his handgun at Martyr's ear and told him to leave the house. Martyr refused to leave because

Add. 8

his family remained in the house. Defendant shouted that Martyr wanted to stay so that he could report the attack. Defendant then swept Martyr's feet out from under him, forcing him to the floor. He started beating Martyr on his sides and chest, pistol-whipping Martyr with his gun and striking him with his fists. Several members of the KOREGA militia and the mayor's staff joined in the assault, Defendant struck Martyr hard in the chest, causing Martyr to collapse face forward. The militia members left Martyr on the floor and carried the broadcasting equipment out the door, at the direction of Defendant.

Meanwhile, a member of the KOREGA militia spotted Plaintiff Ysemé in the backyard. He accused Ysemé of wanting to report the attack, grabbed him, and dragged him into the house. One member of the militia restrained Ysemé as others beat him on his head and the sides of his body. Defendant, who was striking Martyr, turned to Ysemé and said that he "wanted him." While Martyr was lying on the floor in pain, he saw that the front door was open, and he ran to the doorway to escape. Ysemé, who had managed to slip free, followed him and ran toward the door. Some of Defendant's associates tackled Martyr as he tried to run. Ysemé ran past him, onto the street. Martyr broke free again and followed Ysemé onto the street. Seeing them trying to escape, Defendant ordered one of his associates, Villeme Duclona, to shoot and kill Martyr and Ysemé. Duclona opened fire with his shotgun, hitting Martyr in the leg and Ysemé in the face. Defendant and the KOREGA militia members then seized the rest of the radio equipment and fled the scene. They left Martyr and Ysemé for dead.

**\*59** Martyr and Ysemé survived the attack, but both were left with severe, permanent injuries. Martyr spent several months in the hospital as a result of his wounds, and his injured leg was amputated above the knee. Ysemé also required months of intensive medical treatment, including two surgeries to extract shotgun pellets from his face. He is permanently blind in one eye and still has pieces of shotgun pellets in his scalp and arms. He continues to suffer from dizziness and migraine headaches as a result of his injuries.

### C. Arson of 36 Homes, October 29, 2009

In or around January 2009, Defendant fled to the United States after Haitian authorities launched a criminal investigation into the killing of Eclesiaste Boniface and the attack on the radio station. Plaintiffs assert that he continued to hold the office of mayor and exercised control over the KOREGA militia from Massachusetts.

In or around October 2009, Hautefort Bajon, Defendant's Chief of Staff, fell ill. On October 27, 2009, KOREGA supporters, led by Defendant, who was then in Haiti, marched through the streets of Les Irois, threatening to kill people and burn down houses if Bajon died. Defendant publicly declared that the Struggling People's Party had placed a voodoo curse on Bajon. The next day, October 28, 2009, Defendant and members of the KOREGA militia, again marched through the streets. Bajon died on October 29. Shortly thereafter, Defendant went into the town market with several KOREGA associates and started to strike perceived supporters of the Struggling People's Party, accusing them of causing Bajon's death.

On the night of October 29, members of the KOREGA militia and mayoral staff, acting in concert with Defendant, set fire to 36 homes, all belonging to Struggling People's Party supporters, to avenge the death of Bajon. The homes of Martyr, Ysemé, and the Boniface family were burned and rendered uninhabitable.

### D. Pursuit of Remedies in Haiti

Plaintiffs Boniface, Martyr, and Ysemé assert that they have pursued all avenues for justice in Haiti to no avail. Since 2007, although they have lodged at least eight reports or complaints with Haitian law enforcement and judicial authorities, the U.N. Mission in Haiti, and the Inter-American Commission on Human Rights, Defendant still has not been held accountable. In response to Plaintiffs' complaints, the Haitian judiciary initially pursued a criminal investigation. In September 2008, a Haitian judge ordered Defendant's arrest, but he was provisionally released in December 2008, allegedly as a result of political pressure. Defendant and other members of the KOREGA militia then fled or went into hiding.

In 2010, Defendant and 19 members of the KOREGA militia were indicted in Haiti for their involvement in the acts discussed in the Complaint. The indictment stated that the defendants would be tried in absentia, however, Defendant was never tried. Plaintiffs assert that Defendant has been able to return to Haiti without fear of prosecution.

## II. MOTION TO DISMISS

### A. Standard of Review

Add. 9

**[1]** **[2]** When evaluating a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) at the pleading stage, granting such a motion "is appropriate only when the facts alleged in the complaint, taken as true, do not justify the exercise of subject matter jurisdiction. Muniz-Rivera v. United States, 326 F.3d 8, 11 (1st Cir. 2003). "When a district court considers a Rule 12(b)(1) motion, **\*60** it must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor." Merlonghi v. United States, 620 F.3d 50, 54 (1st Cir. 2010). "In addition, the court may consider whatever evidence has been submitted, such as the depositions and exhibits submitted in this case. Aversa v. United States, 99 F.3d 1200, 1210 (1st Cir. 1996). "While the court generally may not consider materials outside the pleadings on a Rule 12(b)(6) motion, it may consider such materials on a Rule 12(b)(1) motion," and attaching exhibits to a Rule 12(b)(1) motion does not convert it to a motion for summary judgment. Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002), as corrected (May 8, 2002).

**[3]** **[4]** To withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must allege a claim for relief that is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Assessing the plausibility of a claim is a two-step process:

> First, the court must sift through the averments in the complaint, separating conclusory legal allegations (which may be disregarded) from allegations of fact (which must be credited). Second, the court must consider whether the winnowed residue of factual allegations gives rise to a plausible claim to relief.

Rodriguez-Reyes v. Molina-Rodriguez, 711 F.3d 49, 53 (1st Cir. 2013) (citation omitted). Along with all well-pleaded facts, the Court must draw all logical inferences from a complaint in favor of the plaintiff. Frappier v. Countrywide Home Loans, Inc., 750 F.3d 91, 96 (1st Cir. 2014). "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." Rodriguez-Reyes, 711 F.3d at 53 (quoting SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010) (en banc) ).

**[5]** "When a court is confronted with motions to dismiss under both Rules 12(b)(1) and 12(b)(6), it ordinarily ought to decide the former before broaching the latter," because "if the court lacks subject matter jurisdiction, assessment of the merits becomes a matter of purely academic interest." Deniz v. Municipality of Guaynabo, 285 F.3d 142, 149–50 (1st Cir. 2002).

### B. Jurisdiction Under the ATS

Defendant first argues that the Court lacks jurisdiction under the ATS to adjudicate Counts I–IV, because all of the relevant conduct occurred in Haiti, not the United States. As an initial matter, the Court notes that Counts I, II, and III assert claims under the TVPA, not the ATS, so Defendant's argument concerning the ATS pertains only to Count IV.

The ATS provides that the "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The statute has been read to allow federal courts to "recognize private claims under federal common law" for a "modest number of international law violations." Sosa v. Alvarez-Machain, 542 U.S. 692, 724, 732, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). Five years ago, the Supreme Court addressed the question of whether a claim brought pursuant to the ATS "may reach conduct occurring in the territory of a foreign sovereign." Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108, 115, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013). Applying the "canon of statutory interpretation known as the presumption against extraterritorial application," which provides that "when a statute gives no clear indication of an extraterritorial application, it has none, and reflects the presumption **\*61** that United States law governs domestically but does not rule the world," the court determined that the principles underlying the canon "constrain courts considering causes of action that may be brought under the ATS." Id. at 115–16, 133 S.Ct. 1659 (internal quotation marks and citations omitted). In Kiobel, "all of the relevant conduct took place outside the United States," and thus the plaintiffs' claims were barred. Id. at 124, 133 S.Ct. 1659. The court recognized however, that claims could be actionable under the ATS where they "touch and concern the territory of the United States ... with sufficient force to displace the presumption against extraterritorial application." Id. at 124–25, 133 S.Ct. 1659. The court has not provided further guidance on the application of the "touch and concern" standard, although it noted that "[c]orporations are often present in many countries,

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 10

and it would reach too far to say that mere corporate presence suffices." Id. at 125, 133 S.Ct. 1659. [1]

 [6]    [7]    [8]  In the years since Kiobel was decided, courts have grappled with the meaning of the "touch and concern" standard, although the First Circuit has not yet had the opportunity to weigh in. While the inquiry is naturally fact-dependent, a few general principles have emerged. First, a court must evaluate a plaintiff's "specific claim to determine what contacts or connections to the United States are relevant." Doe v. Drummond Co., 782 F.3d 576, 597 (11th Cir. 2015). Where some relevant conduct occurs domestically, "the sufficiency question—whether the claims [touch and concern the United States] with 'sufficient force' or to the 'degree necessary' to warrant displacement—will only be answered in the affirmative if *enough* relevant conduct occurred within the United States." Id. This inquiry may "extend to the place of decision-making." Id.; see also Al Shimari v. CACI Premier Tech., Inc., 758 F.3d 516, 530–31 (4th Cir. 2014) (claims touched and concerned U.S. with sufficient force where defendant corporation was based in U.S. hired employees who perpetrated torture, received payments based on contracts issued by U.S. government in U.S., encouraged misconduct, and attempted to cover up conduct when discovered); Mujica v. AirScan Inc., 771 F.3d 580, 592 (9th Cir. 2014) (explaining that allegations that decisions furthering the conspiracy occurred in the United States were relevant to the jurisdictional inquiry, although they were too conclusory to be sufficient); Nestle v. Nestle, S.A., No. CV 05-5133-SVW-MRW, 2017 WL 6059134, at *5 (C.D. Cal. Mar. 2, 2017) (explaining that presumption against extraterritoriality has been displaced "when the tortious conduct itself was planned in the United States"). In contrast, where the activity that occurred in the United States did not directly involve decision-making about the specific conduct alleged to be tortious, several courts have determined that the allegations were insufficient to satisfy the "touch and concern" standard. See, e.g., Drummond, 782 F.3d at 599 ("mere consent" by company president in United States to murder committed abroad "is not enough"); William v. AES Corp., 28 F.Supp.3d 553, 568 (E.D. Va. 2014) (rejecting argument that activities of United States corporation that "profits from and is actively involved in the decision-making of its foreign subsidiaries" were sufficient to touch and concern United States).

The facts of Sexual Minorities Uganda v. Lively, 960 F.Supp.2d 304 (D. Mass. 2013) *62 ("Lively I") and Sexual Minorities Uganda v. Lively, 254 F.Supp.3d 262 (D. Mass.

2017) ("Lively II"), appeal docketed, No. 17-1593 (1st Cir. June 14, 2017) may be the most analogous to the present case. In Lively I, decided at the motion to dismiss stage, the defendant, who lived in the United States, was accused of working with others to devise and execute a "program of persecution" aimed at individuals in Uganda based on their sexual orientation and gender identity. Lively I, 960 F.Supp.2d at 311. The court determined that the plaintiffs had sufficiently plead a cause of action under the ATS, because the complaint alleged that "the tortious acts committed by [the defendant] took place to a substantial degree within the United States, over many years, with only infrequent actual visits to Uganda." Id. at 321. The complaint described how, after the defendant returned from Uganda, "he continued to assist, manage, and advise associates in Uganda on methods to deprive the Ugandan LGBTI community of its basic rights" from the United States. Id. at 323. The complaint described the defendant's specific activities in the United States, including publishing books describing a plan of action to repress LGBTI individuals and reviewing and advising on legislation proposed in the Ugandan Parliament. Id. at 312–14. After discovery was complete in the case, however, the court granted the defendant's motion for summary judgment, concluding that the court had no jurisdiction under the ATS to hear the plaintiff's claims. Lively II, 254 F.Supp.3d at 270. Discovery had revealed that the only activity the defendant had engaged in within the United States was to send "sporadic emails" from the United States "offering encouragement, guidance, and advice to a cohort of Ugandans prosecuting a campaign of repression against the LGBTI community in their country," and the court determined that these emails did not "rise to the level of 'force' sufficient to displace the presumption against extraterritorial application." Id. at 268, 270.

 [9]  In this case, Defendant correctly points out that two of the three major incidents alleged in the complaint—the 2007 death of Eclesiaste Boniface and the 2008 assault of Martyr and Ysemé—occurred before Defendant allegedly fled to the United States. Thus, these incidents do not shed any light on whether the allegedly tortious conduct "touch[es] and concern[s]" the United States. Plaintiffs respond that although Defendant fled to the United States in January 2009, he continued to hold office as the mayor of Les Irois, including at the time of the October 2009 arson. The Complaint reveals, however, that Defendant was physically present in Haiti on the day of the arson, October 29, 2009, as well as the two days prior, although it contains no allegations concerning Defendant's location at the time the

Boniface v. Viliena, 338 F.Supp.3d 50 (2018)

arson occurred. Compl. ¶¶ 53–57. The Complaint does not specifically allege that Defendant planned or orchestrated the arson while he was in the United States. It does, however, include general statements to the effect that Defendant "continued to exercise control over the KOREGA militia in Les Irois from his base in Massachusetts," and that "he coordinated his return to Les Irois and the campaign of persecution against Plaintiffs and other Struggling People's Party supporters," id. ¶ 74, but contains no detail about specific actions Defendant allegedly undertook while he was living in the United States. Plaintiffs also point to another allegation in the Complaint that "[i]n a separate incident, Clorene Francois, a neighbor of the Boniface family, was brutally beaten by members of the KOREGA militia after she was summoned to provide in-court, eyewitness testimony about the killing of Eclesiaste Boniface," id. ¶ 63. The Complaint, however, **\*63** does not provide the date of this incident, although it is included in a paragraph that begins with the assertion that Defendant continues to persecute his political opponents from Massachusetts.

Accordingly, setting aside the major incidents alleged in the Complaint, none of which sufficiently "touch and concern" the United States to alone allow the Complaint to withstand a motion to dismiss, the only remaining allegations indicating that the claims "touch and concern" the United States are that, after he fled to the United States in 2009, Defendant continued to hold office as the mayor of Les Irois, continued to exercise control over the KOREGA militia, and that from the United States, he coordinated his return to Les Irois and the campaign of persecution against his enemies. The Court concludes that these allegations are more similar to Lively II, in which the facts indicated that the defendant's involvement from the United States was limited, than Lively I, which alleged specific actions that the defendant took from the United States that could give rise to a claim under the ATS. Under the Kiobel standard, the "*claims* [must] touch and concern the territory of the United States," and do so with sufficient force to displace the presumption against extraterritorial application. Kiobel, 569 U.S. at 124–25, 133 S.Ct. 1659 (emphasis added). Here, the incidents that give rise to the claims alleged in the Complaint all occurred while the Defendant was in Haiti. If the Plaintiffs could point to specific activities that Defendant engaged in while in the United States that violated international law, the analysis would be different. As it stands, however, the Complaint does not demonstrate that the Plaintiffs' ATS claims have a sufficient connection to the United States, and thus the claims are barred. As such, Count IV is dismissed.

**C. Jurisdiction Over TVPA Claims**

**[10]   [11]   [12]   [13]**   Defendant argues that the Court also lacks jurisdiction over the claims brought pursuant to the TVPA. First, Defendant asserts that "[w]ithout subject matter jurisdiction under the ATS, the Court also lacks jurisdiction over plaintiffs' TVPA claim[s]." Chen Gang v. Zhao Zhizhen, No. 3:04CV1146 RNC, 2013 WL 5313411, at \*4 (D. Conn. Sept. 20, 2013). Defendant is correct that the TVPA creates a cause of action, but unlike the ATS, it does not provide for federal jurisdiction. Kadic v. Karadzic, 70 F.3d 232, 246 (2d Cir. 1995). Federal jurisdiction over TVPA claims is conferred by both the ATS and general federal question jurisdiction pursuant to 28 U.S.C. § 1331, id., but many courts have determined that section 1331 is sufficient in and of itself to establish federal jurisdiction over TVPA claims. See Drummond, 782 F.3d at 601 ("Our jurisdiction to consider Plaintiffs' TVPA claims is grounded ... in 28 U.S.C. § 1331, the general federal question jurisdiction statute."); Haim v. Neeman, No. 12-cv-351 (JLL), 2012 WL 12905235, at \*3 (D.N.J. Aug. 29, 2012) (court has jurisdiction over TVPA claims pursuant to section 1331); Doe v. Rafael Saravia, 348 F.Supp.2d 1112, 1118 n.2 (E.D. Cal. 2004) (same); Xuncax v. Gramajo, 886 F.Supp. 162, 178 (D. Mass. 1995) (same).[2] Thus, in this case, the Court **\*64** may exercise jurisdiction over Plaintiffs' TVPA claims through section 1331.

Next, Defendant argues that the Supreme Court's concerns about extraterritorial jurisdiction as expressed in Kiobel should apply equally to claims brought pursuant to the TVPA. Defendant recognizes that, in enacting the TVPA, Congress relied on its power under Article I, Section 8 of the U.S. Constitution to "define and punish ... Offenses against the Law of Nations," but he asserts that the law of nations does not permit one sovereign to exercise territorial jurisdiction over the affairs of another sovereign. Other courts have rejected this argument, and Defendant cites no legal authority that directly supports this proposition. See Drummond, 782 F.3d at 601–02 (holding that "the TVPA applies extraterritorially," and explaining that "the Act itself gives clear indication of an extraterritorial application"); Chowdhury v. Worldtel Bangl. Holding, Ltd., 746 F.3d 42, 50–51 (2d Cir. 2014) (explaining that the court "find[s] no support in Kiobel or any other authority for the proposition that the territorial constraints on common-law causes of action under the ATS apply to the statutory cause of action created by the TVPA," and after conducting separate analysis of the TVPA, "conclud[ing] that the TVPA, unlike the ATS, has extraterritorial application").

Add. 12

Thus, Defendant has not demonstrated that the Court lacks jurisdiction over Plaintiffs' TVPA claims. [3]

### D. Whether Plaintiffs Have Stated a Claim Under the TVPA

Defendant also argues that Plaintiffs failed to state a claim under the TVPA because they have not demonstrated that they exhausted their available remedies in Haiti, and they have not alleged that Defendant engaged in torture or an extrajudicial killing or that he was acting on behalf of a foreign nation.

#### 1. Exhaustion

[14]  [15]  [16]   [17]  The Court must decline to hear a claim brought pursuant to the TVPA "if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." 28 U.S.C. § 1350 (codified at note). The TVPA exhaustion requirement "is an affirmative defense, requiring the defendant to bear the burden of proof," a burden which is "substantial." Jean v. Dorelien, 431 F.3d 776, 781 (11th Cir. 2005). [4] This requirement is informed by general principles of international law, which provide that:

> the respondent has the burden of raising the nonexhaustion of remedies as an affirmative defense and must show that domestic remedies exist that the claimant **65** did not use. Once the defendant makes a showing of remedies abroad which have not been exhausted, the burden shifts to the plaintiff to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile. The ultimate burden of proof and persuasion on the issue of exhaustion of remedies, however, lies with the defendant.

Jean, 431 F.3d at 782 (quoting Senate Report to the TVPA, S.Rep. No. 102–249, at 9–10 (1991) ). "Under both the TVPA and public international law, it is the respondent or

defendant's burden to demonstrate that plaintiffs had adequate legal remedies which they did not pursue in the country where the alleged abuses occurred." Enahoro v. Abubakar, 408 F.3d 877, 891 (7th Cir. 2005). "Then, *if* the defendant 'makes a showing of remedies abroad which have not been exhausted, the burden shifts to the plaintiff to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.' " Id. (quoting S.Rep. No. 102–249, at 10). The defendant "must prove the existence of specific domestic remedies that should have been utilized." Id. at 892 (internal quotation marks and citation omitted). In most instances, initiation of litigation under the TVPA "will be virtually prima facie evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the torture occurred." Jean, 431 F.3d at 781–82 (quoting S.Rep. No. 102–249, at 9–10). Further, "to the extent that there is any doubt on this issue, both Congress and international tribunals have mandated that such doubts be resolved in favor of the plaintiffs." Enahoro, 408 F.3d at 892.

Defendant points to an affidavit by Mario Joseph, a Haitian attorney who represents Plaintiffs in their civil and criminal proceedings against Defendant in Haiti. [ECF No. 20-1]. The affidavit, which was filed by Plaintiffs, was attached to a supplemental brief that the Court ordered Plaintiffs to submit to address issues concerning Plaintiffs' standing and the substitution of another individual for deceased plaintiff Nissage Martyr. [ECF No. 20]. Its purpose was to demonstrate that Plaintiffs have standing to bring this lawsuit and that they are entitled to substitute another individual for Plaintiff Martyr. It states that "the rights of my clients, Mr. David Boniface, Mr. Nissage Martyr and Mr. Juders Yseme, to file a civil complaint against Defendant Viliena for their injuries, have been recognized in Haitian legal proceedings." [ECF No. 20-1]. It further asserts that Plaintiffs were awarded money damages in a suit against five of Defendant's associates, and that proceedings against Defendant are ongoing. Id.

[18]   [19]   [20]  When evaluating a 12(b)(6), motion, the Court "may properly consider only facts and documents that are part of or incorporated into the complaint; if matters outside the pleadings are considered, the motion must be decided under the more stringent standards applicable to a Rule 56 motion for summary judgment." Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008). The First Circuit has made an exception to this rule "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central

Add. 13

*Boniface v. Viliena, 338 F.Supp.3d 50 (2018)*

to plaintiffs' claim; [and] for documents sufficiently referred to in the complaint." Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp., 523 F.3d 75, 86 (1st Cir. 2008) (internal quotation marks and citation omitted). Here, the only potentially applicable exception would be for a document accepted as authentic by all parties, however, that exception only applies when the "complaint's factual allegations are expressly linked to—and admittedly dependent **\*66** upon" that document. Trans-Spec Truck, 524 F.3d at 321; see also Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001) (complaint must "rel[y] upon" document at issue, which then "merges into the pleadings"). The Joseph affidavit is not referenced at all in the Complaint, and was filed months after the Complaint in response to a request from the Court. The Complaint in no way relies on the affidavit, nor are the facts alleged in the Complaint linked to, or dependent on, the contents of the affidavit. Thus, it is not apparent that the Court may consider the affidavit at the motion to dismiss stage.

In general, courts have declined to consider extrinsic evidence when a defendant argues, in a motion to dismiss a claim under the TVPA, that the plaintiff has not exhausted available remedies. See In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig., 190 F.Supp.3d 1100, 1114 (S.D. Fla. 2016) ("Because it is an affirmative defense, exhaustion of local remedies need not be pled in a complaint under the TVPA, a Plaintiff's alleged failure to exhaust local remedies would not deprive the court of subject matter jurisdiction, and the matter is not properly resolved by reference to extrinsic evidence at the motion to dismiss stage."); Jara v. Nunez, No. 6:13-cv-1426-ORL-37GJK, 2015 WL 8659954, at \*2 (M.D. Fla. Dec. 14, 2015) (concluding that assessment of "[t]he truth" of defendant's exhaustion of remedies defense "is better left for resolution at the summary judgment stage"); Doe v. Drummond Co., No. 7:09-cv-01041-RDP, 2009 WL 9056091, at \*17 (N.D. Ala. Nov. 9, 2009) ("[W]hether Defendants are entitled to the affirmative defense on exhaustion of remedies is not appropriate for decision on a motion to dismiss."); see also Abiola v. Abubakar, No. 02-cv-6093, 2005 WL 3050607, at \*3 (N.D. Ill. Nov. 8, 2005) (concluding that evidence submitted concerning exhaustion of TVPA claims created genuine issue of material fact which could only be resolved by a hearing, not on motion for summary judgment). Accordingly, the Court concludes that it is not able to consider the Joseph affidavit in evaluating the present motion to dismiss.

 [21] Furthermore, even if the Court could consider the Joseph affidavit, it would likely not be sufficient

for Defendant to satisfy his "substantial" burden of demonstrating that Plaintiffs had failed to exhaust their available remedies in Haiti. The Complaint contains detailed allegations concerning the purported dysfunction of the Haitian justice system, including descriptions of events in which individuals were targeted with threats, violence, and death for reporting a crime or participating in court proceedings. The Complaint also asserts that Defendant exerted his political influence in Haiti to avoid accountability for his actions before fleeing to Massachusetts to escape prosecution. Courts have routinely found that threats of violent retaliation and allegations that a country's judicial system is corrupt or ineffective are sufficient to show that a plaintiff lacks effective domestic legal remedies. See Enahoro, 408 F.3d at 892 (where plaintiffs indicated that "they or their relatives were targeted by the Nigerian government as political enemies," and also that "the Nigerian judiciary was under-funded, corrupt, subject to political influence and generally unable or unwilling to compensate victims of past human rights abuses," there was "obviously nothing to be gained by filing complaints in the Nigerian courts," and thus defendant failed to meet his burden to prove that plaintiff had viable legal remedies in Nigeria); In re Chiquita Brands, 190 F.Supp.3d at 1115 (where the plaintiffs alleged facts suggesting exhausting remedies in Colombia "would be futile because of the ongoing **\*67** risk of violent retaliation against civilians, judicial officers and human rights defenders seeking redress for human rights abuses," defendants were not entitled to dismissal based on lack of exhaustion); Doe v. Drummond Co., 2009 WL 9056091, at \*17 (allegation in complaint that seeking redress in Colombia would be futile due to risk of retaliation sufficient to satisfy plaintiffs' burden at motion to dismiss stage). Accordingly, Defendant has not satisfied his burden to prove that Plaintiffs failed to exhaust "adequate and available remedies" in Haiti. See 28 U.S.C. § 1350.

## 2. Extrajudicial Killing

Defendant contends that Plaintiffs have not demonstrated that he can be held liable for the killing of Eclesiaste Boniface, or for the attacks on Martyr and Ysemé, under a secondary theory of liability. In particular, Defendant asserts that Plaintiffs have not pleaded sufficient facts to show that Defendant can be held liable under the command and control doctrine. Plaintiffs respond that they do not allege that Defendant is liable under the command and control doctrine, but rather, they plead direct liability as well as three

Add. 14

other secondary forms of liability: (1) ordering, inciting, or soliciting; (2) conspiracy; and (3) aiding and abetting.

[22]  [23]  Plaintiffs are correct that "the TVPA contemplates liability against officers who do not personally execute the [alleged] torture or extrajudicial killing." Mohamad v. Palestinian Auth., 566 U.S. 449, 458, 132 S.Ct. 1702, 182 L.Ed.2d 720 (2012). "Congress is understood to legislate against a background of common-law adjudicatory principles," id. at 457, 132 S.Ct. 1702, and "since domestic law sets the standards for the TVPA, secondary or indirect theories of liability recognized by U.S. law are available for claims brought under the TVPA." Drummond, 782 F.3d at 607; see also Chowdhury, 746 F.3d at 53 (holding that an individual can be liable for torture "even if his agent administers the torture"); Aziz v. Alcolac, Inc., 658 F.3d 388, 396 (4th Cir. 2011) (acknowledging, prior to Mohamad, that "[v]irtually every court to address the issue" has recognized "secondary liability for violations of international law since the founding of the Republic" (quoting Doe v. Exxon Mobil Corp., 654 F.3d 11, 19 (D.C. Cir. 2011), vacated on other grounds, 527 Fed.Appx. 7 (D.C. Cir. 2013) ) ). Some courts have recognized that a claim for indirect liability under an aiding and abetting theory is cognizable under the TVPA. See Drummond, 782 F.3d at 608. But see Mastafa v. Chevron Corp., 759 F.Supp.2d 297, 300 (S.D.N.Y. 2010), aff'd, 770 F.3d 170 (2d Cir. 2014) (interpreting language of TVPA to not permit aiding and abetting liability).

At this stage, Defendant has not asserted that he cannot be held liable either directly, or under the secondary theories of liability that Plaintiffs have advanced, and instead chose to address only the command and control doctrine, which is not relied on by Plaintiffs. Accordingly, the question of whether Plaintiffs can bring a TVPA claim based on their alternative theories of liability (ordering, inciting, or soliciting, conspiracy, and aiding and abetting) is not before the Court at this time.

Defendant also asserts that the TVPA does not contemplate liability for an "attempted" extrajudicial killing. This argument is based entirely on the text of the statute, and Defendant cites no cases to support this reading. The Court is not aware of any cases that have analyzed whether a claim for attempted extrajudicial killing is tenable under the TVPA, however, several courts have permitted such claims to proceed. See Doe v. Constant, 354 Fed.Appx. 543, 547 (2d Cir. 2009) (affirming entry of judgment, inter *68 alia, for attempted extrajudicial killing under the TVPA); Warfaa

v. Ali, 33 F.Supp.3d 653, 666 (E.D. Va. 2014), aff'd, 811 F.3d 653 (4th Cir. 2016) (denying motion to dismiss claims under TVPA for, inter alia, attempted extrajudicial killing); Yousuf v. Samantar, No. 1:04-cv-1360 LMB/JFA, 2012 WL 3730617, at *16 (E.D. Va. Aug. 28, 2012) (entering default judgment on claims including attempted extrajudicial killing under the TVPA). Further, the Court is not aware of any cases determining that a claim for attempted extrajudicial killing is not actionable under the TVPA. Therefore, Defendant has not demonstrated that Plaintiffs' TVPA claim for attempted extrajudicial killing should be dismissed.

### 3. Torture

Defendant contends that the conduct described in the complaint is not egregious enough to satisfy the definition of torture established by the TVPA. Plaintiffs assert that the acts perpetrated against Martyr and Ysemé during the 2008 incident at Martyr's home constitute torture.

The TVPA definition of torture, as relevant here, is:

(1) the term 'torture' means any act, directed against an individual ... by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions) whether physical or mental, is intentionally inflicted on that individual ...

(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—

(A) the intentional infliction or threatened infliction of severe physical pain or suffering; ...

(C) the threat of imminent death; or

(D) the threat that another individual will imminently be subjected to death, [or] severe physical pain or suffering....

28 U.S.C. § 1350 (codified at note).

[24]  [25]  The requirement that the acts in question reach a certain level of severity "is crucial to ensuring that the conduct proscribed by ... the TVPA is sufficiently extreme and outrageous to warrant the universal condemnation that the term 'torture' both connotes and invokes." Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 92 (D.C. Cir. 2002). "The critical issue is the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict

Add. 15

upon the victim." Id., at 93. "The more intense, lasting, or heinous the agony, the more likely it is to be torture." Id. "This understanding thus makes clear that torture does not automatically result whenever individuals in official custody are subjected even to direct physical assault." Id.

[26]    "Not *all* police brutality, not *every* instance of excessive force used against prisoners, is torture...." Id. Courts have determined that mere allegations that individuals were subject to "kicking, clubbing, and beatings," without detail allowing the court to evaluate the severity of the conduct, such as the "frequency, duration, the parts of the body at which [the assaults] were aimed, and the weapons used to carry them out," are not sufficient to demonstrate that the conduct "evinced the degree of cruelty necessary to reach a level of torture." Id. at 93–94. When something more is alleged, however, such as the threat of imminent death, courts have found that such conduct rises to the level of torture under the TVPA. See Warfaa v. Ali, 33 F.Supp.3d 653, 657, 666 (E.D. Va. 2014), aff'd, 811 F.3d 653 (4th Cir. 2016) (plaintiff sufficiently alleged torture satisfying TVPA standard where he experienced severe beatings over the course of *69 three months, then was shot five times and left for dead).

[27]    In this case, the acts that Plaintiffs have alleged relating to the 2008 assault of Martyr and Ysemé are sufficient to satisfy the TVPA definition of torture. Plaintiffs have described with specificity the physical attacks that they claim occurred during the incident, including that Defendant and his associates pistol-whipped Martyr, that multiple individuals beat him on his sides and chest and threw him on the floor, and that one individual restrained Ysemé while three others beat him on his head and the sides of his body. Furthermore, Plaintiffs describe how Defendant and his associates threatened Martyr and Ysemé with imminent death, first by pointing a handgun directly at Martyr's ear, and then by shooting at Martyr and Ysemé. Moreover, Plaintiffs allege that a KOREGA militia member, carrying out Defendant's orders, shot Martyr and Ysemé, injuring them sufficiently that they were left for dead. Both Martyr and Ysemé endured lengthy recoveries from the gunshot wounds, and both suffered permanent physical disfigurement. Taken together, the combination of severe beatings by multiple individuals at once, threats of imminent death, and gunshot wounds causing painful, permanent injuries are sufficient to allege torture under the TVPA. See Jaramillo v. Naranjo, No. 10-21951-CIV, 2014 WL 4898210, at *14 (S.D. Fla. Sept. 30, 2014) (determining that plaintiff sufficiently plead the elements of torture where she witnessed a relative be

shot three times and bleed to death, and she was threatened with imminent death by having a gun pointed at her); Jara v. Nunez, No. 6:13-cv-1426-ORL37GJK, 2014 WL 12623015, at *3 (M.D. Fla. June 30, 2014) (definition of torture satisfied where the defendant's subordinates "brutally beat" the plaintiff, and then the defendant played "Russian Roulette" with the plaintiff and eventually shot him in the head); Chavez v. Carranza, 413 F.Supp.2d 891, 901 (W.D. Tenn. 2005) (plaintiff sufficiently plead torture where his "attackers forced him to the ground, stepped on him, and pointed a rifle at his back," then shot his father, causing the plaintiff to believe he would be shot next). Thus, Defendant is not entitled to dismissal on this basis.

4. Whether Defendant Acted on Behalf of a Foreign Nation

[28]    To establish liability under the TVPA, Plaintiffs must demonstrate that Defendant acted "under actual or apparent authority, or color of law, of any foreign nation." 28 U.S.C. § 1350 (codified at note). "[F]or purposes of the TVPA, an individual acts under color of law ... when he acts together with state officials or with significant state aid." Chowdhury, 746 F.3d at 52–53 (internal quotation marks and citations omitted). At least one court has determined that a mayor is a state actor. See Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1249 (11th Cir. 2005).

[29]    Here, Defendant argues that the acts attributed to Defendant in the Complaint relate more to his advocacy for a Haitian political party than to acts taken as mayor of Les Irois. He asserts that the Complaint does not allege that Defendant was acting as part of his mayoral responsibilities when he carried out the attacks at issue, and therefore he contends that Plaintiffs have not demonstrated that he was acting "under color of law" at the time of the incidents. This attempt to recast the Complaint in the light most favorable to Defendant is unavailing. The Complaint makes clear that, during each of the three incidents that are the focus of the Complaint, Defendant brought along members of his mayoral staff and instructed them to *70 engage in violent acts. In addition, each of the incidents were related to Defendant's duties as mayor. The July 2007 incident was apparently sparked by an altercation that occurred while Defendant was accompanying a sanitation crew. The April 2008 incident occurred after Defendant had been instructed by other government officials not to shut down the radio station, presumably in his capacity as mayor. Further, Defendant apparently desired to put an end to the radio station because he believed it threatened

Boniface v. Viliena, 338 F.Supp.3d 50 (2018)

his political power. Finally, the October 2009 arson was prompted by the death of Defendant's chief of staff, and again, Defendant expressly targeted his political opponents. Therefore, the Complaint has sufficiently alleged that, during the incidents in question, Defendant was acting in his official capacity as mayor, and used the resources available to him through that office, to target individuals he believed to be a threat to his ability to remain in office and exert power. This is sufficient to allege that Defendant acted under the "color of law."

### E. Abstention

[30]  [31]  [32]  Finally, Defendant makes a one-sentence argument that the Court "should abstain from this matter as an exercise of comity," without elucidating why he believes abstention is appropriate. Defendant cites Ace Arts, LLC v. Sony/ATV Music Pub., LLC, 56 F.Supp.3d 436 (S.D.N.Y. 2014) in support of this proposition. Ace Arts explains that " '[g]enerally, concurrent jurisdiction in United States courts and the courts of a foreign sovereign does not result in conflict,' and such '[p]arallel proceedings in the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata the other.' " Ace Arts, 56 F.Supp.3d 436, 444 (quoting Royal & Sun Alliance Co. of Can. v. Century Int'l Arms, Inc., 466 F.3d 88, 92 (2d Cir. 2006) ). "In exceptional circumstances, however, a district court may exercise its inherent power to dismiss or stay an action based on the pendency of a related proceeding in a foreign jurisdiction." Id. (internal quotation marks and citation omitted). "[T]he mere existence of parallel foreign proceedings does not negate" the district courts' " 'virtually unflagging obligation ... to exercise the jurisdiction given them,' " however. Id. at 445 (quoting Royal & Sun Alliance, 466 F.3d at 92). "Accordingly, a district court should not abstain in deference to a previously filed foreign proceeding under 'circumstances that routinely exist in connection with parallel litigation,' but should rather reserve abstention for situations in which 'additional circumstances ... outweigh the district court's general obligation to exercise its jurisdiction.' " Id. (quoting Royal & Sun Alliance, 466 F.3d at 95).

[33]  Here, Defendant has not explained what "exceptional circumstances" are present that warrant abstention in this particular case, nor is the Court aware of any. It appears that there may be some parallel litigation in Haiti that has occurred or is ongoing, see supra. As Ace Arts makes clear, however, the mere existence of parallel litigation is not enough to make abstention necessary. Here, given that Defendant has not

provided any reason as to why the Court should abstain, and considering the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), the Court cannot conclude that abstention is warranted.

## III. MOTION TO SUBSTITUTE PARTY

Plaintiff Nissage Martyr died on March 24, 2017, two days after this lawsuit was  **\*71**  filed. Plaintiffs move to substitute Nissandère Martyr, the son of Nissage Martyr, as Plaintiff pursuant to Federal Rule of Civil Procedure 25. Under Rule 25, "[i]f a party dies and the claim is not extinguished, the court may order substitution of the proper party." Fed. R. Civ. P. 25(a)(1). Defendant opposes the motion.

[34]  [35]  "The language of Fed. R. Civ. P. 25(a)(1) is permissive." In re Baycol Prod. Litig., 616 F.3d 778, 783 (8th Cir. 2010). "The decision whether to substitute parties lies within the discretion of the trial judge and he [or she] may refuse to substitute parties in an action even if one of the parties so moves." Id. (internal quotation marks and citation omitted). The Advisory Committee on the 1963 amendments to Rule 25 noted, however, that it "intended that motions to substitute be freely granted." Id.; see Fed. R. Civ. P. 25, advisory committee to 1963 amendment ("A motion to substitute made within the prescribed time will ordinarily be granted, but under the permissive language of the first sentence of the amended rule ('the court may order') it may be denied by the court in the exercise of a sound discretion if made long after the death ... and circumstances have arisen rendering it unfair to allow substitution.").

### A. Timeliness of Motion

Defendant first argues that Plaintiffs' motion to substitute is not timely. Under Rule 25, if the motion to substitute "is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." Fed. R. Civ. P. 25(a)(1). The statement noting death "must be served on the parties as provided in Rule 5 and on nonparties as provided in Rule 4." Id. at 25(a)(3).

Defendant notes that Plaintiffs filed a Notice of Death of Nissage Martyr in this case on May 16, 2017 [ECF No. 18], and he contends that Nissandère Martyr must have known of the death by March 31, 2017, when he requested an autopsy. He asserts that, because the motion to substitute was not made within 90 days, it must be dismissed. Plaintiffs contend that

Add. 17

the 90-day limitations period is only triggered once a notice of death identifies the representative or successor who may be substituted as a party, and the notice is properly served on the representative or successor pursuant to Fed. R. Civ. P. 4 and 5.

[36] While courts have interpreted this aspect of Rule 25 in various ways, "six circuits have held that the limitations period in Fed. R. Civ. P. 25(a)(1) does not begin until the decedent's representative or successor is properly served with the statement noting death." In re C.R. Stone Concrete Contractors, Inc., 462 B.R. 6, 19 (Bankr. D. Mass. 2011). The Stone court noted that one concern animating this reading of Rule 25 is that, when a plaintiff dies, it may take some time to identify and notify the rightful successor or an appropriate representative. Id. at 18. Often, a party will need to notify the court of the death to obtain extensions of deadlines or other necessary relief. Id. If such a notification triggers the clock to file a motion to substitute, however, the plaintiff could run out of time to file the motion to substitute before identifying a successor. Id. Given these circumstances, reading Rule 25 to provide that the 90-day period is only triggered when the successor is served is appropriate. Moreover, the text of the rule itself is clear: "only *service* of a statement noting death starts the limitations period under the rule." Id. at 19. But see Unicorn Tales, Inc. v. Banerjee, 138 F.3d 467, 470 (2d Cir. 1998) (holding that Rule 25 does not require the statement of death to identify the successor, and explaining that the proper remedy is to seek an extension of **72** time until the successor can be identified). A magistrate judge in this district reached the same conclusion as Stone. See Americus Mortg. Corp. v. Mark, No. 12-cv-10158-GAO, 2013 WL 3106018, at *5 (D. Mass. June 17, 2013) (explaining that, "in addition to the requirement that a suggestion of death be filed according to Rules 4 and 5, Fed R. Civ. P., the suggestion of death must identify and serve the representative or successor who may be substituted as a party," and holding that an oral statement made in court that a party had died, without naming a representative or successor, did not trigger the 90-day period).

[37] Here, it is apparently undisputed that Nissandère Martyr was never served with the notice of death in a manner that satisfies Rule 4, and thus the Court concludes that the 90-day period to file a motion to substitute had not yet commenced when the motion to substitute was filed.

**B. Whether Nissandère Martyr Is Nissage Martyr's Successor**

[38] [39] [40] Defendant also argues that Plaintiffs have failed to demonstrate that Nissandère Martyr is the legal successor or representative of Nissage Martyr. "[T]he proper parties for substitution are the 'successors or representatives of the deceased party,' " Americus, 2013 WL 3106018, at *13 (quoting Rende v. Kay, 415 F.2d 983, 985 (D.C. Cir. 1969) ), and "[t]he burden is on the moving party to demonstrate that the claims asserted survived the death of the plaintiff." Brenner v. Williams-Sonoma, Inc., No. 13-cv-10931-MLW, 2016 WL 7785456, at *3 (D. Mass. Jan. 27, 2016) (citing Stone, 462 B.R. at 20), report and recommendation adopted, No. 13-cv-10931-MLW, 2016 WL 5661987 (D. Mass. Sept. 28, 2016), appeal dismissed, 867 F.3d 294 (1st Cir. 2017). "[A] person may be a 'successor' under Rule 25(a)(1) if [he or] she is (1) the primary beneficiary of an already distributed estate; (2) named in a will as the executor of the decedent's estate, even if the will is not probated; or (3) the primary beneficiary of an unprobated intestate estate which need not be probated." In re Baycol Prod. Litig., 616 F.3d at 784–85 (citations omitted).

[41] At the time that the briefs on this motion were filed, Plaintiffs had submitted the declaration of Mario Joseph in support of the motion to substitute. The Joseph declaration explains Haitian law concerning the survival of a decedent's legal claims, and then goes on to state that

> By operation of Haitian law, upon Mr. Nissage Martyr's death, his adult son Mr. Nissandère Martyr became his heir and successor-in-interest, with the right to assume his father's pending claims against Defendant Viliena and the right to file new criminal and civil claims for wrongful death as a partie civile.

[ECF No. 20-1 ¶ 16]. Defendant took issue with this declaration, asserting that it was not sufficient to satisfy Plaintiffs' burden of proof on this issue. Regardless of the merits of this argument, after the issue was briefed, Plaintiffs filed a supplemental document which is apparently an order of the Massachusetts Probate and Family Court appointing Nissandère Martyr as the personal representative of Nissage Martyr for purposes of Mass. Gen. Laws ch. 190B, the Massachusetts Uniform Probate Code. [ECF No. 48-1]. Accordingly, the Court concludes that this order, in

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    18

combination with the Joseph Declaration, is sufficient to demonstrate that Nissandère Martyr is the legal successor or representative of Nissage Martyr. Therefore, Plaintiffs have satisfied their burden to prove that the motion to substitute should be granted.

**\*73  IV. CONCLUSION**

Accordingly, Defendant's motion to dismiss [ECF No. 46] is <u>GRANTED</u> as to Count IV, and otherwise <u>DENIED</u>.

Plaintiffs' motion to substitute [ECF No. 29] is <u>GRANTED</u>, and Nissandère Martyr is hereby substituted as plaintiff in place of Nissage Martyr.

**SO ORDERED.**

**All Citations**

338 F.Supp.3d 50

---

## Footnotes

1    The court has since determined that "foreign corporations may not be defendants in suits brought under the ATS." <u>Jesner v. Arab Bank, PLC,</u> —— U.S. ——, 138 S.Ct. 1386, 1407, 200 L.Ed.2d 612 (2018).

2    Other courts have suggested that the question of "[w]hether subject matter jurisdiction for a claim asserted under the TVPA must be conferred on this Court through the [ATS] or can be based solely on 28 U.S.C. § 1331" is a "thorny issue" that has not been resolved. <u>Arndt v. UBS AG,</u> 342 F.Supp.2d 132, 141 (E.D.N.Y. 2004). Defendant has not made any argument as to why section 1331 is insufficient, however, nor has Defendant cited cases explaining why the Court would not have jurisdiction under section 1331. As subject matter jurisdiction is an issue that can be raised at any time, <u>see</u> <u>McBee v. Delica Co.,</u> 417 F.3d 107, 127 (1st Cir. 2005), Defendant may renew his motion for dismissal on this basis with a fully-developed argument if he believes that section 1331 is not sufficient to confer jurisdiction over the TVPA claims.

3    Defendant also argues that, because the Court lacks jurisdiction over the ATS and TVPA claims, it cannot exercise supplemental jurisdiction over the claim for a violation of Haitian law in Count V of the Complaint. This argument is unavailing, however, because the Court has determined that it does have jurisdiction over the TVPA claims.

4    Under the rules of civil procedure, an affirmative defense "may be raised in a motion to dismiss an action for failure to state a claim," however, "for dismissal to be allowed on the basis of an affirmative defense, the facts establishing the defense must be clear on the face of the plaintiff's pleadings," and the complaint (along with any other documents that may be properly reviewed on a Rule 12(b)(6) motion) must "leave no doubt that the plaintiff's action is barred by the asserted defense." <u>Blackstone Realty LLC v. F.D.I.C.,</u> 244 F.3d 193, 197 (1st Cir. 2001) (internal quotation marks and citations omitted).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

417 F.Supp.3d 113
United States District Court, D. Massachusetts.

David BONIFACE, Nissandère
Martyr, and Juders Ysemé, Plaintiffs,
v.
Jean Morose VILIENA, Defendant.

Civil Action No. 17-cv-10477-ADB
|
Signed 09/30/2019

**Synopsis**
**Background:** Residents of city in Haiti brought action against
city's mayor, alleging human rights abuses in violation of
the Alien Tort Statute (ATS) and Torture Victim Protection
Act (TVPA). After mayor's motion to dismiss was granted
in part and denied in part, 338 F.Supp.3d 50, mayor moved
for reconsideration, or in the alternative certification of an
interlocutory appeal.

**Holdings:** The District Court, Allison D. Burroughs, J., held
that:

[1] district court would not reconsider denial of mayor's
motion to dismiss TVPA claims based on lack of subject
matter jurisdiction;

[2] district court's exercise of federal question jurisdiction
over TVPA claims did not violate Law of Nations clause in
constitution;

[3] district court's exercise of federal question jurisdiction
over TVPA claims was not inconsistent with traditional
notions of comity between nations; and

[4] district court would certify for interlocutory appeal its
denial of mayor's motion to dismiss for lack of subject matter
jurisdiction.

Ordered accordingly.

**Procedural Posture(s):** Motion for Reconsideration; Motion
for Certificate of Appealability.

West Headnotes (10)

**[1]** **Federal Civil Procedure** 🔑 Discretion of
court

A federal district court has the discretion to
reconsider interlocutory orders and revise or
amend them at any time prior to final judgment.
Fed. R. Civ. P. 54(b).

1 Case that cites this headnote

**[2]** **Federal Civil Procedure** 🔑 Grounds and
Factors

A district court should grant a motion
for reconsideration of an interlocutory order
only when the movant demonstrates (1) an
intervening change in the law; (2) the discovery
of new evidence not previously available; or (3)
a clear error of law in the first order. Fed. R. Civ.
P. 54(b).

1 Case that cites this headnote

**[3]** **Federal Courts** 🔑 Dismissal or other
disposition

In action brought by residents of city in
Haiti against city's mayor, alleging human
rights abuses in violation of the Alien Tort
Statute (ATS) and Torture Victim Protection
Act (TVPA), district court would not reconsider
denial of mayor's motion to dismiss TVPA claims
based on lack of subject matter jurisdiction,
although case presented a legal question that
had not been addressed by First Circuit Court
of Appeals or the Supreme Court, specifically
whether district court could exercise jurisdiction
under the TVPA based solely on federal question
jurisdiction, where lack of controlling authority
was not sufficient to warrant extraordinary
remedy of reconsideration, as the underlying
order was consistent with persuasive authority
from other circuits. 28 U.S.C.A. §§ 1331, 1350.

More cases on this issue

**[4]** **Federal Courts** 🔑 Tort claims

Add. 20

Federal courts have federal question subject matter jurisdiction over claims brought under the Torture Victim Protection Act (TVPA). 28 U.S.C.A. §§ 1331, 1350.

1 Case that cites this headnote

**[5]    Aliens, Immigration, and Citizenship** 🔑 Actions

**Federal Courts** 🔑 Tort claims

District court's exercise of federal question jurisdiction over Haitian city residents' claims under the Torture Victim Protection Act (TVPA) against city's mayor did not violate Law of Nations clause in Constitution and was not a clear err of law, as would warrant reconsideration of denial of mayor's motion to dismiss for lack of subject matter jurisdiction; Law of Nations clause in Constitution permitted Congress to prescribe punishments for conduct that United States had an international obligation to prevent, such as torture and extrajudicial killings, and Congress intended TVPA to have extraterritorial application. U.S. Const., art. 1, § 8; 28 U.S.C.A. §§ 1331, 1350.

1 Case that cites this headnote

More cases on this issue

**[6]    Federal Courts** 🔑 Tort claims

District court's exercise of federal question jurisdiction over Haitian city residents' claims under the Torture Victim Protection Act (TVPA) against city's mayor was not inconsistent with traditional notions of comity between nations, and thus was not unconstitutional or a clear error of law, as would warrant reconsideration of denial of mayor's motion to dismiss for lack of subject matter jurisdiction; mayor did not cite to any case in which a court had dismissed a TVPA claim on comity grounds, and courts in other circuits permitted TVPA claims to proceed in cases where neither defendant nor victim were U.S. citizens at time of alleged torture and which torture took place outside of United States. 28 U.S.C.A. §§ 1331, 1350.

2 Cases that cite this headnote

More cases on this issue

**[7]    Federal Courts** 🔑 Dismissal or nonsuit in general

As a general rule, the First Circuit Court of Appeal does not grant interlocutory appeals from a denial of a motion to dismiss. 28 U.S.C.A. § 1292(b).

**[8]    Federal Courts** 🔑 Particular Actions and Rulings

District court would certify for interlocutory appeal its denial of Haitian city mayor's motion to dismiss city residents' claims under the Torture Victim Protection Act (TVPA) for lack of subject matter jurisdiction, where issue of scope of permissible jurisdiction under the TVPA was a question of law that controlled the case, interlocutory appeal could materially advance litigation, there was substantial ground for difference of opinion on the issue, and mayor's circumstances suggested that he would be unable to proceed in normal course or seek relief through post-judgment appeal, as interlocutory appeal might have been mayor's final opportunity to challenge claims against him with legal representation. 28 U.S.C.A. §§ 1292(b), 1350.

More cases on this issue

**[9]    Federal Courts** 🔑 Certification and Leave to Appeal

A question of law is controlling, such that certification of question for interlocutory appeal is appropriate, if reversal of the district court's order would terminate the action.

**[10]    Federal Courts** 🔑 Certification and Leave to Appeal

A controlling question of law, for purposes of determining whether certification of question for interlocutory appeal is appropriate, usually involves a question of the meaning of a statutory or constitutional provision, regulation,

Add. 21

or common law doctrine rather than an application of law to the facts.

**Attorneys and Law Firms**

**\*114** Bonnie Lau, Pro Hac Vice, Morrison & Foerster LLP, San Francisco, CA, Carmen K Cheung, Pro Hac Vice, Daniel McLaughlin, Pro Hac Vice, Elzbieta T. Matthews, Pro Hac Vice, Laura Kathleen Roberts, Pro Hac Vice, Scott A. Gilmore, Pro Hac Vice, Center for Justice and Accountability, San Francisco, CA, Philip A. O'Connell, Jr., Tony K. Lu, Dentons US LLP, Boston, MA, for Plaintiffs.

Patrick T. Uiterwyk, Peter J. Haley, Nelson Mullins Riley & Scarborough LLP, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR RECONSIDERATION, OR IN THE ALTERNATIVE, CERTIFICATION OF AN INTERLOCUTORY APPEAL

BURROUGHS, D.J.

**\*115** David Boniface, Nissandère Martyr,[1] and Juders Ysemé (together, "Plaintiffs"), residents of Les Irois, Haiti, allege that Jean Morose Viliena ("Defendant"), the former mayor of Les Irois, committed human rights abuses in violation of the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and the Torture Victim Protection Act ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992), 28 U.S.C. § 1350 (codified at note). [ECF No. 1 ("Complaint" or "Compl.")]. On August 31, 2018, the Court granted in part and denied in part Defendant's motion to dismiss. [ECF No. 56]. Now before the Court is Defendant's motion for reconsideration of the Court's motion to dismiss order, or, in the alternative, a motion for certification of an interlocutory appeal. [ECF Nos. 59, 66]. For the reasons set forth below, Defendant's motion for reconsideration [ECF No. 66] is DENIED, and Defendant's motion for the alternative relief of certification of an interlocutory appeal [ECF No. 59] is GRANTED.

## I. BACKGROUND

### A. August 31, 2018 Motion to Dismiss Order

The Court presumes familiarity with the underlying facts alleged in the Complaint that were summarized in the Court's

memorandum and order granting in part and denying in part Defendant's motion to dismiss ("Motion to Dismiss Order"). See Boniface v. Viliena, 338 F. Supp. 3d 50, 56 (D. Mass. 2018). Below, the Court summarizes the portions of the Motion to Dismiss Order that are relevant to Defendant's request for reconsideration.

The Motion to Dismiss Order began by addressing Defendant's argument that the Court lacked jurisdiction over Counts I–IV under the ATS because the relevant conduct occurred in Haiti. Id. at 60. The ATS states that "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. After clarifying that Defendant's argument applied only to Count IV because Counts I–III asserted claims under the TVPA, the Court concluded that it lacked jurisdiction over Count IV under the ATS. See id. at 60–63.

The Court began its analysis of the ATS claim with Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013), which "addressed the question of whether a claim brought pursuant **\*116** to the ATS 'may reach conduct occurring in the territory of a foreign sovereign.'" Boniface, 338 F. Supp. 3d at 60 (quoting Kiobel, 569 U.S. at 115, 133 S.Ct. 1659). In Kiobel, the Supreme Court observed that the "presumption against extraterritorial application"—which is a canon of statutory interpretation that provides that "when a statute gives no clear indication of an extraterritorial application, it has none"—"constrain[s] courts considering causes of action that may be brought under the ATS." Kiobel, 569 U.S. at 115–16, 133 S.Ct. 1659 (internal quotation marks and citations omitted). Applying this construction, the Supreme Court in Kiobel held that the plaintiffs' claims were barred by the ATS because "all of the relevant conduct took place outside the United States." Id. at 124, 133 S.Ct. 1659. In so holding, however, the Supreme Court also recognized that claims could be actionable under the ATS so long as they "touch[ed] and concern[ed] the territory of the United States ... with sufficient force to displace the presumption against extraterritorial application." Id. at 124–25, 133 S.Ct. 1659.

The Court then turned to Kiobel's progeny to flesh out the boundaries of the "touch and concern" standard while noting that the inquiry is "naturally fact-dependent." Boniface, 338 F. Supp. 3d at 61–62. Next, the Court summarized analogous cases from this district. See id. at 61–62 (first citing Sexual Minorities Uganda v. Lively, 960 F. Supp. 2d 304 (D. Mass.

Add. 22

2013) and then citing Sexual Minorities Uganda v. Lively, 254 F. Supp. 3d 262 (D. Mass. 2017) ("Lively II"), aff'd in part, appeal dismissed in part, 899 F.3d 24 (1st Cir. 2018)). Finally, the Court examined the Complaint and found that the three major incidents alleged in the Complaint occurred before Defendant fled to the United States and therefore did not "touch and concern" the United States sufficiently to confer jurisdiction under the ATS. Id. at 62. Removing these allegations,

> the only remaining allegations indicating that the claims "touch and concern" the United States are that, after he fled to the United States in 2009, Defendant continued to hold office as the mayor of Les Irois, continued to exercise control over the KOREGA militia, and that from the United States, he coordinated his return to Les Irois and the campaign of persecution against his enemies.

Id. at 63. Analogizing to Lively II, the Court concluded that these facts indicate that Defendant's involvement from the United Stated was "limited" and held that "the Complaint does not demonstrate that the Plaintiffs' ATS claims have a sufficient connection to the United States." Id. The Court dismissed Count IV and proceeded to assess whether it had jurisdiction over Counts I–III under the TVPA.

The Court recognized that "the TVPA creates a cause of action, but unlike the ATS, it does not provide for federal jurisdiction." Id. (citing Kadic v. Karadzic, 70 F.3d 232, 246 (2d Cir. 1995)). The Court summarized that federal jurisdiction over TVPA claims "is conferred by both the ATS and general federal question jurisdiction pursuant to 28 U.S.C. § 1331, but many courts have determined that section 1331 is sufficient in and of itself to establish federal jurisdiction over TVPA claims." Id. (first citing Doe v. Drummond Co., 782 F.3d 576, 601 (11th Cir. 2015), then citing Haim v. Neeman, No. 12-cv-00351, 2012 WL 12905235, at *3 (D.N.J. Aug. 29, 2012), then citing Doe v. Saravia, 348 F. Supp. 2d 1112, 1118 n.2 (E.D. Cal. 2004), and then citing Xuncax v. Gramajo, 886 F. Supp. 162, 178 (D. Mass. 1995)). The Court appended a footnote to the end of this sentence that read:

**\*117** Other courts have suggested that the question of "[w]hether subject matter jurisdiction for a claim asserted under the TVPA must be conferred on this Court through the [ATS] or can be based solely on 28 U.S.C. § 1331" is a "thorny issue" that has not been resolved. Defendant has not made any argument as to why section 1331 is insufficient, however, nor has Defendant cited cases explaining why the Court would not have jurisdiction under section 1331. As subject matter jurisdiction is an issue that can be raised at any time ... Defendant may renew his motion for dismissal on this basis with a fully-developed argument if he believes that section 1331 is not sufficient to confer jurisdiction over the TVPA claims.

Id. at 63 n.2 (citations omitted). The Court concluded that it could exercise jurisdiction over the TVPA claims through section 1331. Id. at 63–64.

After concluding that it possessed jurisdiction over the TVPA claims, the Court rejected Defendant's argument that the concerns about extraterritorial jurisdiction expressed by the Supreme Court in Kiobel "should apply equally to claims brought pursuant to the TVPA." Id. at 64. The Court observed that "[o]ther courts have rejected this argument, and Defendant cites no legal authority that directly supports this proposition." Id. (first citing Drummond, 782 F.3d at 601–02 and then citing Chowdhury v. Worldtel Bangl. Holding, Ltd., 746 F.3d 42, 50–51 (2d Cir. 2014)).

### B. Procedural History

On September 25, 2018, following entry of the Motion to Dismiss Order, Defendant filed a motion for certification of interlocutory appeal. [ECF No. 59]. On September 26, 2018, the Court issued an electronic order advising the parties that it deemed Defendant's filing to be a motion for reconsideration or, in the alternative, a motion for certification of an interlocutory appeal, and permitted Defendant to file a supporting memorandum. [ECF No. 60]. On November 2, 2018, Defendant filed a motion for reconsideration and supporting memorandum. [ECF Nos. 66–67]. On November 21, 2018, Plaintiffs opposed reconsideration and certification of an interlocutory appeal. [ECF No. 70].

## II. MOTION FOR RECONSIDERATION

### A. Legal Standard

**[1]  [2]** "A federal district court has the discretion to reconsider interlocutory orders and revise or amend them

Add. 23

Boniface v. Viliena, 417 F.Supp.3d 113 (2019)

at any time prior to final judgment." Davis v. Lehane, 89 F. Supp. 2d 142, 147 (D. Mass. 2000); see Fed. R. Civ. P. 54(b); see Fernandez-Vargas v. Pfizer, 522 F.3d 55, 61 n.2 (1st Cir. 2008) ("[A] district court has the inherent power to reconsider its interlocutory orders, and we encourage it to do so where error is apparent."); see also Perez-Ruiz v. Crespo-Guillen, 25 F.3d 40, 42 (1st Cir. 1994) ("Interlocutory orders ... remain open to trial court reconsideration...."). The Supreme Court, however, has cautioned that "courts should be loathe to [reconsider orders] in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.' " Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (quoting Arizona v. California, 460 U.S. 605, 618 n.8, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)). With these principles in mind, "a court should grant a motion for reconsideration of an interlocutory order only when the movant demonstrates (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error of **118** law in the first order." Davis, 89 F. Supp. 2d at 147; see Tomon v. Entergy Nuclear Operations, Inc., No. 05-cv-12539-MLW, 2011 WL 3812708, at *1 (D. Mass. Aug. 25, 2011) ("[M]otions for reconsideration are appropriate only in a limited number of circumstances: if the moving party presents newly discovered evidence, if there has been an intervening change in the law, or if the movant can demonstrate that the original decision was based on a manifest error of law or was clearly unjust.") (citing United States v. Allen, 573 F.3d 42, 53 (1st Cir. 2009)).

**B. Analysis**

**[3]** Defendant frames the subject of its motion for reconsideration as follows: "whether the Court can exercise jurisdiction under the TVPA based solely on federal question jurisdiction, 28 U.S.C. § 1331, in instances where the claims at issue concern only parties who are aliens and do not touch and concern the territory of the United States." [ECF No. 67 at 2]; see also [ECF No. 70 at 6–7] (framing issue raised by Defendant's motion as whether Court has jurisdiction over Plaintiffs' TVPA claims pursuant to 28 U.S.C. § 1331)]. The Court understands the motion to raise two related issues: first, whether a court may exercise subject matter jurisdiction over TVPA claims based on 28 U.S.C. § 1331, and second, whether the exercise of jurisdiction over TVPA claims pursuant to § 1331 is unconstitutional in some circumstances. To prevail on his motion for reconsideration, Defendant must demonstrate that the Motion to Dismiss Order contained a clear error of law or resulted in a manifest injustice as to either of

these two issues. [2] See Fernandez-Vargas, 522 F.3d at 61 n.2; Davis, 89 F. Supp. 2d at 147. Because Defendant is unable to meet this burden, the motion for reconsideration is denied. Although this case presents a legal question that has not been addressed by the First Circuit or the Supreme Court, the lack of controlling authority is not sufficient to warrant the extraordinary remedy of reconsideration where the underlying order is consistent with persuasive authority from other circuits.

1. Jurisdiction Over TVPA Claims
   Pursuant to 28 U.S.C. § 1331

Since the TVPA was enacted in 1995, courts have exercised subject matter jurisdiction over TVPA claims based on federal question jurisdiction, 28 U.S.C. § 1331. See, e.g., Warfaa v. Ali, 811 F.3d 653, 657 (4th Cir. 2016) (affirming district court holding that dismissed ATS claims and allowed TVPA claims to proceed and noting that "the TVPA ... provides a jurisdictional basis separate from the ATS"); Drummond, 782 F.3d at 601 ("Our jurisdiction to consider Plaintiffs' TVPA claims is grounded, instead, in 28 U.S.C. § 1331, the general federal question jurisdiction statute."); Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1269 (11th Cir. 2009) ("The district court determined there was no subject matter jurisdiction for the ATS claims, and because ATS jurisdiction was lacking, ... concluded the TVPA claims also failed.... We conclude the district court erred ... because jurisdiction over the TVPA claims is conferred by 28 U.S.C. § 1331 in this case." (citations omitted)), abrogated on other grounds by Mohamad v. Palestinian Auth., 566 U.S. 449, 132 S.Ct. 1702, 182 L.Ed.2d 720 (2012); Garcia v. Chapman, 911 F. Supp. 2d 1222, 1239 & n.12 (S.D. Fla. 2012) (allowing ATS claim to proceed and noting that "jurisdiction **119** [over the TVPA claim] is conferred by 28 U.S.C. § 1331," which the defendant conceded at a hearing); Jaramillo v. Naranjo, No. 10-cv-21951, 2012 WL 12915426, at *2–3 (S.D. Fla. June 26, 2012) (allowing TVPA claim to proceed regardless of outcome of ATS claim upon finding that "the weight of authority, specifically within the Eleventh Circuit, support[ed] TVPA jurisdiction under § 1331"); see also Arce v. Garcia, 434 F.3d 1254, 1257 n.8 (11th Cir. 2006) ("The omission of a jurisdictional basis for the first count [alleging a claim under the TVPA] is not fatal, however, for we assume jurisdiction under § 1331 when it appears that a complaint's allegations state a cause of action under federal law."); Hua Chen v. Honghui Shi, No. 09-cv-08920, 2013 WL 3963735, at *7 n.4 (S.D.N.Y. 2013) (dismissing TVPA claim for lack of

Add. 24

personal jurisdiction but noting that "[t]he Court might still have subject matter jurisdiction over claims cognizable under the TVPA" in the absence of a viable ATS claim).

 [4] As Defendant observes, some courts that have approached the issue of whether section 1331 is sufficient for jurisdiction have adopted the following syllogism: The TVPA is a law of the United States. Section 1331 establishes federal subject matter jurisdiction over the laws of the United States. Therefore, federal courts have subject matter jurisdiction over claims brought under the TVPA. See [ECF No. 67 at 5] (citing Drummond Co., 782 F.3d at 601)]; see also Xuncax v. Gramajo, 886 F. Supp. 162, 177 (D. Mass. 1995) ("[F]ederal statutory law clearly creates the cause of action upon which [plaintiff's] lawsuit is founded. The case thus 'arises under' the laws of the United States for purposes of federal question jurisdiction under 28 U.S.C. § 1331."). Defendant decries the "tautological certainty" of this approach and finds it lacking in legal analysis. [ECF No. 67 at 5].

Defendant's assessment aside, only a minority of courts have rejected the notion that section 1331 alone may confer jurisdiction over TVPA claims. See, e.g., Chen Gang v. Zhao Zhizhen, No. 3:04-cv-01146, 2013 WL 5313411, at *4 (D. Conn. Sept. 20, 2013) ("Without subject matter jurisdiction under the ATS, the Court also lacks jurisdiction over plaintiffs' TVPA claim."). A few other courts have declined to express a view on the issue where doing so is unnecessary to the adjudication of the case. See Singh v. G.K., No. 1:15-cv-05372, 2016 WL 3181149, at *6 (S.D.N.Y. June 2, 2016) (stating that after the Second Circuit "noted without resolving a split of authority on the issue of whether a claim under the TVPA could be brought solely under the jurisdiction conferred by § 1331," "district courts have generally attempted to avoid this 'thorny issue' ") (citing Arndt v. UBS AG, 342 F. Supp. 2d 132, 141 (E.D.N.Y. 2004)).

Accordingly, secure in its assessment that it was not a clear error of law to adopt the majority approach and to exercise jurisdiction over the TVPA claims through § 1331, the Court proceeds to consider the second, related issue of whether the Constitution limits the exercise of such jurisdiction in situations where the TVPA claims "concern only parties who are aliens and do not touch and concern the territory of the United States." [3] See [ECF No. 67 at 2].

### 2. Statutory and Constitutional Limits of the Extraterritorial Application of the TVPA

Defendant presents two arguments in support of its position that "the exercise of **\*120** jurisdiction over domestic crimes within another country between persons who are not United States citizens falls outside the limits of the authority vested in Congress by the Constitution:" first, that the exercise of jurisdiction in these situations falls outside the scope of the statutory language of the TVPA, and second, that the exercise of jurisdiction in these situations is unconstitutional as violative of the law of nations. See [ECF No. 67 at 2, 9]. The Court rejects Defendant's statutory construction argument, as it did in the Motion to Dismiss Order, and declines to reconsider its exercise of jurisdiction over Plaintiffs' TVPA claims based on Defendant's reasoned, but unsupported, constitutional law argument.

#### i. Statutory Construction

Defendant asserted in his original motion that "the jurisdictional limits of the ATS remain, as well, the appropriate limit of jurisdiction under the TVPA," which the Court understands as arguing for an extension of the Kiobel holding to the TVPA. See [ECF No. 59 ¶ 5]. In his supplemental memorandum, however, Defendant concedes that the TVPA's legislative history indicates an intention to provide a remedy for torture committed abroad, and he notes that several courts, including this Court, have identified "[the TVPA's] intent to extend beyond the territory of the United States." See [ECF No. 67 at 8 (first citing Chowdhury v. Worldtel Bangladesh Holding, Ltd., 746 F.3d 42, 51 (2d Cir. 2014) and then citing Boniface, 338 F. Supp. 3d at 64 (rejecting argument that "the Supreme Court's concerns about extraterritorial jurisdiction as expressed in Kiobel should apply equally to claims brought pursuant to the TVPA")]; see also [ECF No. 70 at 11–12 (stating that the TVPA's legislative history supports its extraterritorial application)]. Accordingly, the Court affirms its conclusion that Congress intended the TVPA to have an extraterritorial application, see Boniface, 338 F. Supp. 3d at 64, and proceeds to consider whether its exercise of jurisdiction over the TVPA claims in this case was unconstitutional and merits reconsideration.

#### ii. Constitutional Analysis

Add. 25

[5] Defendant presents two arguments in support of his position that application of the TVPA to situations where a non-U.S. citizen was tortured by a non-U.S. citizen outside the United States is unconstitutional. First, Defendant argues that the Law of Nations clause in the Constitution, which authorizes Congress to "define and punish ... offenses against the law of nations," cannot be relied on as a source of Congress' power to extend the TVPA in this fashion. [ECF No. 67 at 6 ("There is nothing within the clause or its historical antecedents to suggest that it was meant to permit Congress to create forums for the exercise of civil jurisdiction governing events unrelated to the United States.")]; see U.S. Const., art. 1, § 8. Plaintiffs argue that the Law of Nations clause permits Congress "to prescribe punishments for conduct that the United States has an international obligation to prevent," such as torture and extrajudicial killings, and directs the Court to the TVPA Senate Report, the Motion to Dismiss Order, and case law. See [ECF No. 70 at 12–13 (quoting U.S. Const., art. I, § 8)]; see also S. Rep. No. 102-249 (1991), 1991 WL 258662 (adding that, in addition to the Offenses Clause, the "arising under" clause of Article III also "allows Congress to confer jurisdiction on U.S. Courts to recognize claims brought by a foreign plaintiff against a foreign defendant"). The Court understands Defendant's argument on this point to be another attempt at arguing for an extension of Kiobel's holding to the TVPA, which the Court has already rejected. See supra Section II.B.2.i; see also *121 Boniface, 338 F. Supp. 3d at 64 (summarizing Defendant's argument that "the law of nations does not permit one sovereign to exercise territorial jurisdiction over the affairs of another sovereign" and concluding that "[o]ther courts have rejected this argument, and Defendant cites no legal authority that directly supports his proposition").

[6] Second, Defendant contends that comity between nations, or "the respect sovereign nations afford each other by limiting the reach of their laws," makes application of the TVPA to this case unconstitutional. [ECF No. 67 at 8 (quoting Hartford Fire Ins. Co., 509 U.S. at 817, 113 S.Ct. 2891), 10]. Defendant relies on Justice Scalia's dissent in Hartford Fire Insurance Co. v. California, 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993), which interpreted the scope of the Sherman Act and addressed the constitutionality of its extraterritorial application. See [ECF No. 67 at 6–7]. In Hartford Fire, Justice Scalia accepted the presumption that federal question jurisdiction applied to a case brought under the Sherman Act and observed that doing so "changes the problem set from one about jurisdiction ... to one about the substantive scope of the legislation." [Id. at 7]. This shift led Justice Scalia to two questions: does the statute have extraterritorial reach and "if ... the presumption against the extraterritorial scope of the statute is overcome, is the statute being construed to violate the law of nations...." [Id. (quoting Hartford Fire Ins. Co., 509 U.S. at 814–15, 113 S.Ct. 2891)].

The former question concerning extraterritorial reach has been resolved, see supra Section II.B.2.i, which leaves the question of whether the TVPA is being construed to violate the law of nations. On this point, Justice Scalia noted that "even where the presumption against extraterritoriality does not apply, statutes should not be interpreted to regulate foreign persons or conduct if that regulation would conflict with principles of international law." [ECF No. 67 at 7 (quoting Hartford Fire Ins. Co., 509 U.S. at 815, 113 S.Ct. 2891)]. Justice Scalia also utilizes the Restatement (Third) of Foreign Relations Law, which instructs that even if a nation may have some "basis" for jurisdiction to prescribe law, it should refrain from exercising that jurisdiction with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable." Restatement (Third) of Foreign Relations Law, § 403(1) (Am. Law Inst. 1987). The Restatement suggests a series of factors to consider when determining whether the exercise of jurisdiction is reasonable. [4] [ECF No. 67 at 9 (quoting Hartford, 509 U.S. at 818–19, 113 S.Ct. 2891)]. Here, Defendant argues that the exercise of jurisdiction would be unreasonable, based on reference to these factors, and "would be inconsistent with the traditional notions of comity between nations." [Id. at 9–10].

Defendant does not cite to any case in which a court has accepted this argument *122 or dismissed a TVPA claim on comity grounds. [5] See [ECF No. 70 at 16]. In fact, courts have permitted TVPA claims to proceed in cases where neither the defendant nor victim was a U.S. citizen at the time of the alleged torture and in which the torture took place outside of the United States. See, e.g., Jara v. Nunez, No. 6:13-cv-01426, 2015 WL 12852354, at *4–6 (M.D. Fla. Apr. 14, 2015); Warfaa, 33 F. Supp. 3d at 656–57, 659, 666; Jaramillo, 2012 WL 12915426, at *3–4. For example, in Warfaa v. Ali, 33 F. Supp. 3d 653 (E.D. Va. 2014), a Somalian native and citizen who had been tortured in Somalia and left for dead brought claims under the ATS and TVPA. 33 F. Supp. 3d at 656–57. The defendant was also a Somalian native and citizen, but was residing in the United States at the time of the case. Id. at 656. The Court dismissed the victim's ATS claim because the conduct occurred in Somalia but allowed the TVPA claims to proceed pursuant to federal question jurisdiction as they

Add. 26

"are not subject to the same analysis."[6] Id. at 659, 666. Similarly, in Jaramillo v. Naranjo, No. 10-cv-21951, 2012 WL 12915426 (S.D. Fla. June 26, 2012), beneficiaries of the estates of Columbian citizens who had been killed by paramilitary forces in Columbia brought claims under the ATS and TVPA. See Compl. ¶¶ 1–2, 9–16, 51–100, Jaramillo v. Naranjo, No. 10-cv-21951, 2010 WL 2968632 (S.D. Fla. June 14, 2010), ECF No. 1. The court stayed the action pending the Supreme Court's ruling in Kiobel. Jaramillo, 2012 WL 12915426, at *1. On a motion for reconsideration, the court vacated the stay as to the TVPA claims and explained that "as the Court now understands it, the Torture Victim Protection Act presents a separate claim and a separate basis for subject matter jurisdiction." Id. at *2.[7] Finally, in Jara v. Nunez, No. 6:13-cv-01426, 2015 WL 12852354 (M.D. Fla. Apr. 14, 2015), the court dismissed ATS claims but allowed TVPA claims brought by surviving family members against a former member of the Chilean military for extrajudicial killing and torture that occurred in Chile. See 2015 WL 12852354, at *4–6; Am. Compl. ¶¶ 1, 11, 13–16, No. 6:13-cv-01426 (M.D. Fla. Feb. 19, 2014) (describing torture and killing in Chile, alleging that defendant moved permanently to the United States after the killing, and alleging that plaintiffs and surviving family members of the deceased were all not U.S. citizens). In the absence of case law supporting Defendant's position, the Court is not persuaded that its exercise of jurisdiction in this matter was unconstitutional or a clear error of law that should be reconsidered.

## III. MOTION FOR CERTIFICATION OF INTERLOCUTORY APPEAL

### A. Legal Standard

In the alternative to reconsideration, Defendant asks the Court to certify an **\*123** interlocutory appeal of the Motion to Dismiss Order to allow the First Circuit to weigh in on the question of the limits of jurisdiction under the TVPA. See [ECF Nos. 59, 66]. A district judge may certify an interlocutory appeal in a written order when issuing an otherwise not-appealable civil order if she is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The First Circuit has "repeatedly emphasized that 'interlocutory certification under 28 U.S.C. § 1292(b) should be used sparingly and only in exceptional circumstances, and where the proposed intermediate appeal presents one or more

difficult and pivotal questions of law not settled by controlling authority.' " Caraballo-Seda v. Municipality Of Hormigueros, 395 F.3d 7, 9 (1st Cir. 2005) (quoting Palandjian v. Pahlavi, 782 F.2d 313, 314 (1st Cir. 1986)).

[7] "As a general rule, [the First Circuit does] not grant interlocutory appeals from a denial of a motion to dismiss." Id. (citing McGillicuddy v. Clements, 746 F.2d 76, 76 n.1 (1st Cir. 1984)). "This reflects [the First Circuit's] policy preference against piecemeal litigation as well as prudential concerns about mootness, ripeness, and lengthy appellate proceedings." Id. (citation omitted). In addition, the First Circuit has recognized that "the 'fact that appreciable trial time may be saved is not determinative,' and neither is the fact that the case has 'tremendous implications' ...." Id. (citations omitted) (first quoting Palandjian, 782 F.2d at 314 and then quoting Slade v. Shearson, Hammill & Co., 517 F.2d 398, 400 (2d Cir. 1974)).

### B. Analysis

[8] Defendant argues that certification of an interlocutory appeal is merited here because the question of the limits of jurisdiction under the TVPA is a controlling question of law, there are "ample grounds" for Defendant's position that jurisdiction is lacking, and allowing the appeal "may materially advance the ultimate termination of the litigation." See [ECF No. 59 ¶¶ 9–12; ECF No. 67 at 10–11]. Plaintiffs respond that certification of an interlocutory appeal is inappropriate because Defendant has not established a controlling question of law, which "typically involves a question of statutory or regulatory interpretation," and has not demonstrated a substantial difference of opinion "because every court that has addressed this issue has ruled in favor of jurisdiction," [ECF No. 70 at 17–19]. Plaintiffs also assert that this case does not present exceptional circumstances that would justify an interlocutory appeal. [Id. at 19–20].

[9] [10] The proposed interlocutory appeal of the Motion to Dismiss Order clearly concerns a controlling question of law: whether "the Court may exercise jurisdiction over Plaintiffs' TVPA claims through section 1331." See Boniface, 338 F. Supp. 3d at 63–64. "[A] question of law is controlling if reversal of the district court's order would terminate the action." Johansen v. Liberty Mut. Grp., Inc., No. 15-cv-12920-ADB, 2017 WL 937712, at *1 (D. Mass. Mar. 9, 2017) (quoting Philip Morris Inc. v. Harshbarger, 957 F. Supp. 327, 330 (D. Mass. 1997)). "A controlling question of law usually involves a question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.     8

rather than an application of law to the facts." Id. (quoting S. Orange Chiropractic Ctr., LLC v. Cayan LLC, No. 15-cv-13069-PBS, 2016 WL 3064054, at *2 (D. Mass. May 31, 2016)). Here, the issue of **124** the scope of permissible jurisdiction under the TVPA is a question of law that controls the case because, as Defendant asserts, "[i]f there is no jurisdiction under the TVPA, there is no jurisdiction." [ECF No. 67 at 10]. For the same reason, the Court concludes that an interlocutory appeal may materially advance the litigation. See [ECF No. 59 ¶ 12].

There is also substantial ground for difference of opinion on the issue. Although "many courts have determined that section 1331 is sufficient in and of itself to establish federal jurisdiction over TVPA claims," Boniface, 338 F. Supp. 3d at 63, other courts have resisted adopting this position, see Singh v. G.K., 2016 WL 3181149, at *6; Chen Gang, 2013 WL 5313411, at *4, and the First Circuit has not provided guidance to district courts on this issue. As noted in the Motion to Dismiss Order, this Court considered the issue unsettled enough to invite Defendant to re-present argument on the issue in response to the Order. See Boniface, 338 F. Supp. 3d at 63 n.2. Although the Court does not ultimately find that its Motion to Dismiss Order merits reconsideration, it nonetheless concludes that there is disagreement within the judiciary concerning how to approach personal jurisdiction under the TVPA.

Finally, the Court believes that this case presents an exceptional circumstance justifying a break from the First Circuit's general practice of disfavoring interlocutory appeals from a denial of a motion to dismiss. See Caraballo-Seda, 395 F.3d at 9 (citing McGillicuddy, 746 F.2d at 76 n.1). The Court recognizes that the controlling legal question in this case is a jurisdictional matter that could be addressed in the normal course on a post-judgment appeal. Cf. U.S. v. Sorren, 605 F.2d 1211, 1213–14 (1st Cir. 1979) ("[D]ecisions denying appeals from other jurisdictional challenges suggest that the individual litigant's interest in the limitations on the courts' jurisdiction is adequately served by postjudgment appeal."). Defendant's circumstances, however, suggest that he will be

unable to proceed in this normal course or seek relief through a post-judgment appeal.

As the Court understands the situation, this interlocutory appeal may be Defendant's final opportunity to challenge the claims against him with legal representation. Defendant's counsel confirms in their motion papers, "absent an interlocutory appeal, the Defendant will most likely return to his pro se status and this issue, and its potential chance for appellate review, stand a good chance of being lost." [ECF No. 59 ¶ 12]. Indeed, if an interlocutory appeal is denied, the Court is not optimistic that additional pro bono counsel could be retained given the tremendous difficulty the Court faced in identifying pro bono counsel at the outset of this litigation due to the nature of the claims asserted and the anticipated cost of conducting discovery in Haiti. Should Defendant return to *pro se* status following the denial of an interlocutory appeal, the Court does not have confidence that he would be able to represent himself effectively through the appellate process. Because there may not be another opportunity for Defendant to argue on appeal the merits of his legal arguments favoring dismissal of the claims against him, which contain serious allegations of extrajudicial killing and torture, the Court believes that this case presents an exceptional scenario appropriate for interlocutory review. Accordingly, Defendant's motion for the alternative relief of certification of an interlocutory appeal is granted.

## IV. CONCLUSION

Accordingly, Defendant's motion for reconsideration [ECF No. 66] is UNDERLINED DENIED, **125** and Defendant's motion for the alternative relief of certification of an interlocutory appeal [ECF No. 59] is GRANTED.

**SO ORDERED.**

**All Citations**

417 F.Supp.3d 113

## Footnotes

1    On August 31, 2018, the Court allowed Plaintiffs to substitute Nissandère Martyr as a party following the death of his father, Nissage Martyr, who had been a named plaintiff in this action. See [ECF No. 56].

Add. 28

Boniface v. Viliena, 417 F.Supp.3d 113 (2019)

2    Defendant does not argue that there has been an "intervening change in the law" or that he has discovered "new evidence not previously available." See Davis v. Lehane, 89 F. Supp. 2d 142, 147 (D. Mass. 2000).

3    The Court observes that subject matter jurisdiction pursuant to 28 U.S.C. § 1331 is not limitless because the scope of claims a court may adjudicate is constrained by the court's ability to exercise personal jurisdiction over a defendant.

4    These factors include

"the extent to which the activity takes place within the territory [of the regulating state]," id., § 403(2)(a); "the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the ... activity to be regulated," id., § 403(2)(b); "the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted," id., § 403(2)(c); "the extent to which another state may have an interest in regulating the activity," id., § 403(2)(g); and "the likelihood of conflict with regulation by another state," id., § 403(2)(h).

[ECF No. 67 at 9].

5    Apart from the Motion to Dismiss Order, Defendant cites to one TVPA case throughout its constitutionality argument. See [ECF No. 67 at 6–10]. That case is Chowdhury v. Worldtel Bangladesh Holding, Ltd., 746 F.3d 42 (2d Cir. 2014), which held that "unlike the ATS, [the TVPA] has extraterritorial application." 746 F.3d at 51.

6    The court in Warfaa v. Ali, 33 F. Supp. 3d 653 (E.D. Va. 2014), does not expressly assert jurisdiction pursuant to 28 U.S.C. § 1331, but it is implied based on its analysis of other jurisdictional issues such as the application of the political question doctrine, act of state doctrine, and official acts immunity. See 33 F. Supp. 3d at 659–63.

7    The ATS claims were later dismissed for lack of jurisdiction because all of the events alleged occurred in Columbia. See Order at 16–17, 30, Jaramillo v. Naranjo, No. 10-cv-21951, 2014 WL 4898210 (S.D. Fla. Sept. 30, 2014), ECF No. 101. The court also dismissed some of the TVPA claims pursuant to Federal Rule of Civil Procedure 12(b)(6). See id. at 17–30.

---

End of Document       © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Add. 29

# United States Court of Appeals
## For the First Circuit

---

No. 19-8027

DAVID BONIFACE; NISSANDRE MARTYR; JUDER S. YSEME,

Plaintiffs - Respondents,

v.

JEAN MOROSE VILIENA,

Defendant - Petitioner.

---

Before

Lynch, Kayatta and Barron,
Circuit Judges.

---

**JUDGMENT**

Entered: February 19, 2020

The district court certified that its order denying in part defendant-petitioner Jean Morose Viliena's motion to dismiss was appropriate for interlocutory review pursuant to 28 U.S.C. § 1292(b) (allowing district court to certify issue(s) for interlocutory review when order "involves a controlling question of law as to which there is substantial ground for difference of opinion" and when "an immediate appeal from the order may materially advance the ultimate termination of the litigation"). Defendant-petitioner then filed a petition for permission to appeal in this court. Having considered the district court's ruling and the parties' filings with this court, we conclude that defendant-petitioner has failed to demonstrate that immediate appeal is appropriate. See Camacho v. Puerto Rico Ports Auth., 369 F.3d 570, 573 (1st Cir. 2004) ("Section 1292(b) is meant to be used sparingly, and appeals under it are, accordingly, hen's-teeth rare. They require, among other things, leave of both trial and appellate courts."); see also Coopers & Lybrand v. Livesay, 437 U.S. 463, 474 (1978) (stating the court may deny a § 1292(b) appeal "for any reason").

Accordingly, defendant-petitioner's § 1292(b) petition is DENIED.

By the Court:

Maria R. Hamilton, Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DAVID BONIFACE, NISSANDÈRE MARTYR, and JUDERS YSEMÉ, | * | |
| | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 17-cv-10477-ADB |
| | * | |
| JEAN MOROSE VILIENA, | * | |
| | * | |
| Defendant. | * | |
| | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Following a trial from March 13, 2023 through March 21, 2023, a jury found Defendant

Jean Morose Viliena ("Defendant" or "Viliena") liable for the extrajudicial killing of Plaintiff

David Boniface's brother, Eclesiaste Boniface; the attempted extrajudicial killing and torture of

Plaintiff Nissandère Martyr's father, Nissage Martyr; and the attempted extrajudicial killing and

torture of Plaintiff Juders Ysemé ("Ysemè," and collectively with David Boniface and

Nissandère Martyr, "Plaintiffs"). [ECF No. 250 at 2 ("Verdict"); ECF Nos. 251–255, 257–258[1]].

The jury awarded David Boniface $1.75 million to compensate for the killing of his brother,

Nissandère Martyr $1.25 million to compensate for the attempted killing and torture of his father,

Ysemè $1.5 million to compensate for his attempted killing and torture, plus a total of $11

million in punitive damages for all of the Plaintiffs. [Verdict at 3–4]. Now pending before the

Court is Viliena's motion for judgement as a matter of law under Federal Rule of Civil Procedure

---

[1] The trial transcript is docketed at ECF Nos. 251 ("Day 1"), 252 ("Day 2"), 253 ("Day 3"), 254 ("Day 4"), 255 ("Day 5"), 257 ("Day 6"), and 258 ("Day 7").

50(b) and/or for a new trial under Rule 59, and remittitur of the damages award. [ECF No. 261].

For the reasons set forth below, Viliena's motion is <u>DENIED</u>.[2]

## I.    STANDARD OF REVIEW

"A party seeking to overturn a jury verdict faces an uphill battle." <u>Marcano Rivera v. Turabo Med. Ctr. P'ship</u>, 415 F.3d 162, 167 (1st Cir. 2005). "Courts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." <u>Id.</u> (quoting <u>Rivera Castillo v. Autokirey, Inc.</u>, 379 F.3d 4, 9 (1st Cir. 2004)). In evaluating a motion for judgment as a matter of law, the Court must consider "the evidence presented to the jury, and all reasonable inferences that may be drawn from such evidence, in the light most favorable to the jury verdict." <u>Osorio v. One World Techs. Inc.</u>, 659 F.3d 81, 84 (1st Cir. 2011) (quoting <u>Granfield v. CSX Transp., Inc.</u>, 597 F.3d 474, 482 (1st Cir. 2010)).

In contrast, the Court's power to grant a Rule 59 motion for a new trial "is much broader than its power to grant a [motion for judgment as a matter of law]." <u>Jennings v. Jones</u>, 587 F.3d 430, 436 (1st Cir. 2009). The Court may grant a motion for a new trial "if the verdict is against the demonstrable weight of the credible evidence," or if it "results in a blatant miscarriage of justice." <u>Foisy v. Royal Maccabees Life Ins. Co.</u>, 356 F.3d 141, 146 (1st Cir. 2004) (quoting <u>Sanchez v. P.R. Oil Co.</u>, 37 F.3d 712, 717 (1st Cir. 1994)). "The district court may 'independently weigh the evidence' in deciding whether to grant a new trial," <u>Cham v. Station Operators, Inc.</u>, 685 F.3d 87, 97 (1st Cir. 2012) (quoting <u>Jennings</u>, 587 F.3d at 435), and "wields 'broad legal authority' when considering a motion for a new trial . . . ." <u>Jennings</u>, 587 F.3d at

---

[2] Because this Order resolves the motion that is the subject of Plaintiffs' request for a status conference, [ECF No. 272], that request is <u>DENIED</u> as moot.

436 (quoting de Pérez v. Hosp. del Maestro, 910 F.2d 1004, 1006 (1st Cir.1990)). At the same

time, a "'district judge cannot displace a jury's verdict merely because [she] disagrees with it' or

because 'a contrary verdict may have been equally . . . supportable.'" Id. (quoting Ahern v.

Scholz, 85 F.3d 774, 780 (1st Cir. 1996)). "[W]hen an argument that the evidence was

insufficient forms the basis of a motion for new trial, the district court is generally well within

the bounds of its discretion in denying the motion using the same reasoning as in its denial of a

motion for judgment as a matter of law." Lama v. Borras, 16 F.3d 473, 477 (1st Cir. 1994).

## II.   EVIDENCE AT TRIAL

### A.   Factual Background

In reaching its verdict, the jury could have found the following facts, based on the

evidence presented at trial. These facts are construed in the light most favorable to the verdict.

#### 1.   Haiti Generally

On the first day of trial, Dr. Robert Earl Maguire testified as an expert regarding "the

conditions of political violence in Haiti and particularly organizations that are characterized as

community-based armed gangs, armed groups." [Day 1 at 33:10–12]. In sum, he provided,

supported by detailed testimony, [see, e.g., id. at 39:2–50:10], the following opinions that he

summarized for the jury:

> [1] Haiti is a country that is suffering under many challenges, and primary among
> them would be extreme poverty, dysfunctional or weak organizations, particularly
> in rule of law, and . . . the use of unrestrained violence in politics is another very
> common trait in Haiti. . . .

> [2] [C]ommunity-based armed groups . . . have what [he] would call a symbiotic
> relationship with a patron, or patron, usually a politician who they serve. And when
> they serve this politician, they receive benefits in return, material and financial
> benefits and access to power. . . .

> [3] [T]hese groups, these community-based armed groups, given their relationship
> with the political sponsor, they can function in their communities with impunity,
> or, in other words, they function above the arm of the law.

[Id. at 34:1–17]; see also [id. at 47:13–48:10 ("The groups aligned with a political patron, there's a package of services they can provide. . . . [T]hey may discourage, find ways of discouraging people from voting against their candidate.  This could be through means of intimidation or threats. . . . They also can use threats of violence and violence itself against voters. . . . [O]nce the patron wins [election], the groups do not stand down. . . . [T]hey're going to serve his interest . . . [,] [i]t's a symbiotic relationship.  So they want to maintain access to power and control over the limited resources, so they will continue to serve that master as he retains power and as he continues to extend his power.")].

He also testified more specifically regarding KOREGA, a group "bear[ing] all the trademarks and characteristics of [a] community-based armed group[]."  [Day 1 at 33:16–22].  KOREGA was founded in the 1980s, and since then has "affiliate[ed] itself with political groups and provid[ed] them with the muscle they needed to make sure they would get power and get in office."  [Id. at 51:7–23].  KOREGA operated in Grand'Anse, Haiti, which includes the community of Les Irois.  [Id. at 50:11–51:6; Day 3 at 20:16–19].

Regarding the justice system in Haiti, another expert, Brian Concannon, opined that (1) individuals who "pursue claims against powerful people in Haiti for human rights violations . . . face a very significant risk of retributive violence," and (2) "Haiti's justice system is pervasively corrupt and subject to deep political interference."  [Day 4 at 24:22–25:5].  With respect to his first opinion, he further testified that he could not "think of anyone who has pursued a legal claim for human rights violations against a powerful person where there has not been retributive violence."  [Id. at 25:10–21].

2.    Les Irois and Viliena's Mayorship

Turning to the events relevant to this case, in the late 2000s in Grand'Anse, where Les Irois is located, see supra, there were two major political parties—the Movement for the Reform

of Haiti ("MODEREH"), and the Struggling People's Party ("SPP").[3]  [Day 1 at 52:23–53:12].

They were "highly competitive" and the competition was "hard-edged."  [Id. at 62:24–63:7].

KOREGA was "aligned" with MODEREH.  [Id. at 54:16–21].

In 2006, there was an election for mayor of Les Irois.  [Day 1 at 25:11–12].  Viliena ran

as part of the MODEREH party, [Day 2 at 15:7–9], against William Lebon of the SPP and

Renault Vaillant of the ESKANP party.  [Day 1 at 25:16–18; Day 2 at 45:12–19].  Viliena won

and became mayor.  [Day 4 at 54:7–13].

KOREGA supported Viliena in the race.  [Day 2 at 44:17–45:9].  For example, Osephita

Lebon, William Lebon's sister, [Day 3 at 14:14–16, 19:21–22], testified that "[d]uring the

election, since Viliena was campaigning, he had a group of gangs that surrounded him and that

blocked William Lebon's participation," [id. at 16:21–23].  In addition, Plaintiff Nissandère

Martyr testified that Viliena himself said he was associated with KOREGA and wore KOREGA

shirts while campaigning.  [Day 4 at 75:1–2, 78:5–15].

After the election, Viliena "became mayor with his group of gangs, they started killing

people, they beat people up."  [Day 3 at 17:2–7].  In addition, between 2007 and 2009, the time

period at issue in this case, KOREGA was "using [] method[s] such as arson and surrogate

killings and beatings and threats and intimidation."  [Day 1 at 57:1–12].

Moreover, Osephita testified, for example, that Viliena "as the mayor would do certain

things affiliated to KOREGA and KOREGA would always support him."  [Day 3 at 20:20–21:1].

KOREGA was "not in hiding," Osephita explained, "[w]hen they come, everyone could see they

[we]re members of the KOREGA team, and they accompany [Viliena]."  [Id. at 22:12–14].

---

[3] The SPP is also referred to as "OPL."  [Day 1 at 53:8–11].

Osephita identified the following individuals as having been seen wearing KOREGA clothing: Viliena, Hautefort Bajon, Pierrot Boileau, Benicoit Bell, and Jean Louis Bell.  [Id. at 27:8–13]. In addition, Nissandère Martyr identified Lifaite Livert, Villeme Duclona, Agnel Jean, Pierrot Boileau, and Meritus Beaublanc as always being "behind" Viliena wearing KOREGA shirts during the election.  [Day 4 at 78:10–22].

Once Viliena became mayor, he appointed Hautefort Bajon as the director of "Mayoral Hall."  [Day 3 at 28:15–21]; see also [Day 5 at 37:11–13].[4]  In that role, he worked in the mayor's office as general secretary and directed the city hall for Viliena.  [Day 1 at 25:3–5; Day 2 at 16:16–25].  Osephita Lebon also testified that Viliena had a "security team," which included Hautefort Bajon, Pierrot Boileau, Lifaite Livert, Benicoit Bell, Jean Louis Bell, and others.  [Day 3 at 29:4–14].  Further, Jean Denais, who lived in Les Irois during the relevant time period, testified that Viliena's "mayoral staff" included Agnel Jean, Benicoit Bell, Lifaite Livert, Michelet Noel, Meritus Beaublanc (a.k.a. Ti Amerikan), and Pierrot Boileau.  [Day 3 at 100:9–101:11]; see also [Day 5 at 38:19–23 (Viliena testifying that Meritus Beaublanc worked for him at City Hall)].  Finally, Franckel Isme testified that Maxene Vilsaint worked at the City Hall for the mayor.  [Day 4 at 51:24–25, 54:14–21].

### 3.   July 27, 2007: Eclesiaste Boniface Killing

Plaintiff David Boniface grew up in Les Irois.  [Day 2 at 11:7–9].  In 2006, he lived there with his mother, father, brothers and sisters, including his younger brother Eclesiaste.  [Id. at 11:17–21].  Viliena was David's cousin, and he had "known him for quite some time."  [Id. at

---

[4] Osephita Lebon herself was the mayor of Les Irois for four years around 1995.  [Day 3 at 17:9–12].  She testified that the mayor of Les Irois selects their "director of City Hall," and that the mayor has authority over his team such that "[w]hat he says, tells them to do, they do."  [Id. at 18:24–19:15].

13:20–25].  In the 2006 election, David voted for Viliena's opponent, William Lebon of the SPP, but David himself was not an SPP member.  [Id. at 14:12–15:6].

David worked as a schoolteacher, but he was also taking classes about "violence, injustices, and a lot of other things, including women's rights."  [Day 2 at 12:8–20].  The classes were offered through a national network for human rights called RNDDH, and he participated from 2006–2008.  [Id. at 12:12–13:5].  Through the classes, he became a certified human rights advocate.  [Id. at 13:10–19].

On the morning of July 27, 2007, David was at home when Nissage Martyr came to him and told him there had been an argument between "Ms. Ostanie" and Viliena. [Day 2 at 15:19–16:5].  Viliena had apparently hit Ostanie in the face after she had a dispute with the sanitation department over a trash pile in front of her home.  [Day 3 at 30:11–18, 31:20–25]; see also [Day 4 at 80:6–81:9].  Nissage had come to David because he was a certified human rights advocate. [Day 2 at 16:1–5].

In Les Irois, a judge would typically help resolve disputes, and thus Viliena "arrested Ostanie and took her to [Judge Bell's] house to discuss the issue."  [Day 3 at 33:3–18].  After Nissage came to see him, David went to the judge's home, where Ostanie and Viliena were explaining the incident.  [Day 2 at 16:3–15, 17:4–13].  Osephita Lebon was present at the judge's house, [Day 3 at 33:21–22], as were Hautefort Bajon Meritus Beaublanc, Pierrot Boileau, Benicoit Bell, Jean Louis Bell, Lifaite Livert, and others, [Day 2 at 16:16–24; Day 3 at 35:3–9].

Viliena saw that David was present, and asked the judge to make David leave because he was a "certified human rights defender," and Ostanie's story had nothing to do with human rights.  [Day 2 at 17:4–16].  When he was asked to leave, David "said that everyone has rights," Bajon accused him of speaking in "harsh terms," and Viliena "stormed out."  [Id. at 17:17–18:1];

see also [Day 3 at 101:21–102:24 ("David Boniface was asking the judge if officially the mayor has the right to slap the lady. And [Viliena] was making a lot of – he was making a lot of pressure on David Boniface. . . . All of his partisans who were there were putting pressure.")].

After Viliena left, the judge told David to leave because "he said that [David's] life was threatened." [Day 2 at 18:4–7]. While David was leaving, Viliena returned with "a group of people who were not there before," though Bajon was still present, and one of the members of the group, Jean Louis Bell, "started swinging at" David. [Id. at 18:8–24]. A nearby pastor in the area then grabbed David and brought him into a church for safety. [Id. at 19:1–7]; see also [Day 3 at 102:25–103:6 ("They were saying bad words to him. And they threatened to beat him. Thanks to a pastor that was passing by who saw this, who saw that the men were -- threaten him and wanted to hit him, so he said to David to go away from this place.")].

David did not stay in the church long. [Day 2 at 19:8–9]. A group of his students and their parents came to accompany him from the church, but Viliena and his group kept following David up to the house of Nissage Martyr. [Id. at 19:8–15]. The group included Michelet Noel, Agnel Jean, Pierrot Boileau, Meritus Beaublanc, Lifaite Livert, Rolande Vilsaint, and France Ysemè. [Day 3 at 104:1–5]. Once he got to the front of Nissage's house, "one of the partisans of Mayor" Viliena "grabbed a bicycle" and threw it at David, but a parent "caught the bicycle in midair to avoid [him] getting hit." [Day 2 at 19:16–21]. Viliena then turned to Bajon and said, "leave him alone, we'll deal with him later." [Id. at 19:24–20:2].[5]

Later, Viliena and "his crew," the same men that were at the judge's house, were standing outside David's home with guns, machetes, and clubs. [Day 3 at 36:12–37:25]. Viliena himself

---

[5] Similarly, Osephita Lebon testified that she heard Viliena say to David that "[l]ater on I'm coming for you." [Day 3 at 35:24–36:1].

had a gun, as did Hautefort.  [Id. at 37:24–38:4, 59:4–10].  They were calling for David, but were told that he was not home.  [Id. at 37:11–16].  They then asked someone to "[c]ome get something that we have brought for David[,]" Eclesiaste came outside, and he was shot.  [Id. at 38:12–25]; see also [id. at 59:11–23].

The testimony regarding the shooting was somewhat inconsistent.  Lebon testified that it was Viliena who shot Eclesiaste, and that after he was shot, Benicoit Bell picked up a cinder block and dropped it on Eclesiaste's head.  [Day 3 at 39:3–23].  In contrast, Mers Ysemè, Ysemè's father, testified that he was standing nearby and that, shortly before the shooting, Viliena told Hautefort that "[a]s we don't find David, let's shoot Eclesiaste like, in his place." [Id. at 61:8–18]; see also [id. at 74:17–22].  Mers said that Hautefort Bajon shot Eclesiaste.  [Id. 61:16–18].

Later that night, David went to church with his mother.  [Day 2 at 20:13–21].  While he was at church, a friend came and told him that Eclesiaste had died.  [Id. at 20:24–21:1].  He couldn't leave to go home, though, because Viliena's group had "surrounded the church so they could kill [him]."  [Id. at 21:2–5].  Instead, he spent the night in the pastor's home.  [Id. at 21:6–10].

The next morning, he and Judge Bell went to David's home to start an investigation into Eclesiaste's death.  [Day 2 at 21:13–25].  After seeing Eclesiaste's body, "the population picked" the body up and, with David present, "carried it to . . . Viliena's office at the City Hall."  [Id. at 22:14–23].[6]  When they arrived, Viliena called the police "to come and evacuate" the group,

---

[6] Osephita Lebon testified that it was tradition in Les Irois for the person who killed another to bury them, and thus they had walked to city hall to "insist[]" that Viliena pay for Eclesiaste's funeral and bury him.  [Day 3 at 42:14–18, 43:19–24].

"and the police officers hit [them] with the back of their shotgun and had everybody evacuate." [Id. at 22:24–23:4].

Thereafter, David buried Eclesiaste and then left Les Irois.  [Day 2 at 23:5–14].  He left "because Viliena's father[] announced in public that they would have to kill [David] to put an end to this story."  [Id. at 23:9–14].[7]  He went back and forth to Les Irois after he left, and continued to receive threats related to his brother's death, including from Viliena.  [Id. at 29:13–31:22].  David permanently left Les Irois in 2017 to live in another city in Haiti without his wife and children.  [Id. at 31:25–33:10].

### 4.    April 8, 2008: The Radio Station Incident

Ysemè was born and raised in Les Irois.  [Day 2 at 43:4–5].  In the 2006 election, he voted for William Lebon of the SPP party, though Ysemè was not himself a member of SPP. [Id. at 45:20–46:4].

In April of 2008, Ysemè was a student, 21 years old, and living in Les Irois.  [Day 2 at 47:3–8].  In his free time, he would go to the New Vision Radio (the "Radio Station"), [id. at 47:12–15, 18–21], which was established in Les Irois around March 2008, [Day 1 at 26:4–5].

The Radio Station, located at Nissage Martyr's house, [Day 2 at 47:16–17], was founded by Orelien Joquim, who was associated with SPP.  [Day 4 at 55:9–56:3].  Viliena had been opposed to setting it up.  [Id. at 56:10–22].  Once it was set up, its programming included political discussions that were critical of Viliena as mayor.  [Day 5 at 60:3–5].

---

[7] The statement regarding Viliena's father was admitted into evidence for the limited purpose of explaining why David left Les Irois.  [Day 2 at 24:8–17].

In late March 2008, Vilfranc Larrieux, who worked for the town, [Day 3 at 80:6–11, 81:6–8], had a meeting with Viliena where Viliena requested that the Civil Protection Agency[8] in Les Irois take over the Radio Station.  [Id. at 82:7–19]; see also [id. at 106:14–107:9].  The Civil Protection Agency declined, and Viliena suggested that if they would not do it, he would do it himself.  [Id. at 106:14–107:9].  As a proposed compromise, the Civil Protection Agency suggested Viliena either set up a radio station of his own, or set up a commission to negotiate with the existing Radio Station to find common ground.  [Id. at 82:20–83:11, 106:14–107:9].

A commission was apparently established and it called the Radio Station, which offered to have Viliena come on a show.  [Day 3 at 83:17–24].  He did, and Viliena and Orelien proceeded to have an argument on air.  [Id. at 84:4–11]; see also [id. at 106:14–107:9].[9]  In the end, Viliena said, on the air, that he would shut down or destroy the Radio Station.  [Day 2 at 48:2–8; Day 3 at 107:18–23; Day 4 at 57:2–18, 83:4–8].

On April 8, 2008, Ysemè was at the Radio Station with Nissage Martyr and his family.  [Day 2 at 48:9–14].  Around noon, Viliena and his "henchman" [sic] Maxene Vilsaint came by the radio station on a motorcycle on their way to another town.  [Id. at 48:15–21].  An hour and a half later, they came back and stood near the Radio Station with a duffle bag.  [Id. at 48:22–49:17].  There were more than 30 people with them now, including Lissage Viliena (Viliena's father), Lifaite Livert, Agnel Jean, Gardy Jean-Pierre, Pierrot Boileau, Meritus Beaublanc,

---

[8] The Civil Protection Agency was a group of about 30 individuals, who reported to Viliena as mayor, and whose purpose "was to educate the population through diverse trainings.  We hold activities, social activities, in the town, and also to [sic] alert when there's a disaster, catastrophe, before, during and after."  [Day 3 at 81:6–82:4].

[9] Thereafter, Larrieux went on air and said that the Radio Station was a community station for the people, and that Viliena "had no right to take over the radio station because it was the people's radio station."  [Day 3 at 84:20–85:4].  He was beaten after making this statement.  [Id. at 85:5–86:11].

Villeme Duclona, Isme Frantz, Michelet Noel, Roland Vilsaint, and France Ysemè.  [Id. at
49:18–50:12, 51:19–21; Day 3 at 62:5–63:7, 89:7–9, 108:3–13].  Viliena started "putting his
hand in the bag and he was handing, distributing" guns.  [Day 2 at 49:18–50:5; Day 4 at 63:17–
64:10].  Once he was done, Viliena was armed with what looked like a handgun, Villeme
Duclona was armed with a shotgun, and others had machetes, ice picks, and clubs.  [Day 2 at
50:13–51:7].  Ysemè and Nissage were unarmed.  [Id. at 51:8–11].

Viliena then "made a gesture, he said, 'guys, attack.'"  [Day 4 at 64:11–13].  He led the
group toward the Radio Station, a gun was fired, and "everyone scattered around."  [Day 2 at
51:22–24, 94:17–21; Day 4 at 64:11–65:3].  They then entered the house, [Day 2 at 54:19–24],
where Ysemè and Nissage were hiding.  [Id. at 55:3–14, 94:17–21].

a.   *Ysemè*

Once inside, Ysemè could not see Nissage and Viliena because there was a wall between
them, but he could hear them.  [Day 2 at 55:9–14, 95:7–11].  Ysemè heard Nissage screaming
that he was being beaten up by Viliena, and also heard Nissage say that Viliena had "busted
[Nissage's] head with [his] gun."  [Id. at 55:25–56:12].  The beating lasted more than a minute.
[Id. at 56:9–12].

Viliena then discovered Ysemè, [Day 2 at 56:22–25], and he

grabbed [Ysemè] by the collar, and he started beating [Ysemè] up[,] . . . hitting
[him] all over [his] face, [his] body.  And then he dragged [Ysemè] through the
hallway all the way to the porch.  . . . He said, "So this is where you're hiding so
you can go and report this is who destroyed the radio?  I'm going to put a noose
around your neck, and then I'm going to hang you on the public plaza."

[Id. at 56:22–57:9].[10]  Eventually Viliena "held [Ysemè's] hand and said to Lifaite, 'Restrain

Juders.  We're going to hang him on the public plaza.'"  [Id. at 57:24–58:2].

At this point, "all of [Ysemè's] bones were cracking because [he] was in pain from all the

blows from [Viliena][,] [a]nd Lifaite was holding [him] very tightly.  [He] felt like [his] bones

were breaking."  [Day 2 at 58:5–8].  Meanwhile, Villeme Duclona was "standing next to the

porch" with a shotgun.  [Id. at 58:9–24].

Lifaite let go of Ysemè so he could "take equipment" and "vandalize," at which point

Ysemè "realized that [he] was free, so [he] ran[,] . . . [a]nd while [he] was getting away . . . [he]

heard . . . Viliena's voice very forcefully sa[y] . . . 'Villeme, shoot him.  Shoot Juders.'"  [Day 2

at 58:25–59:6].  Duclona then shot Ysemè "in [his] eyes," one of which he lost, [id. at 59:7–17;

Day 3 at 9:20–22]; see also [Day 3 at 64:24–65:4], and he was also hit in his head, arm, stomach,

and abdomen, [Day 2 at 59:13–17].  At the time of trial, he still had shotgun pellets in his head

and throughout his body, was in consistent pain, and struggled to do certain types of jobs.  [Id. at

62:3–63:22].  Ysemè's father covered his medical costs, which he testified were about $16,500

Haitian dollars.  [Day 3 at 66:16–68:4].

Ysemè left Les Irois in 2017 for safety reasons, namely because he "didn't want [Viliena]

and his crew to kill him."  [Day 2 at 87:10–14].  He is unable to live with his "wife" and family

and as of the time of trial, had seen them twice since 2017.  [Id. at 87:15–20].[11]

---

[10] In addition, the jury heard testimony that around this time, "Villeme Duclona, Gardy Jean-Pierre, Lifaite Livert, Lissage Viliena, Agnel Jean, and many others" were there, and they were "vandalizing the radio station, removing all the equipment from the station."  [Day 2 at 57:14–23].

[11] On cross-examination, Ysemè testified that "I have a wife, but I'm not married."  [Day 2 at 91:10–12].

b.     *Nissage Martyr*

Nissage Martyr was also attacked and shot during the Radio Station incident. <u>See</u> [Day 2 at 64:25–65:3; Day 3 at 63:24–64:3; Day 4 at 64:19–65:16]. Specifically, in addition to Viliena "bust[ing] [Nissage's] head with the butt of his weapon," [Day 2 at 64:25–65:3], Viliena told Villeme to shoot Nissage, [Day 3 at 63:24–64:4]. He did not immediately do so, so Viliena said "I ask you to shoot Nissage. I'm here for a mission that you need to follow. I asked you to shoot Nissage." [<u>Id.</u>]; <u>see also</u> [Day 4 at 65:8–16]. Villeme then shot Nissage in the leg, [Day 3 at 64:5–14], which was later amputated, [Day 2 at 64:25–65:3].

Nissage Martyr died on March 24, 2017. [Day 2 at 77:21–25; Day 4 at 87:4–7].[12] Thereafter, Nissandère Martyr replaced Nissage as the plaintiff in this suit. [Day 4 at 87:8–10]. After doing so, Nissandère received threats, including from Viliena himself. [<u>Id.</u> at 87:11–25]. When Viliena threatened him, Villeme Duclona, Lifaite Livert, Agnel Jean, Pierrot Boileau, Meritus Beaublanc, and "many others" were with Viliena. [<u>Id.</u> at 88:1–6].

5.     <u>Criminal Proceedings in Haiti</u>

In 2018, Viliena participated in a criminal trial in Haiti regarding the Eclesiaste Boniface killing and the attack on the Radio Station. [Day 5 at 84:17–25]. Viliena was asked a total of ten questions at that trial, and the record was three pages long. [<u>Id.</u> at 85:9–14]. Concannon reviewed the case record and, based on his review, testified that

> The questions -- there weren't many to begin with and the questions that were asked were softball questions. He was not confronted with any facts. There were no follow-ups, no efforts to ask him to explain anything. And not only were they softballs, they were also irrelevant softballs. All the questions were asked about things other than -- other than the attack on the radio station and the killing of Eclesiaste Boniface. In fact, you know, the killing of Mr. Boniface was a big part of this case and had been processed by the justice system, you know, at this point for close to ten years. There was not -- in the whole record of the trial, there's no -- the word "Eclesiaste" does not appear. The word "Boniface" does not appear. I

---

[12] Testimony did not establish that his death was related to his injuries.

don't believe the word "radio" appears either. Juders Ysemè and Nissage Martyr, they're mentioned but there's no mention in the entire transcript of any of the details of the attacks or of any evidence that was created by the courts over a decade.

[Id. at 85:15–86:8]. After the trial, the judge decided without any reasoning that Viliena was not guilty. [Id. at 86:9–24]. Concannon testified that, in his opinion, the result was "highly consistent with corrupt verdicts" in Haiti. [Id. at 86:25–87:6].

### B. Procedural History

From March 13, 2023 through March 21, 2023, the parties presented their cases to a jury, which returned a verdict in favor of Plaintiffs on the extrajudicial killing, attempted killing, and torture claims, [Verdict at 2; ECF Nos. 251–255, 257–258], and in favor of Viliena on arson claims, [Verdict at 5].[13] Viliena filed the instant motion for judgment as a matter of law ("JMOL") and/or a new trial, as well as remittitur, on April 18, 2023. [ECF No. 261]. Plaintiffs opposed on May 18, 2023. [ECF No. 269].

## III. DISCUSSION

### A. Judgment as a Matter of Law

#### 1. Previously Dismissed Legal Arguments

As an initial matter, Viliena raises several legal arguments that this Court has already considered and rejected at various stages of the case. First, he argues there is no secondary liability under the Torture Victim Protection Act ("TVPA"), such that he cannot be held liable for the actions of others as an aider and abettor. [ECF No. 262 at 2]. The Court rejected this argument in its order on Viliena's motion to dismiss, finding, for example, that (1) "the TVPA contemplates liability against officers who do not personally execute the [alleged] torture or extrajudicial killing," Boniface v. Viliena, 338 F. Supp. 3d 50, 67 (D. Mass. 2018) (quoting

---

[13] Because the alleged arson is not at issue in this motion, the Court does not describe the facts surrounding it.

Mohamad v. Palestinian Auth., 566 U.S. 449, 458 (2012)); (2) "since domestic law sets the standards for the TVPA, secondary or indirect theories of liability recognized by U.S. law are available for claims brought under the TVPA," id. (quoting Doe v. Drummond Co., 782 F.3d 576, 607 (11th Cir. 2015)); and (3) "[s]ome courts have recognized that a claim for indirect liability under an aiding and abetting theory is cognizable under the TVPA," id. (citing Drummond, 782 F.3d at 608). Viliena provides no basis for the Court to reach a different result here, and it declines to do so.

Second, Viliena avers that the TVPA provides no remedy for attempted extrajudicial killing, arguing that "[t]he plain language of the TVPA does not contemplate an 'attempted' extrajudicial killing as a recoverable offense." [ECF No. 262 at 3 (citing Moskal v. United States, 498 U.S. 103, 108 (1990))]. The Court previously found that "several courts have permitted such claims to proceed," Boniface, 338 F. Supp. 3d at 67–68 (first citing Doe v. Constant, 354 Fed. App'x 543, 547 (2d Cir. 2009) (affirming entry of judgment, inter alia, for attempted extrajudicial killing under the TVPA); then citing Warfaa v. Ali, 33 F.Supp.3d 653, 666 (E.D. Va. 2014), aff'd, 811 F.3d 653 (4th Cir. 2016) (denying motion to dismiss claims under TVPA for, inter alia, attempted extrajudicial killing); and then citing Yousuf v. Samantar, No. 1:04-cv-1360 LMB/JFA, 2012 WL 3730617, at *16 (E.D. Va. Aug. 28, 2012) (entering default judgment on claims including attempted extrajudicial killing under the TVPA)), and noted that it was "not aware of any cases determining that a claim for attempted extrajudicial killing is not actionable under the TVPA," id. at 68. Again, Viliena has provided no reason for the Court to reach a different conclusion here, and it declines to do so.

Third, Viliena states that the Court does not have subject matter jurisdiction over the TVPA claims, and that the evidence at trial—without pointing to any specific evidence—

"confirmed the fact that the TVPA claim should be dismissed for lack of jurisdiction." [ECF No. 262 at 9–10]. The Court previously found that it has jurisdiction, see, e.g., Boniface v. Viliena, 417 F. Supp. 3d 113, 118–22 (D. Mass. 2019); Boniface, 338 F. Supp. 3d. at 63–64, and again Viliena has provided no reason for the Court to reach a different result here.

### 2.    Third Party Recovery for Torture

Viliena next argues, for the first time, that the TVPA does not specifically provide for recovery by third parties (here, Nissandère Martyr) for torture. See [ECF No. 262 at 3 (citing Doe v. Qi, 349 F. Supp. 2d 1258 (N.D. Cal. 2004))]. In response, Plaintiffs argue that Viliena waived this argument by not raising it in his Rule 50(a) motion, and that, in any event, Nissandère Martyr is not a third party, but was instead substituted as a plaintiff for his father. [ECF No. 269 at 19]. The Court agrees that Viliena waived this argument, see Correa v. Hosp. S.F., 69 F.3d 1184, 1195–96 (1st Cir. 1995) ("The suggestion that the Rule 50(a) motion preserved the defense is little short of jejune. A motion for judgment as a matter of law made at the close of all the evidence preserves for review only those grounds specified at the time, and no others."). The Court also notes that Nissandère is not a third/non-party, but rather a substituted party who "steps into the same position as the original party." Carrizosa v. Chiquita Brands Int'l, 47 F.4th 1278, 1337 (11th Cir. 2022) (quoting Ransom v. Brennan, 437 F.2d 513, 516 (5th Cir. 1971)); see also Boniface, 338 F. Supp. 3d at 71–72 (substituting Nissandère Martyr as a plaintiff in place of Nissage Martyr under Federal Rule of Civil Procedure 25). Accordingly, the Court will not grant JMOL on the basis that the TVPA does not provide for Nissandère's recovery.

### 3.    Control Person Liability

Viliena next argues that, with respect to the attempted killings of Ysemè and Nissage Martyr during the Radio Station incident, the evidence at trial does not support a finding that he

had control over the shooter, Villeme Duclona.  [ECF No. 262 at 3–4].  Specifically, he argues that

> [t]here was no testimony or evidence regarding the relationship between the Defendant and Vileme [sic] Duclona, beyond the Defendant's acknowledgment that he knew Duclona as someone who lived in Les Irois and the testimony of the Plaintiffs that Duclona was often seen in the presence of the Defendant and as such was regarded by them as part of the Defendant's "crew."

> Other than the testimony that Mr. Duclona was sometimes seen in the vicinity of the Defendant there was no evidence from which the jury could find that the Defendant had the ability to control or direct the actions of Mr. Duclona or that the Defendant otherwise took actions consistent with the requirements to establish solicitation, conspiracy or aiding and abetting liability. . . .

> There was no evidence presented to the jury from which it could reasonably find that a superior/subordinate relationship existed between the Defendant and the shooter Duclona or that the actions of Duclona resulted from any direction or order initiated by the Defendant.

[Id. at 3–5].  Even if Plaintiffs were advancing a control person theory of liability, which they are not, see [ECF No. 269 at 20–21], the Court disagrees with Defendant's characterization of the facts.  Among other things, the jury could have found the following facts supporting a finding that Duclona was a member of KOREGA and under Viliena's control when he shot Ysemè and Nissage Martyr: (1) Viliena was the mayor of Les Irois, [Day 1 at 25:11–15]; (2) KOREGA was a group "bear[ing] all the trademarks and characteristics of [a] community-based armed group[]," [id. at 33:16–22], and such groups "have . . . a symbiotic relationship with a patron, or patron, usually a politician who they serve.  And when they serve this politician, they receive benefits in return, material and financial benefits and access to power," [id. at 33:23–34:17]; (3) as the mayor, Viliena "would do certain things affiliated to KOREGA and KOREGA would always support him," [Day 3 at 20:20–21:1]; (4) Duclona was always "behind" Viliena with a KOREGA shirt during the election, [Day 4 at 78:10–22]; (5) Viliena initiated and led the attack on the Radio Station, in which Duclona participated, [Day 2 at 49:18–50:12, 51:19–24, 94:17–

21; Day 4 at 64:8–13]; (6) Viliena "forcefully" told Duclona to shoot Ysemè, which he did, [Day 2 at 58:25–59:17; Day 3 at 9:20–22]; and (7) Viliena told Duclona to shoot Nissage, and when he did not immediately do so, Viliena repeated that "I ask[ed] you to shoot Nissage. I'm here for a mission that you need to follow. I asked you to shoot Nissage," and then Duclona did shoot Nissage, [Day 3 at 63:24–64:14; Day 4 at 65:8–16]. Accordingly, the Court disagrees with Viliena's characterization of the facts with respect to control person liability, and declines to grant JMOL on this ground.

### 4. Secondary Liability

Viliena next argues that "[t]here were no facts presented to the jury from which it could reasonably find that he provided "knowing substantial assistance" to Villeme Duclona, or that the two of them engaged in any conspiracy. [ECF No. 262 at 5–6]. Specifically, he argues that "Defendant had no connection to the victims, who were both unaffiliated with any political party nor advocating any political cause. There was no evidence that either the Defendant or Duclona engaged in any planning with respect to the event," and that "[t]here was no evidence as to any of the[] elements" of a conspiracy claim, namely that

> 1. That two or more persons agreed to commit a wrongful act; 2. That Defendant Viliena joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it; and 3. That one or more of the alleged wrongful acts was committed by someone who was a member of the conspiracy and acting in furtherance of the conspiracy.

[Id. at 5 (citing Day 6 at 31:10–17)].

Again, the Court disagrees with Viliena's characterization of the evidence. In addition to the facts above regarding control person liability, see supra, the jury could have found the following additional facts that would support that Viliena provided "knowing substantial assistance" to Duclona and that they engaged in planning and a conspiracy surrounding the Radio Station incident: (1) Viliena said publicly that he would shut down, or destroy, the Radio

Station, [Day 2 at 48:2–8; Day 3 at 107:18–23; Day 4 at 57:2–18, 83:4–14]; (2) a group of 30

individuals, including Duclona, met outside the Radio Station and Viliena provided them with

weapons, [Day 2 at 49:18–51:21]; (3) Viliena led the group into the Radio station after telling

them to "attack," [Day 2 at 51:22–24, 94:17–21; Day 4 at 64:11–65:3]; and (4) during the attack,

Viliena told Duclona to shoot Ysemè and Nissage Martyr, which he did, [Day 2 at 58:25–59:17;

Day 3 at 9:20–22, 63:24–64:4]. Accordingly, the Court declines to grant JMOL on the ground

that the facts at trial could not support a claim for secondary liability.

### 5. Death of Eclesiaste Boniface

Viliena further argues that the jury could not have "reasonably determine[d] the identity

of the shooter" of Eclesiaste Boniface based on the evidence at trial. [ECF No. 262 at 6].

Specifically, he avers that Lebon testified that Viliena was the shooter, whereas Ysemè testified

that Bajon was the shooter. [Id.]. In response, Plaintiffs argue that "there was evidence from

which the jury could reasonably determine that Defendant was directly liable, as the shooter

himself, or that he was secondarily liable, having directed or ordered; solicited; aided and

abetted; or conspired with Hautefort to shoot Eclesiaste." [ECF No. 269 at 26]. In addition,

Plaintiffs assert that "[f]ollowing the jury's determination, it would be improper for the Court to

'resolve conflicts in the testimony or to evaluate the credibility of witnesses when ruling on a

Rule 50(b) motion.'" [Id. at 27 (quoting Rogers v. Cofield, No. 08-10684-MBB, 2011 WL

6140974, *3 (D. Mass. Dec. 8, 2011) (citing Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 208

(1st Cir. 2006) (under Rule 50, courts "may not consider the credibility of witnesses, resolve

conflicts in testimony, or evaluate the weight of the evidence")))].

The Court agrees with Plaintiffs. The jury could have found Viliena responsible for

Eclesiaste's death, either as the shooter himself or as the person who ordered the shooting. See

[Day 3 at 39:3–5 (Lebon testifying the Viliena shot Eclesiaste); id. at 61:8–18 (Mers Ysemè

testifying that Viliena told Hautefort that "[a]s we don't find Davis, let's shoot Eclesiaste like, in his place.")].  Accordingly, drawing all inferences in favor of the jury verdict, the Court declines to grant JMOL on the ground that there was conflicting evidence about who shot Eclesiaste Boniface.  See Rogers, 2011 WL 6140974, *3; see also Osorio, 659 F.3d at 84 (the Court must consider "the evidence presented to the jury, and all reasonable inferences that may be drawn from such evidence, in the light most favorable to the jury verdict." (quoting Granfield, 597 F.3d at 482)).

6.    State Action

Viliena next argues that the evidence at trial does not support a finding of state action because it could not establish that there was a campaign of political dominance carried out against the opposition party SPP.  [ECF No. 262 at 6].  Rather, he argues the evidence showed that none of the Plaintiffs were members of or "had any control or dominance over" SPP, and that Viliena was "not . . . a political actor[,] but . . . a thin-skinned and petty person who had overreacted."  [Id. at 6–7].  Moreover, he avers that "[n]o jury could reasonably conclude that [he] was a state actor with respect to the actions complained of or that the acts could not have been accomplished absent the exercise of such power" because (1) "[b]oth incidents involved a mob of people"; (2)"there was no evidence presented that the assemblages were part of some state action"; and (3) "[t]here was no use of state force and no evidence whatsoever that the color of law of the Republic of Haiti played any material part."  [Id. at 8].

"[F]or purposes of the TVPA, an individual acts under color of law . . . when he acts together with state officials or with significant state aid."  Boniface, 338 F. Supp. 3d at 69 (quoting Chowdhury v. Worldtel Bangl. Holding, Ltd., 746 F.3d 42, 52–53 (2d Cir. 2014) (internal quotation marks and citations omitted)).  "At least one court has determined that a

mayor is a state actor." Id. (citing Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d
1242, 1249 (11th Cir. 2005)).

In denying Defendant's motion to dismiss, the Court found the following with respect to
state action:

> during each of the three incidents that are the focus of the Complaint, Defendant
> brought along members of his mayoral staff and instructed them to engage in
> violent acts.  In addition, each of the incidents were related to Defendant's duties as
> mayor.   The July 2007 incident was apparently sparked by an altercation that
> occurred while Defendant was accompanying a sanitation crew.  The April 2008
> incident occurred after Defendant had been instructed by other government officials
> not to shut down the radio station, presumably in his capacity as mayor.  Further,
> Defendant apparently desired to put an end to the radio station because he believed
> it threatened his political power.  . . . Therefore, the Complaint has sufficiently
> alleged that, during the incidents in question, Defendant was acting in his official
> capacity as mayor, and used the resources available to him through that office, to
> target individuals he believed to be a threat to his ability to remain in office and
> exert power.  This is sufficient to allege that Defendant acted under the "color of
> law."

Boniface, 338 F. Supp. 3d at 69–70.  Evidence at trial bore these allegations out.  First, the jury

could have credited testimony that community-based armed groups, like KOREGA, [Day 1 at

33:16–22], "have . . . a symbiotic relationship with a patron, or patron, usually a politician who

they serve.  And when they serve this politician, they receive benefits in return, material and

financial benefits and access to power[,]" [id. at 33:23–34:17].  Second, the jury could have

reasonably concluded that KOREGA members included Hautefort Bajon, Benicoit Bell, Jean

Louis Bell, Lifaite Livert, Villeme Duclona, Agnel Jean, Pierrot Boileau, and Meritus Beaublanc,

and that they "served" Viliena in his capacity as mayor.  See [id.; Day 3 at 20:20–21:3 (Viliena

"as the mayor would do certain things affiliated to KOREGA and KOREGA would always

support him."), 27:8–13 (the following individuals had been seen wearing KOREGA clothing:

Viliena, Hautefort Bajon, Pierrot Boileau, Benicoit Bell, and Jean Louis Bell); Day 4 at 78:10–22

(Lifaite Livert, Villeme Duclona, Agnel Jean, Pierrot Boileau, and Meritus Beaublanc were

"behind" Viliena with KOREGA shirts during the election)]. Third, several of these individuals were part of Viliena's actual mayoral administration. <u>See</u> [Day 3 at 28:15–21 (Hautefort Bajon was the director of "Mayor Hall"), 29:4–14 (Viliena had a "security team," which included Hautefort Bajon, Pierrot Boileau, Lifaite Livert, Benicoit Bell, and Jean Louis Bell), 100:25–101:11 (Viliena's "mayoral staff" included Agnel Jean, Benicoit Bell, Lifaite Livert, Michelet Noel, Meritus Beaublanc, and Pierrot Boileau); Day 4 at 54:14–21 (Maxene Vilsaint worked at the City Hall for the mayor)]. Fourth, these individuals were directly involved in both the July 2007 killing of Eclesiaste Boniface, <u>see</u> [Day 3 at 36:13–37:25 (on July 27, 2007, Viliena and "his crew," the same men that were at the judge's house, were standing outside David's home with guns, machetes, and clubs)]; <u>see also</u> [Day 2 at 16:16–21 (Hautefort Bajon and Meritus Beaublanc were at the judge's house); Day 3 at 35:3–9 (Pierrot Boileau, Benicoit Bell, Jean Louis Bell and Lifaite Livert went to the judge's house)], and the April 2008 Radio Station incident, <u>see</u> [Day 2 at 49:8–50:12 (Maxene Vilsaint, Lifaite Livert, Agnel Jean, Gardy Jean-Pierre, Pierrot Boileau, Meritus Beaublanc, Villeme Duclona approached the radio station with weapons)], both of which the jury could have found that Viliena led in his capacity as mayor, <u>see</u> [Day 3 at 30:11–33:18 (Viliena "arrested Ostanie and took her to [Judge Bell's] house to discuss" an issue that arose with the sanitation department), 39:3–5 (Viliena shot Eclesiaste), 61:8–18 (Viliena ordered Hautefort to shoot Eclesiaste)]; <u>see also</u> [Day 4 55:9–56:3 (the Radio Station was affiliated with SPP), 64:11-65:3 (Viliena "took the lead" and told the group to "attack" the Radio Station), 83:4–14 (Viliena said he would destroy the Radio Station); Day 5 at 60:3–5 (the Radio Station had political discussions that were critical of Viliena as mayor)]. Finally, the jury could have found that the state's investigation and trial regarding the incidents were perfunctory and "highly consistent with corrupt verdicts" in Haiti. [Day 5 at 84:17–87:6].

These facts support a finding that Viliena acted under color of law as mayor of Les Irois, that he was supported by mayoral staff officials and/or affiliated groups, and that Viliena knew that, in his capacity as mayor, the state was unlikely to condemn or punish him for his actions. Thus, the Court declines to grant JMOL on the basis that Defendant did not act under color of law.

       7.   <u>David Boniface's Standing</u>

Viliena argues that there is "no evidence from which a jury could reasonably find that David Boniface is a proper claimant" because "Massachusetts law does not permit recovery by siblings for wrongful death," and because state law should govern the assessment of liability under the TVPA and who is a proper plaintiff for purposes of recovery. [ECF No. 262 at 9 (first citing <u>Drummond</u>, 782 F.3d at 607; and then citing <u>Bobick v. U.S. Fid. & Guar. Co.</u>, 790 N.E.2d 653, 661 (Mass. 2003))]. Plaintiffs respond that under the TVPA, "where state law would provide no remedy, a court may apply the foreign law that would recognize the Plaintiff's claim." [ECF No. 269 at 20 (quoting <u>Drummond</u>, 782 F.3d at 607)]. Thus, Plaintiffs aver, "[i]t is . . . settled that standing under the TVPA can arise from foreign or domestic law." [<u>Id.</u>]. Moreover, Plaintiffs state that David has standing under Massachusetts law because he was appointed as the personal representative of Eclesiaste's estate. [<u>Id.</u> at 21].

As an initial matter, standing is a question of law, not fact, and thus it was not the role of the jury to determine whether David has standing. <u>See</u> <u>Steir v. Girl Scouts of the USA</u>, 383 F.3d 7, 15 (1st Cir. 2004) ("A district court's determination that a plaintiff lacks standing is a question of law."); <u>Wilson v. HSBC Mortg. Servs., Inc.</u>, 744 F.3d 1, 8 (1st Cir. 2014) ("[T]he question of whether certain facts establish standing is a question of law."). Because Defendant only argues that David is not a proper claimant under Massachusetts law, the Court addresses only that issue, and finds that he is.

The Court already addressed a similar issue with respect to Nissandère Martyr, finding the following:

> "[a] person may be a 'successor' under [Federal Rule of Civil Procedure] 25(a)(1) if [he or] she is (1) the primary beneficiary of an already distributed estate; (2) named in a will as the executor of the decedent's estate, even if the will is not probated; or (3) the primary beneficiary of an unprobated intestate estate which need not be probated." In re Baycol Prod. Litig., 616 F.3d 778, 784–85 (8th Cir. 2010) (citations omitted) . . . .
>
> Plaintiffs filed a supplemental document which is apparently an order of the Massachusetts Probate and Family Court appointing Nissandère Martyr as the personal representative of Nissage Martyr for purposes of Mass. Gen. Laws ch. 190B, the Massachusetts Uniform Probate Code. [ECF No. 48-1]. Accordingly, the Court concludes that this order, in combination with the [Mario] Joseph Declaration [that explained that Nissandère was his father's successor-in-interest], is sufficient to demonstrate that Nissandère Martyr is the legal successor or representative of Nissage Martyr. Therefore, Plaintiffs have satisfied their burden to prove that the motion to substitute should be granted.

Boniface, 338 F. Supp. 3d at 72. The Massachusetts Probate and Family Court similarly appointed David Boniface as the personal representative of Eclesiaste's estate. [ECF No. 48-2].[14] Thus, for largely the same reasons that it found that Nissandère Martyr had standing to bring claims on behalf of Nissage, the Court will not grant JMOL on the basis that David Boniface is not a proper claimant.

---

[14] Mario Joseph, an attorney who represents David Boniface and Ysemè in Haiti, [ECF No. 20-1 ¶¶ 2, 4], similarly declared that "under the Haitian law of succession, David is an heir-at-law of his deceased brother, Eclesiaste, and David is the appointed representative of his elderly father, Salvane Boniface, who is also an heir-at-law," [ECF No. 20 at 9], and further that the Haitian courts have allowed David to pursue civil claims for the wrongful death of his brother, [id. at 10].

### B. New Trial Motion[15]

 1.  Expert Testimony

Viliena firsts requests a new trial on the grounds that the jury was unfairly prejudiced by the expert testimony of Maguire and Concannon because they "had [no] particular knowledge about the venue of the facts in this matter, Les Irois, nor offered any testimony that directly related to the acts involved in this action." [ECF No. 262 at 11]. Instead, they testified about "crime in Haiti and the offensive and insidious conduct of bad political actors," which was not enough to establish any connection between Viliena and KOREGA. [Id.]. In sum, Viliena argues that "[t]he lengthy testimony of experts, while potentially relevant to the efficacy of the Haitian judgment in favor of the Defendant, was instead employed in a manner to characterize Haiti and Haitian politicians as universally criminal. This unfairly, and wrongly, influenced the jury." [Id. at 11–12].

Both Maguire and Concannon provided opinions that were supported by their expertise, see, e.g., [Day 1 at 53:20–57:12 (Maguire testifying about KOREGA's relationship with MODEREH and its operations in Les Irois and explaining the basis for his knowledge, after initial objections, for the same); Day 4 at 25:10–21 (Concannon testifying without objection regarding retributive violence in Haiti, and the basis of his knowledge for same)], and Defendant does not point the Court to any particular overruled objection at trial that would call into question the basis for the opinions they provided, see [ECF No. 262 at 10–12]. Rather, the crux of

---

[15] In addition to the arguments for a new trial addressed below, Viliena argues that "[i]n applying its own independent judgment to the question of state action and the other issues raised [in his motion for judgment as a matter of law], the Court should grant a new trial." [ECF No. 262 at 10]. The Court denies this request for largely the same reasons explained above. See Lama, 16 F.3d at 477 ("[W]hen an argument that the evidence was insufficient forms the basis of a motion for new trial, the district court is generally well within the bounds of its discretion in denying the motion using the same reasoning as in its denial of a motion for judgment as a matter of law.").

Defendant's argument appears to be that testimony regarding KOREGA and the political situation in Haiti was unfairly prejudicial because it was not specifically connected to Viliena or the two incidents at issue, and instead merely "characterized Haiti and Haitian politicians as universally criminal." See [id. at 11–12].

Maguire and Concannon provided general opinions regarding, for example, "the conditions of political violence in Haiti and particularly organizations that are characterized as community-based armed gangs, armed groups," [Day 1 at 33:10–12 (Maguire)]; the fact that individuals who "pursue claims against powerful people in Haiti for human rights violations . . . face a very significant risk of retributive violence," and that "Haiti's justice system is pervasively corrupt and subject to deep political interference," [Day 4 at 24:22–25:9 (Concannon)]. Then, fact witnesses provided testimony that supported those general opinions in the context of the claims made here, including that Viliena was associated with KOREGA and KOREGA did his bidding. See, e.g., [Day 3 at 22:12–15 (KOREGA was "not in hiding," Osephita Lebon explained, "[w]hen they come, everyone could see they [we]re members of the KOREGA team, and they accompany [Viliena].")]; see also id. at 17:2–7 (Viliena "became mayor with his group of gangs, they started killing people, they beat people up.")].

In sum, Maguire and Concannon's opinions, in combination with the fact witness' testimony, supported the jury verdict and there is nothing to suggest that their testimony resulted "in a blatant miscarriage of justice." Foisy, 356 F.3d at 146 (quoting Sanchez, 37 F.3d at 717). Thus, the Court declines to grant a new trial based on the experts' testimony.

### 2. Plaintiffs' Closing Argument

Viliena next argues that, during closing arguments, Plaintiffs improperly tried to rehabilitate the credibility of Ysemè with facts not in evidence. [ECF No. 262 at 12]. Specifically, he avers that on direct examination Ysemè testified that he was married, on cross he

admitted he was not married, and then only in their rebuttal closing argument did Plaintiffs say that calling an unmarried partner one's wife is "just a cultural thing" in Haiti. [Id.]. Viliena states that in doing so, "Plaintiffs improperly sought to supplement and correct the record by arguing facts that were not in evidence in a way that was unfair and unduly prejudicial." [Id.]. Plaintiffs, in response, characterize Viliena's argument as an untimely objection. [ECF No. 269 at 35].

> Sustaining an untimely objection requires Viliena to show that

> (1) an error was committed; (2) the error was "plain" (i.e. obvious and clear under current law); (3) the error was prejudicial (i.e. affected substantial rights); and (4) review is needed to prevent "a miscarriage of justice or [if the error has] seriously affected the fairness, integrity or public reputation of the judicial proceedings."

Granfield v. CSX Transp., Inc., 597 F.3d 474, 490–91 (1st Cir. 2010) (quoting Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 189 (1st Cir. 1996)). Here, the Court finds that even if the rebuttal statement was improper and it was error to allow the statement to go unaddressed, the relevant testimony was very tangential to the facts at issue, and the verdict was supported by ample evidence, such that a new trial is not required to prevent a miscarriage of justice. See Granfield, 597 F.3d at 490–91; see also Foisy, 356 F.3d at 146; cf. United States v. Taylor, 54 F.3d 967, 977 (1st Cir. 1995) (under plain error standard, "reversal is justified only if the illegitimate portion of the closing argument 'so poisoned the well that the trial's outcome was likely affected.'" (quoting United States v. Mejia-Lozano, 829 F.2d 268, 274 (1st Cir. 1987))).

## C. Remittitur

Viliena finally argues that the Court should remit the damages award because, for example, "[o]ther than emotion and sympathy there was no basis whatsoever for the award of these amounts and they lack any basis in the evidence presented to the jury," "[t]he TVPA does not provide for the recovery of punitive damages," and "[t]he $11 million awarded to the

Plaintiffs in this action serves no deterrent effect, is grossly excessive and stands only as a symbolic gesture devoid of any recognizable or legitimate judicial purpose." [ECF No. 262 at 12–14].

"[A] district court has discretion to order a remittitur if such an action is warranted in light of the evidence adduced at trial." Trainor v. HEI Hosp., LLC, 699 F.3d 19, 29 (1st Cir. 2012) (citing Kelley v. Airborne Freight Corp., 140 F.3d 335, 355 (1st Cir. 1998)). That said, "a party seeking remittitur 'bears a heavy burden,'" Currier v. United Techs. Corp, 393 F.3d 246, 256 (1st Cir. 2004) (quoting Koster v. TWA, 181 F.3d 24, 34 (1st Cir. 1999)), and "'the obstacles which stand in the path of' such claims of excessiveness 'are formidable ones,'" Trull v. Volkswagen of Am., Inc., 320 F.3d 1, 9 (1st Cir. 2002) (quoting Wagenmann v. Adams, 829 F.2d 196, 215 (1st Cir. 1987)). Moreover, "[t]ranslating legal damage into money damages is a matter 'peculiarly within a jury's ken,' especially in cases involving intangible, non-economic losses." Travers v. Flight Servs. & Sys., Inc., 808 F.3d 525, 540 (1st Cir. 2015) (quoting Trull, 320 F.3d at 9). "[T]he jury's assessment of damages will not be disturbed unless it is 'grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand.'" Trull, 320 F.3d at 9 (quoting Wagenmann, 829 F.2d at 215); see also Trainor, 699 F.3d at 29 ("In exercising this discretion, the court is obliged to impose a remittitur 'only when the award exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it.'" (quoting Wortley v. Camplin, 333 F.3d 284, 297 (1st Cir. 2003) (internal quotation marks omitted)).

With respect to compensatory damages, the Court provided the following instruction, which Viliena does not take issue with in his briefing:

Compensatory damages are the measure of the loss or injury sustained by the injured plaintiff, and may embrace shame, mortification, humiliation, indignity to

the feelings, and the like. You may also award compensatory damages for pain and suffering, physical disfigurement and mental and emotional distress. There is no exact standard for fixing the compensation to be awarded for these elements of damages. Any award you make must be fair in light of the evidence presented at trial.

In determining the amount of compensatory damages that a plaintiff may be entitled to recover, you may consider the reasonable value of medical care incurred by the plaintiff for the treatment and cure of the injury; the plaintiff's physical mental and emotional pain and suffering to date; and reasonable probable future physical, mental, and emotional pain and suffering; any harm to plaintiff's reputation; and fair compensation for any lost wages or diminution in earning capacity, meaning the loss of plaintiff's capacity to work and earn a living that you find were proximately caused by the defendant's unlawful conduct. No evidence of the value of tangible things, such as physical pain and suffering, needs to be introduced. There's no exact standard by which you can measure the money equivalent of such an injury. The only measuring stick is the collective enlightened conscience of the jury. The law leaves it up to the fairness and common sense of the jury to determine the amount of these damages. In this difficult task of putting a money figure on an aspect of injury that does not readily lend itself to an evaluation in terms of money, you should try to be fair, objective, and dispassionate, and not be unduly swayed by sympathy for the plaintiffs or for the defendant. Once you have calculated each of these areas of damages, medical expenses, pain and suffering, mental and emotional distress, reputational harm, lost wages or earning capacity and so on, you should add them up to arrive at the total award. There must not be any overlapping of the various elements constituting the damages. The total sum must be fair compensation for the entire injury, no more and no less. In other words, if you decide that a plaintiff is entitled to compensatory damages for more than one of his claims, any damages awarded for one claim must not be duplicative of any damages you award for the other claim. Damages should not be awarded more than once for the same injury. Compensatory damages aim to make the plaintiff whole, and he may not recover more than he has lost.

[Day 6 at 34:3–35:21]. Viliena primarily takes issue with the discrepancy between the compensatory amounts awarded here ($1.75 million for Boniface, $1.25 million for Ysemè, and $1.5 million for Martyr) and the amounts recovered in Haiti ($17,496 for Boniface, $14,315 for Ysemè, and $15,905 for Martyr), as well as the fact that "damages represented many multiples of their annual earnings." [ECF No. 262 at 13]. He then states that otherwise "plaintiff provided no evidence on damages." [Id.].

Viliena ignores that the jury heard ample evidence regarding, for example, Eclesiaste's killing which led to the separation of his family and continuing threats, [Day 2 at 23:5–14, 29:13–33:10]; Ysemè's ongoing and consistent pain due to his injuries; and his inability to live with his family due to ongoing fear for his safety, [id. at 62:4–25, 87:10–20]; and Nissage Martyr's amputated leg and the ongoing threats to his family, [id. at 64:25–65:3; Day 4 at 87:8– 88:6]. As the Court explained to the jury, "[n]o evidence of the value of tangible things, such as physical pain and suffering, needs to be introduced. . . . The law leaves it up to the fairness and common sense of the jury to determine the amount of these damages." [Day 6 at 34:22–35:3]. The Court will not upend the jury's collective decision here, even if it would have found a lesser amount itself. See McDonald v. Fed. Laby's, Inc., 724 F.2d 243, 247 (1st Cir. 1984) (where Plaintiff "suffered, and will continue to suffer for an indeterminate time into the future, considerable physical pain, humiliation, and the loss of meaningful business, social and home life," finding that "[p]lacing a value on human suffering is always a subjective enterprise, turning on the jury's sensibilities to the facts and circumstances presented in a particular case. Though [the First Circuit], like the trial judge, may have awarded a lesser amount, [it] cannot say that the jury so overstepped its bounds as to 'shock the conscience' of th[e] court." (citing Mitchell v. Evelyn C. Brown, Inc., 310 F.2d 420, 425 (1st Cir. 1962)).

Regarding punitive damages, as an initial matter, they have been awarded in TVPA cases. See Ditullio v. Boehm, 662 F.3d 1091, 1102 (9th Cir. 2011) ("revers[ing] district court's determination that punitive damages are unavailable under the TVPA"); cf. Xuncax v. Gramajo, 886 F. Supp. 162, 199–200 (D. Mass. 1995) (although declining to find retroactive punitive damages under the TVPA, noting that "it appears the statute was designed not simply to compensate the victims of torture, but with an eye toward eradicating the evil altogether. In the

civil context, of course, to prevent or deter heinous behavior is the particular province of punitive or exemplary damages.").

Here, the Court provided the following instruction to the jury, which Defendant has not taken issue with:

> In addition to awarding damages to compensate the plaintiff, you may, but are not required to, award plaintiff punitive damages if you find that the acts of the defendant were wanton, reckless, or malicious. . . . The purpose of punitive damages is not to compensate the plaintiff but to punish the defendant and thereby discourage the defendant and others from acting in a similar way in the future.

> An act is malicious when it is done deliberately with knowledge of the plaintiffs' rights and with the intent to interfere with those rights. An act is wanton and reckless when it demonstrates conscious indifference and utter disregard of its effect upon the health, safety and rights of others. If you find the defendant's acts were not wanton or reckless or malicious, you may not award punitive damages. On the other hand, if you find that defendant's acts were wanton and reckless or malicious, you may award plaintiffs punitive damages. Punitive damages are appropriate only for especially shocking and offensive misconduct.

> In arriving at your decision as to the amount of punitive damages, you should consider the nature of what the defendant did, including the character of the wrongdoing, whether the conduct was done with an improper motive or with vindictiveness, whether the act or acts constituted outrageous or oppressive intentional misconduct, defendant's awareness of the harm and potential harm caused by the conduct, how often defendant engaged in similar conduct, and any effort to conceal or cover up the wrongdoing.

> There is no exact standard for fixing the amount of punitive damages. The amount can be as large as you believe is necessary to fulfill the purpose of punitive damages, but the amount of punitive damages that you award must be fair, reasonable and proportionate to the actual and potential harm suffered by plaintiffs, and to the compensatory damages you award to plaintiffs. Generally speaking, this means that the ratio of punitive damages to compensatory damages must not exceed a 9:1 ratio. The nature of defendant's conduct, including how offensive you find the conduct, is an important factor in deciding the amount of punitive damages.

[Day 6 at 35:22–37:11]; see also BMW of N.A., Inc. v. Gore, 517 U.S. 559, 574–75 (1996) (explaining "[t]hree guideposts" that should be used to assess the fairness of punitive damages: (1) the "degree of reprehensibility" of the conduct; (2) "the disparity between the harm or potential harm" and the punitive award; and (3) "the difference between" the punitive damages

amount "and the civil penalties authorized or imposed in comparable cases"). The jury heard evidence that Viliena participated in and/or directed the organized killing and/or torture of the Plaintiffs and/or their family members, see, e.g., [Day 2 at 55:25–56:12 (Viliena "busted [Nissage's] head with [his] gun."), 56:22–57:9 (Viliena "beat[] [Ysemè] up[,] . . . hitting [him] all over [his] face, [his] body" and said "I'm going to put a noose around your neck, and then I'm going to hang you on the public plaza."), 58:25–59:6 (Viliena told Duclona to shoot Ysemè); Day 3 at 17:2–7 (Viliena "became mayor with his group of gangs, they started killing people, the beat people up."), 39:3–23 (Lebon testified that it was Viliena who shot Eclesiaste), 61:8–18 (Mers Ysemè testified that Viliena told Hautefort that "[a]s we don't find Davis, let's shoot Eclesiaste like, in his place."), 63:24–65:4 (Viliena ordered the shooting of Nissage Martyr); Day 4 at 64:11–13 (Viliena led the attack on the Radio Station)], persisted in threats to these individuals when they pursued a remedy for that reprehensible conduct, see, e.g., [Day 2 at 29:13–31:22 (threats to David Boniface), 86:17–87:14 (threats to Ysemè); Day 4 at 87:8–88:6 s(threats to Nissandère Martyr)], and the jury's punitive damages award was proportional to the compensatory amounts they awarded, see, e.g., [Verdict]. Under these circumstances, the jury's award was not so "grossly excessive" as to warrant remitter of damages, and the Court declines to do so. See BMW, 517 U.S. at 568.

## IV. CONCLUSION

Accordingly, Viliena's motion, [ECF No. 261], is DENIED.

**SO ORDERED.**

April 8, 2024                                          /s/ Allison D. Burroughs
                                                      ALLISON D. BURROUGHS
                                                      U.S. DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

David Boniface et al.
$\qquad$

    Plaintiff(s)

    v.        CIVIL ACTION NO. 17cv10477-ADB

Jean Morose Viliena
$\qquad$

    Defendant(s)

## JUDGMENT IN A CIVIL CASE

Burroughs, D.J.

  X    **Jury Verdict.** This action came before the court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

       **Decision by the Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

  **IT IS ORDERED AND ADJUDGED:**

**Judgment for plaintiffs in the amount of $15,500,000.**

            ROBERT M. FARRELL

            CLERK OF COURT

Dated: 4/12/23        By: /s/ Karen Folan

            Deputy Clerk#

Add. 64