# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

DAVID BONIFACE; NISSANDÈRE MARTYR; JUDERS YSEMÉ,

*Plaintiffs-Appellees*,

v.

JEAN MOROSE VILIENA,

*Defendant-Appellant*.

Appeal from the U.S. District Court for the District of Massachusetts,
Case No. 1:17-cv-10477; Hon. Allison D. Burroughs

## PLAINTIFFS-APPELLEES' RESPONSE BRIEF

BONNIE LAU
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Tel: (415) 268-6511

DANIEL MCLAUGHLIN
CARMEN K. CHEUNG
CENTER FOR JUSTICE &
ACCOUNTABILITY
268 Bush Street #3432
San Francisco, CA 94104
Tel: (415) 544-0444

PHILIP A. O'CONNELL, JR.
DENTONS US LLP
101 Federal Street, Suite 1900
Boston, MA 02110
Tel: (617) 235-6802

DIANA L. KIM
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
Tel.:  (202) 887-8738
DKim@mofo.com

BRIAN R. MATSUI
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel: (202) 887-8784

*Counsel for David Boniface, Nissandère Martyr, and Juders Ysemé*

October 9, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... v

JURISDICTIONAL STATEMENT ..................................................................... 1

INTRODUCTION .................................................................................................. 1

STATEMENT OF ISSUES .................................................................................... 3

STATEMENT OF THE CASE ............................................................................... 4

    A.    Factual Background ................................................................................. 4

        1.    Defendant became mayor through support from KOREGA, an armed community-based group ........................... 4

        2.    Defendant led the extrajudicial killing of Eclesiaste Boniface in retaliation for David Boniface's human rights advocacy ....................................................................................... 5

        3.    Defendant tortured and ordered the attempted extrajudicial killings of Nissage Martyr and Juders Ysemé ........................... 7

        4.    Defendant fled to Massachusetts to escape responsibility for his crimes and, from here, continued to use intimidation and violence to thwart judicial proceedings in Haiti ................................................................................................ 9

    B.    Procedural Background .......................................................................... 11

        1.    Plaintiffs sued defendant under the TVPA for torture, extrajudicial killing, and attempted extrajudicial killing .......... 11

        2.    The district court denied defendant's motion to dismiss plaintiffs' TVPA claims ........................................................... 12

        3.    This Court denied interlocutory appeal ..................................... 14

        4.    The jury found defendant liable for extrajudicial killing, attempted extrajudicial killing, and torture under the TVPA ........................................................................................ 14

        5.    The district court denied defendant's motions for a new trial, judgment as a matter of law, and remittitur .................... 15

SUMMARY OF ARGUMENT .............................................................17

STANDARDS OF REVIEW ..............................................................19

ARGUMENT .......................................................................................20

I.    THE DISTRICT COURT CORRECTLY CONCLUDED IT HAD
JURISDICTION OVER PLAINTIFFS' TVPA CLAIMS ...........................20

    A.    Federal Courts Have Federal-Question Jurisdiction Over TVPA
Claims .......................................................................................20

        1.    Statutory text, legislative history, and precedent establish
that 28 U.S.C. §1331 confers jurisdiction over TVPA
claims .........................................................................20

        2.    Defendant's attempt to limit TVPA claims to ATS
jurisdiction fails.........................................................22

            a.    Defendant's incomplete recounting of the TVPA's
legislative history contains no suggestion that
TVPA claims are limited to ATS jurisdiction ...............22

            b.    Defendant identifies no case holding that TVPA
claims cannot be brought under federal-question
jurisdiction ...................................................................24

    B.    Jurisdiction Over TVPA Claims Applies Extraterritorially ...............26

        1.    Statutory text, legislative history, and precedent establish
that the TVPA applies extraterritorially....................................26

        2.    No presumption against extraterritoriality applies because,
as defendant concedes, Congress clearly indicated that the
TVPA applies extraterritorially..............................................27

    C.    The TVPA Is Constitutional...........................................................28

        1.    Congress had authority to enact the TVPA under Article
I's "Offenses" and "Necessary and Proper" Clauses...............29

        2.    Defendant's constitutional challenge is baseless and
threatens numerous statutes beyond the TVPA .......................31

a.      Defendant fundamentally misunderstands comity, which is a prudential judicial doctrine, not a constitutional limit on Congress ...................................... 32

b.      Defendant identifies no authority establishing that Congress's power is limited by international law .......... 34

c.      The TVPA is fully consistent with the law of nations .......................................................................... 36

d.      Upholding the TVPA would not grant Congress limitless authority over foreign states' domestic affairs ............................................................................ 37

e.      Defendant ignores the United States' significant interest in fulfilling its international obligations and ensuring it does not become a safe haven for torturers .......................................................................... 39

II.      THE DISTRICT COURT CORRECTLY CONCLUDED THE TVPA PERMITS SECONDARY LIABILITY ........................................................ 40

     A.      Statutory Text, Legislative History, And Precedent Establish That The TVPA Permits Secondary Liability ..................................... 40

     B.      Defendant's Argument For A Presumption Against Secondary Liability Fails ................................................................................ 42

III.      THE JURY'S VERDICT WAS SUPPORTED BY EVIDENCE OF DEFENDANT'S SECONDARY LIABILITY ........................................... 43

     A.      Extensive Evidence Supports The Finding That Defendant Was Secondarily Liable For Attempted Extrajudicial Killings Of Nissage And Juders ................................................................... 43

     B.      Extensive Evidence Supports The Finding That Defendant Was Liable For The Extrajudicial Killing Of Eclesiaste ........................... 44

     C.      Defendant does not dispute his direct liability or his secondary liability under a solicitation theory ..................................... 45

IV.      THE DISTRICT COURT CORRECTLY CONCLUDED CONTROL WAS NOT REQUIRED .............................................................. 46

V.      THE DISTRICT COURT CORRECTLY REFUSED TO DISTURB THE JUDGMENT FOR NISSAGE AND JUDERS .................................... 47

VI.     THE JURY'S FINDING THAT DEFENDANT ACTED UNDER
        COLOR OF LAW WAS SUPPORTED BY THE EVIDENCE ...................49

VII.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
        ADMITTING PROFESSOR MAGUIRE'S EXPERT TESTIMONY .........51

        A.     Defendant's Objection On The Eve Of Trial Was Untimely..............51

        B.     Professor Maguire's Testimony Was Reliable....................................52

        C.     Professor Maguire's Testimony Was Relevant And Not Unfairly
               Prejudicial............................................................................................54

VIII.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
        DENYING REMITTITUR OF COMPENSATORY DAMAGES ..............54

IX.     THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
        DENYING REMITTITUR OF PUNITIVE DAMAGES ............................56

        A.     Punitive Damages Are Available Under The TVPA .........................56

        B.     The Jury's Punitive Damages Award Was Not Grossly Excessive
               ............................................................................................................58

CONCLUSION ....................................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alvarado-Santos v. Dep't Health of P.R.*,
   619 F.3d 126 (1st Cir. 2010) ........................................................................ 19, 43

*Am. Banana Co. v. United Fruit Co.*,
   213 U.S. 347 (1909) ............................................................................................ 33

*Appel v. Cohen*,
   No. 22-170, 2023 WL 1431691 (2d Cir. Feb. 1, 2023) ...................................... 49

*Appel v. Hayut*,
   No. 20-6256, 2021 WL 2689059 (S.D.N.Y. June 30, 2021) .............................. 49

*Arce v. Garcia*,
   434 F.3d 1254 (11th Cir. 2006) .................................................................... 22, 59

*Cabello v. Fernández-Larios*,
   402 F.3d 1148 (11th Cir. 2005) ...............................................41, 43, 46, 55, 57

*Central Bank of Denver v. First Interstate Bank*,
   511 U.S. 164 (1994) ............................................................................................ 42

*Chavez v. Carranza*,
   559 F.3d 486 (6th Cir. 2009) ........................................................................ 52, 53

*Chen Gang v. Zhao Zhizhen*,
   No. 3:04-cv-1146(RNC), 2018 WL 4693949 (D. Conn. Sept. 30, 2018),
   *aff'd*, 799 F. App'x 16 (2d Cir. 2020) ................................................................ 25

*Chen Gang v. Zhao Zhizhen*,
   No. 04-cv-1146, 2013 WL 5313411 (D. Conn. Sept. 20, 2013) ........................ 25

*Chowdhury v. Worldtel Bangl. Holding, Ltd.*,
   746 F.3d 42 (2d Cir. 2014) .......................................... 25, 26, 27, 28, 40, 55, 57

*Dahlgren v. First Nat'l Bank of Holdredge*,
   533 F.3d 681 (8th Cir. 2008) ............................................................................. 48

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579 (2009) ........................................................53

*Ditullio v. Boehm*,
662 F.3d 1091 (9th Cir. 2011) ...............................57, 58

*Doe I v. Cisco Sys.*,
73 F.4th 700 (9th Cir. 2023) .........................40, 41, 42

*Doe v. Constant*,
354 F. App'x 543 (2d Cir. 2009) ....................49, 57, 59

*Doe v. Drummond*,
782 F.3d 576 (11th Cir. 2015) ............ 21, 25, 26, 27, 28, 38, 40

*Doe v. Saravia*,
348 F. Supp. 2d 1112 (E.D. Cal. 2004) ...............57, 59

*Ford ex rel. Estate of Ford v. Garcia*,
289 F.3d 1283 (11th Cir. 2002) ...............................46

*FDIC v. Constructora Japimel*,
981 F.3d 66 (1st Cir. 2020) .....................................21

*Feliciano-Hill v. Principi*,
439 F.3d 18 (1st Cir. 2006) .....................................52

*Filartiga v. Pena-Irala*,
577 F. Supp. 860 (E.D.N.Y. 1984) .........................57

*Filartiga v. Pena-Irala*,
630 F.2d 876 (2d Cir. 1980) .............................29, 36

*Gillespie v. Sears, Roebuck & Co.*,
386 F.3d 21 (1st Cir. 2004) .....................................46

*Hartford Fire Ins. Co. v. California*,
509 U.S. 764 (1993) ..........................................32, 33

*Jane W. v. Thomas*,
560 F. Supp. 3d 855 (E.D. Pa. 2021) ....................46, 49

*Kadic v. Karadžić*,
70 F.3d 232 (2d Cir. 1995) ..............................................22, 24, 25

*Katt v. City of N.Y.*,
151 F. Supp. 2d 313 (S.D.N.Y. 2001) ...............................53

*Kiobel v. Royal Dutch Petroleum Co.*,
569 U.S. 108 (2013)............................... 12, 13, 21, 27, 28, 31, 33, 37

*Marcano Rivera v. Turabo Med. Ctr. P'ship*,
415 F.3d 162 (1st Cir. 2005) .............................................20

*Mass. Eye & Ear Infirmary v. QLT Phototherapeutics*,
552 F.3d 47 (1st Cir. 2009)...............................................46

*Mastafa v. Chevron Corp.*,
759 F. Supp. 2d 297 (S.D.N.Y. 2010) ...............................42

*Mastafa v. Chevron Corp.*,
770 F.3d 170 (2d Cir. 2014) .............................................43

*McBee v. Delica Co.*,
417 F.3d 107 (1st Cir. 2005)...............................................32

*Merrell Dow Pharms. v. Thompson*,
478 U.S. 804 (1986).......................................................21, 24

*Miller v. Nichols*,
586 F.3d 53 (1st Cir. 2009)...............................................20

*Missouri v. Holland*,
252 U.S. 416 (1920).......................................................29, 35

*Mohamad v. Palestinian Auth.*,
566 U.S. 449 (2012).......................................................40

*Molloy v. Blanchard*,
115 F.3d 86 (1st Cir. 1997)............................................47, 48

*Morales-Tañon v. P.R. Elec. Power Auth.*,
524 F.3d 15 (1st Cir. 2008).........................................44, 56, 58

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010)................................................................34

*Rimkus v. Islamic Republic of Iran*,
    575 F. Supp. 2d 181 (D.D.C. 2008)..................................57

*Rodowicz v. Mass. Mut. Life Ins. Co.*,
    279 F.3d 36 (1st Cir. 2001)......................................19, 50

*Rodríguez-García v. Miranda-Marín*,
    610 F.3d 756 (1st Cir. 2010)...............................................56

*Sánchez v. Foley*,
    972 F.3d 1 (1st Cir. 2020)...................................................55

*Sinaltrainal v. Coca-Cola Co.*,
    578 F.3d 1252 (11th Cir. 2009),
     *abrogated on other grounds by Mohamad v. Palestinian Auth.*,
    566 U.S. 449 (2012)............................................................23

*Smith v. Wade*,
    461 U.S. 30 (1983)......................................................57, 58

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004)............................................................36

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003)....................................................58, 59

*Underhill v. Hernandez*,
    168 U.S. 250 (1897)............................................................33

*United States v. Aluminum Co. of Am.*,
    148 F.2d 416 (2d Cir. 1945) ..............................................28

*United States v. Articles of Drug Consisting of Following: 5,906
    Boxes*,
    745 F.2d 105 (1st Cir. 1984)..............................................24

*United States v. Cafiero*,
    242 F. Supp. 2d 49 (D. Mass. 2003)..................................28

*United States v. Hayes*,
653 F.2d 8 (1st Cir. 1981)........................................................28

*United States v. Jordan*,
813 F.3d 442 (1st Cir. 2016)....................................................51

*United States v. Kantengwa*,
781 F.3d 545 (1st Cir. 2015)....................................................53

*United States v. Mikhel*,
889 F.3d 1003 (9th Cir. 2018) ................................................29

*United States v. Nippon Paper Indus. Co.*,
109 F.3d 1 (1st Cir. 1997).......................................................32

*United States v. Pinto-Mejia*,
720 F.2d 248 (2d Cir. 1983),
*as amended on den. of reh'g en banc* (Feb. 15, 1984) ........................34

*United States v. Smith*,
18 U.S. (5 Wheat.) 153 (1820) ...............................................35

*United States v. Smith*,
680 F.2d 255 (1st Cir. 1982)....................................................31

*United States v. Teganya*,
997 F.3d 424 (1st Cir. 2021)....................................................54

*United States v. Viliena*,
No. 1:23-cr-10074 (D. Mass. Mar. 21, 2023)....................................15

*Warfaa v. Ali*,
33 F. Supp. 3d 653 (S.D.N.Y. 2006),
*aff'd*, 811 F.3d 653 (4th Cir. 2016)........................................49

*Warfaa v. Ali*,
811 F.3d 653 (4th Cir. 2016) ...........................................25, 27

*Xuncax v. Gramajo*,
886 F. Supp. 162 (D. Mass. 1995)....................................22, 27, 55, 57

*Yousuf v. Samantar*,
552 F.3d 371 (4th Cir. 2009),
*aff'd*, 560 U.S. 305 (2010) ..................................................22

## Constitutional Provisions

U.S. Const. art I, §8, cl.10.......................................29, 36

U.S. Const. art. I, §8, cl.18.............................................29

U.S. Const. art. III, §2, cl.1............................................21

## United States Code

18 U.S.C. §1091(e)(2)(D) ...............................................31

18 U.S.C. §1116(c)(3)......................................................31

18 U.S.C. §1201(e)(3).......................................................31

18 U.S.C. §1596(a)(2).......................................................31

18 U.S.C. §1651 ...............................................................31

18 U.S.C. §2332f(b)(2)(C) ...............................................31

18 U.S.C. §2332i(b)(4) .....................................................31

18 U.S.C. §2340A .......................................................31, 48

18 U.S.C. §2441(d)(1)(D) ...............................................48

28 U.S.C. §1291 .................................................................1

28 U.S.C. §1331 ....................................................1, 20, 21

28 U.S.C. §1350..........................................................12, 23

28 U.S.C. §1350 note .......................11, 17, 26, 38, 41

49 U.S.C. §46502(b)(2)(C) ..............................................31

## California Code

Cal. Code Civ. Proc. §354.8(a)(1)(D)..............................49

## Rules

Fed. R. Evid. 703 ...................................................................52

## Legislative Materials

H.R. Rep. No. 102-367 (1991)........................................23, 29, 42, 48, 57

S. Rep. No. 102-249 (1991) ................ 1, 21-23, 26, 27, 29-31, 37-39, 41, 42, 48, 57

## Treaties and Conventions

Convention Against Torture, G.A. Res. 39/46, Dec. 10, 1984,
   1465 U.N.T.S. 85 ....................................................................30, 41, 48

Convention on Prevention and Punishment of Crime of Genocide,
   Dec. 9, 1948, 78 U.N.T.S. 277 ........................................................48

Int'l Covenant on Civil and Political Rights, G.A. Res. 2200A (XXI),
   Dec. 16, 1966, 999 U.N.T.S. 171 ......................................................30

Rome Statute of the Int'l Crim. Court, July 1, 2002, 2187 U.N.T.S. 90.................48

Universal Declaration of Human Rights, G.A. Res. 217A (III), Dec.
   10, 1948, U.N. Doc. A/810 at 71 ......................................................30

## Other International Materials

Amnesty Int'l, *Universal Jurisdiction: A Preliminary Survey of
   Legislation Around the World* 13 (2011)............................................37

*Ould Dah v. France*,
   App. No. 13113/03, European Court of Human Rights (Mar. 17, 2009)...........37

## Restatements of the Law

*Restatement (Fourth) of Foreign Relations Law* §402 ......................................31, 34

*Restatement (Fourth) of Foreign Relations Law* §403 ................................29, 30, 36

*Restatement (Fourth) of Foreign Relations Law* §407 ...........................................31

*Restatement (Fourth) of Foreign Relations Law* §413 ...........................................30

*Restatement (Second) of Torts* §908 ........................................................57

**Other Authorities**

Amended Final Judgments, *Arce v. Garcia*,
   No. 99-cv-8364 (S.D. Fla. Aug. 1, 2002), ECF 257-259 ...................................59

Findings of Fact and Conclusions of Law, *Doe v. Constant*,
   No. 04-cv-10108 (S.D.N.Y. Oct. 24, 2006), ECF 71 .........................................59

Michael Morley, Note, *The Law of Nations and the Offenses Clause of
   the Constitution*, 112 Yale L.J. 109 (2002) ........................................................35

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over plaintiffs' TVPA claims pursuant to 28 U.S.C. §1331.  This Court has jurisdiction pursuant to 28 U.S.C. §1291.

# INTRODUCTION

The Torture Victim Protection Act ("TVPA") ensures that "torturers and death squads will no longer have a safe haven in the United States" by providing victims of such human rights abuses a remedy in federal court.  S. Rep. 102-249, at 3 (1991).  This is precisely the kind of case the TVPA was designed to redress.

Defendant Jean Morose Viliena abused his authority as mayor of Les Irois, Haiti, by using torture, killing, and other violence to persecute those he perceived as challenging his power.  He personally led an armed group to commit brutal attacks of retaliation on plaintiffs.

Plaintiff David Boniface, a human rights advocate, was targeted by defendant after David spoke before a judge about defendant's abuse of power.  Defendant led a group of armed men to David's house to retaliate.  Finding David not at home, they killed his younger brother, Eclesiaste Boniface, as a surrogate—first shooting him and then crushing his head with a cinderblock.  Mourning his brother's death and receiving threats on his own life, David fled Les Irois to live in hiding.

Plaintiffs Nissage Martyr and Juders Ysemé were targeted by defendant because they supported a radio station that broadcasted programs critical of

1

defendant as mayor.  Defendant led a group of 30 armed men to attack the radio station.  Defendant personally beat Nissage and Juders, hitting them repeatedly over the head and body.  He ordered his associate to shoot them, and his associate obeyed. After hospitalization and multiple surgeries, Nissage and Juders survived, but Nissage lost his leg, and Juders was left blind in one eye.  Juders continues to suffer excruciating pain from shotgun pellets that remain embedded in his head and body. Like David, Juders fled Les Irois fearing for his life.

When plaintiffs sought justice in Haiti, defendant fled to Massachusetts to escape responsibility for his crimes.  From here, he continued to act as mayor and direct the same armed group, using violence to intimidate witnesses and thwart proceedings in Haiti.  He is now a U.S. legal permanent resident in Massachusetts.

When their efforts to obtain justice in Haiti proved futile, plaintiffs sued defendant in federal court under the TVPA.  After a seven-day jury trial, including testimony from multiple eyewitnesses who saw defendant lead and commit the attacks, the jury found defendant liable for the extrajudicial killing of Eclesiaste and the torture and attempted extrajudicial killings of Nissage and Juders.

This Court should affirm that verdict and reject defendant's laundry list of nine arguments attempting to evade accountability.

Defendant's factual and evidentiary arguments misstate the record and ignore the overwhelming evidence.  The jury's verdict is supported by testimony of

eyewitnesses who saw defendant shoot Eclesiaste, beat Nissage and Juders, and order his associate to shoot them. This Court affords considerable deference to the jury's verdict, particularly when based on live testimony.

Defendant's legal arguments fare no better. His jurisdictional and statutory-interpretation arguments cite no binding authority, relying solely on dissents or outlier district court decisions. His attempts to curtail the TVPA's reach would contradict its text and undermine its purpose—an unprecedented step no appellate court has taken. Doing so here would render this Court an outlier, creating a circuit split and upsetting longstanding practice since the TVPA's enactment. This Court should not be the first to gut Congress's remedy for torture victims and turn the First Circuit into a refuge for torturers.

## STATEMENT OF ISSUES[1]

1. Whether the district court correctly concluded it had federal-question jurisdiction over plaintiffs' TVPA claims.

2. Whether the district court correctly concluded the TVPA permits secondary theories of liability.

---

[1] Defendant lists 11 questions presented, but two summary questions about denial of defendant's post-trial motions are duplicative. Def.Br.2 (questions 8 and 9).

3.   Whether the jury's verdict was supported by evidence under a secondary theory of liability.

4.   Whether the district court correctly concluded control was not a necessary element of any of plaintiffs' secondary theories of liability.

5.   Whether the district court correctly rejected defendant's challenge to his liability for attempted extrajudicial killing.

6.   Whether the jury's verdict was supported by evidence that defendant acted under color of law.

7.   Whether the district court acted within its discretion in admitting Robert Maguire's expert testimony.

8.   Whether the district court acted within its discretion in declining to remit the jury's compensatory damages award.

9.   Whether the district court acted within its discretion in declining to remit the jury's punitive damages award.

## STATEMENT OF THE CASE

### A.   Factual Background

#### 1.   *Defendant became mayor through support from KOREGA, an armed community-based group*

During the last 50 years, Haiti has experienced dictatorship, political instability, and extreme poverty, leading to the weakening of institutions and proliferation of political violence.  RA342-345.  Political parties have formed

alliances with armed community-based groups: the armed groups use violence and intimidation to ensure their political patron is elected and stays in power, and in return, the patron provides members of the armed group with jobs, resources, and impunity to continue their violence. RA349-352.

In 2006, defendant ran for mayor of Les Irois for a party called MODEREH. RA750. Defendant and MODEREH were allied with an armed group called KOREGA. RA354-355; RA413-414; RA483; RA670. Typical of such groups, KOREGA enabled its patrons to secure power through "method[s] such as arson and surrogate killings and beatings and threats and intimidation." RA358; RA353-356.

Defendant won and was mayor from 2007 to 2010, during which time he committed the attacks at issue. SA19. Throughout the election and his time as mayor, defendant was often seen with his "crew" of KOREGA members, many of whom held positions on his mayoral staff. *E.g.*, RA413-414; RA487-496.

### 2. Defendant led the extrajudicial killing of Eclesiaste Boniface in retaliation for David Boniface's human rights advocacy

On July 27, 2007, within a month of becoming mayor, defendant assaulted a woman, Ostanie Mersier, over a garbage-collection dispute. RA497-500; RA524-525; RA671-673. Ostanie and the city's sanitation department had disagreed over garbage in front of her house. RA497-498; RA524-525; RA672. Defendant argued with her and slapped her in the face. RA498-500; RA672-73. He arrested her and

took her to a judge's house, accompanied by his KOREGA crew, including his city hall director, Hautefort Bajon.  RA385; RA501-502; RA525.

David Boniface, a human rights advocate trained and certified by the RNDDH (National Human Rights Defense Network), also went to the judge's house.  RA381-382; RA385; RA501.  Defendant demanded that David leave, claiming the dispute "ha[d] nothing to do with" human rights.  RA386; RA525.  But David spoke against him and stated that "everyone has rights."  RA386.  Defendant stormed out and, once outside, threatened David, saying, "Later on I'm coming for you."  RA502-503; RA386-387; RA525-526.  After attempting to follow David, defendant and Hautefort agreed to "deal with [David] later."  RA388-389; RA541.

Later that day, defendant carried out his threat.  He brought a large group of his KOREGA crew to David's house, armed with guns, machetes, and clubs.  RA503-504; RA526.  Defendant and his crew called for David, but David was at church, so they lured his younger brother, Eclesiaste, outside and killed him in David's place.  RA505-506; RA527; RA541.  Defendant said, "As we don't find David, let's shoot Eclesiaste, like, in his place."  RA528.  One witness testified that defendant shot Eclesiaste, and another testified that defendant ordered Hautefort to shoot Eclesiaste.  RA505-506; RA527-528; RA541-542.  After Eclesiaste was shot down, one of defendant's associates dropped a cinderblock on him, crushing his head.  RA506; RA527.  They left Eclesiaste's dead body in the street.  RA506; SA1.

David could not return home that night because defendant's crew "surrounded the church so they could kill [him]" too.  RA389-390.  The next day, David brought his brother's body to the mayor's office and asked defendant to bury him according to local tradition requiring killers to bury their victims.  RA391-392; RA509-511.  Defendant refused and called police to "evacuate" the crowd that had formed; the police did so by hitting the crowd with shotguns.  RA391-392; RA511.

David fled Les Irois because defendant's father publicly threatened "to kill [David] to put an end to this story."  RA392.  David had to live in hiding, separated from his wife and daughters.  RA402.

### 3. *Defendant tortured and ordered the attempted extrajudicial killings of Nissage Martyr and Juders Ysemé*

Less than a year later, defendant violently attacked a radio station founded by a member of an opposing political party.  RA416-428; RA555-557; RA647-648.  The radio station was located at Nissage's house, and Juders, a student, frequented the station.  RA416.  Some of the radio's programming included commentary critical of defendant.  RA779.  Defendant opposed the radio station and attempted to shut it down.  RA549-554; RA573-574; RA648-651.  He called into the radio show and threatened to "come and destroy" the station.  RA674-675; RA417; RA574-575; RA648-649.

On April 8, 2018, defendant fulfilled his threat.  He gathered over 30 of his KOREGA crew, including Villeme Duclona, in front of Nissage's house.  RA418-

420; RA529-530; RA575; RA653-654.  Defendant distributed firearms to the group, keeping a handgun for himself and handing Villeme a shotgun.  RA417-420; RA529-530; RA555-557; RA575-576; RA654-656.

Defendant ordered his crew to "attack" and led the mob inside.  RA656; RA423-424; RA530.  While defendant's crew vandalized the radio station, defendant personally and brutally beat Nissage and Juders.  RA424-426.  Juders heard Nissage screaming that defendant was beating him and had "busted [his] head with [defendant's] gun."  RA424-425.  After beating Nissage for over a minute, defendant moved on to Juders, "grabb[ing] [Juders] by the collar," "beating [him] up," and "hitting [him] all over [his] face, [his] body."  RA424-426.  Defendant then dragged Juders outside and threatened to "put a noose around [his] neck" and "hang [him] on the public plaza."  RA426.  Juders lost count of how many times defendant hit him; he felt like "all of [his] bones were cracking."  RA426-427.

Defendant then ordered Villeme to shoot Juders and Nissage.  RA428 ("Villeme, shoot him.  Shoot Juders."); RA530-531 ("I ask you to shoot Nissage. I'm here for a mission that you need to follow.  I asked you to shoot Nissage."); RA657 ("Shoot Nissage. …. I am telling you to shoot Nissage.").  Villeme complied and shot them with the shotgun defendant had given him, hitting Nissage in the leg and Juders in the head, eyes, arm, and abdomen.  RA428; RA531-532; RA544-545; RA657-658.

Nissage spent four months in the hospital, where his leg was amputated. RA434; RA677; SA3.  He was in "excruciating pain" and thought he would die. RA658; RA676.  He could not work with one leg and felt he was no longer "living with the dignity of a human being" but "as an animal."  SA25; RA677.

Juders spent 23 days in the hospital, undergoing multiple surgeries.  RA431-432; RA532-534.  He was left blind in one eye.  RA432; RA532.  Doctors could not remove all the shotgun pellets, and those remaining in his head and body cause him "a continuing excruciating headache, nonstop" and a feeling "like [his] skin is tearing apart."  RA431-432.  He cannot do simple things like bending over without a headache.  RA432.  Like David, Juders received threats and fled Les Irois because he feared defendant would kill him.  RA455-456.  He also lived in hiding for years, separated from his family.  RA456-457.

### 4. Defendant fled to Massachusetts to escape responsibility for his crimes and, from here, continued to use intimidation and violence to thwart judicial proceedings in Haiti

Because of corruption in Haiti's judicial system and the threat of retributive violence, obtaining justice in Haiti against "powerful people" for human rights violations is difficult.  RA616-635; RA247-251.  Plaintiffs filed complaints with multiple Haitian authorities, but as detailed below, defendant repeatedly thwarted plaintiffs' attempts to seek justice.  RA236-238.

Defendant became a legal permanent resident of the United States in 2008 and fled to Massachusetts in 2009, following his arrest and subsequent release in Haiti pending investigation into the attacks. RA237; RA758; RA799-801. Based here, he traveled to and from Haiti, continuing to act as mayor of Les Irois until 2010. RA237; SA20. He continued to direct his KOREGA crew, who used threats and violence to intimidate plaintiffs and witnesses. RA398-401; RA455-456; RA679. For example, when Haitian authorities conducted a trial on the attacks, defendant called and threatened to "take care" of David. RA398-399. One of defendant's crew barricaded the road to the courthouse to prevent plaintiffs and witnesses from testifying. RA400; RA558-559.

By fleeing to the United States, defendant avoided participating in the 2015 Haitian trial in which his associates were convicted. RA799-RA802. That Haitian court declared defendant a fugitive. RA801-802; RA237-238.

In 2018—after the complaint was filed in this case—defendant returned to Haiti to participate in his own "trial" on the attacks where he was the sole witness. RA803-804. Defendant answered ten questions, none of which addressed the radio station attack or Eclesiaste's killing. RA804-805. The three-page record made no mention of "Eclesiaste," "Boniface," or "radio." RA804-805. Providing no reasoning, the judge declared defendant not guilty. RA803-806 (expert testifying defendant's acquittal was "highly consistent with a corrupt verdict").

Even during this federal litigation, defendant continued to threaten plaintiffs. Defendant went to Les Irois and threatened Nissage's son, Nissandère Martyr: "I will shoot you if you don't calm down." RA679-680.[2] Two men on motorcycles searched for Juders while he and David were in hiding. RA455-456; ECF 78-1, at 2. Recognizing that plaintiffs "reasonably fear for their safety and are concerned about retaliation," the district court entered five protective orders to prevent defendant from harming plaintiffs. ECF 80; ECF 106; ECF 180; ECF 186; ECF 247; *see* ECF 78-1; ECF 87-2; ECF 105; ECF 105-1; ECF 178; ECF 242; ECF 243.

## B. Procedural Background

### 1. Plaintiffs sued defendant under the TVPA for torture, extrajudicial killing, and attempted extrajudicial killing

Plaintiffs sued defendant, asserting TVPA claims for the extrajudicial killing of Eclesiaste and the torture and attempted extrajudicial killings of Nissage and Juders. RA52-56. The TVPA provides a remedy against persons who, "under actual or apparent authority, or color of law, of any foreign nation," "subject[] an individual to torture" or "extrajudicial killing." 28 U.S.C. §1350 note §2(a). Plaintiffs asserted both direct and secondary liability. RA49-51 (secondary theories of conspiracy, aiding and abetting, solicitation, and directing or ordering).

---

[2] Nissage died suddenly one day after defendant was served with the complaint; Nissandère was substituted as plaintiff. Add17-19; ECF 87-2, at 1.

Plaintiffs also asserted two claims not at issue in this appeal. They alleged defendant's attacks constituted crimes against humanity under the Alien Tort Statute ("ATS"), which gives district courts jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. §1350; RA56-58. They also asserted arson claims under Haitian law, alleging that defendant ordered his crew to burn down 36 homes, including those of David, Nissage, and Juders's father. RA58-59; *see, e.g.*, RA394-397.

### 2. The district court denied defendant's motion to dismiss plaintiffs' TVPA claims

Defendant moved to dismiss the complaint, arguing, among other things, that (1) the court lacked subject matter jurisdiction; (2) plaintiffs could not state a TVPA claim by relying on the command-and-control doctrine as a secondary theory of indirect liability[3]; and (3) plaintiffs could not state a claim for attempted extrajudicial killing because the TVPA did not provide for attempt liability. RA69-76.

The court concluded it lacked jurisdiction over plaintiffs' ATS claim because ATS claims must "touch and concern" the territory of the United States. Add10-12 (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 124-125 (2013)). The

---

[3] As the district court noted (Add14-15), plaintiffs never asserted command-and-control as one of their bases for secondary liability, so defendant's argument was misdirected.

court deemed defendant's move to Massachusetts insufficient to satisfy *Kiobel*'s touch-and-concern standard. Add12.

But the court concluded that, independent of the ATS, it had federal-question jurisdiction over the TVPA claims, which arose under a federal statute, and supplemental jurisdiction over the arson claim. Add12-13. It rejected defendant's argument that the TVPA contained the same jurisdictional touch-and-concern requirement as the ATS. Add12-13. *Kiobel* had interpreted the ATS to contain such a requirement by relying on the presumption against extraterritoriality. 569 U.S. at 124-125. Following the Second and Eleventh Circuits, the district court concluded that no such presumption applied here because the TVPA expressly contemplates extraterritorial application. Add12-13.

The court then concluded that plaintiffs adequately pleaded claims for torture, extrajudicial killing, and attempted extrajudicial killing. Add14-15. It concluded that the TVPA permits secondary liability because Congress legislated against a common-law background that permits such liability. Add15. It also concluded that the TVPA permits attempt liability. Add15. It noted that defendant cited no case holding that attempt was not actionable; in contrast, multiple courts, including the Second and Fourth Circuits, had permitted such claims to proceed. Add15.

### 3. *This Court denied interlocutory appeal*

Defendant moved for reconsideration or, alternatively, to certify an interlocutory appeal challenging jurisdiction over the TVPA claims. The district court denied reconsideration but granted certification. Add20-29. This Court denied interlocutory appeal. Add30.

### 4. *The jury found defendant liable for extrajudicial killing, attempted extrajudicial killing, and torture under the TVPA*

A seven-day jury trial was held for the TVPA and arson claims. Plaintiffs presented testimony from plaintiffs David, Juders, and Nissandère; eyewitnesses Osephita Lebon, Mers Ysemé, Vilfranc Larrieux, Jean Denais Laguerre, and Franckel Isme; and experts Robert Maguire and Brian Concannon.

Maguire, a professor and former Senior Advisor on Haiti to the U.S. Department of State, had four decades of expertise on Haiti and had visited Haiti over 125 times. RA329-334. He testified about the role of armed community-based groups and their use of violence to secure power for their patrons. RA334-358; *supra* pp.4-5. Concannon, a lawyer and expert on Haiti's judicial system, testified about the corruption and retaliatory violence that prevented victims of human rights abuses from obtaining justice, as well as his opinion that defendant's 2018 acquittal was "highly consistent with a corrupt verdict." RA803-806; RA616-617; RA618-635.

The remaining witnesses testified to the facts described above (*supra* pp.4-11). Osephita and Mers witnessed Eclesiaste's killing (RA503-506; RA524-528), and Juders, Mers, Vilfranc, Jean, and Franckel witnessed the radio station attack (RA418-428; RA529-532; RA544-545; RA555-557; RA575-576; RA654-658).

Defendant testified on his own behalf and denied any role in either attack. RA754-794. He offered no other witnesses to support his version of events.

The jury found defendant liable for the extrajudicial killing of Eclesiaste and the torture and attempted extrajudicial killings of Nissage and Juders. RA952. It found defendant not liable for arson under Haitian law. RA955. It awarded David $1.75 million, Nissandère $1.25 million, and Juders $1.5 million in compensatory damages, plus a collective $11 million in punitive damages. RA953-954.[4]

### 5. *The district court denied defendant's motions for a new trial, judgment as a matter of law, and remittitur*

Defendant moved for a new trial, judgment as a matter of law, and remittitur, and the district court denied the motions. Add31-63. The court reiterated its prior jurisdictional rulings and interpretation of the TVPA. Add45-47.

---

[4] After the verdict, defendant was indicted for falsely stating on his visa application that he had not ordered or assisted in extrajudicial killings in Haiti. *United States v. Viliena*, No. 1:23-cr-10074 (D. Mass. Mar. 21, 2023). He is awaiting trial.

It rejected defendant's factual challenges to the jury's verdict, noting that defendant mischaracterized the evidence. Add47-54. The court concluded there was ample evidence for the jury to find that defendant conspired with and/or aided and abetted Villeme Duclona in shooting Nissage and Juders (Add49-50); was responsible for Eclesiaste's death, "either as the shooter himself or as the person who ordered the shooting" (Add50-51); and had acted under color of law as mayor (Add51-54). It further concluded that plaintiffs' secondary theories of liability did not require proof that defendant had actual control over Villeme and, regardless, that the evidence supported such a finding. Add47-49.

The court also rejected defendant's objection to Professor Maguire's testimony because Maguire's opinion was reliable, was not unfairly prejudicial, and supported the jury's verdict. Add56-57. Maguire's opinion about armed community-based groups was connected to the claims here because fact witnesses testified that defendant was associated with KOREGA. Add57.

Finally, the court declined to disturb the damage awards. It concluded that the compensatory awards were supported by ample evidence of harm, including David's loss of his brother, Juders's ongoing pain, Nissage's amputated leg, and David's and Juders's separation from their families due to continuing threats. Add61. The court noted that valuing harms like physical suffering was left to the jury's fairness and common sense and did not require calculable evidence. Add61.

It also concluded that punitive damages were permitted under the TVPA and that the amount awarded here was proportional to the compensatory damages and supported by the reprehensibility of killing and torture.  Add61-63.

## SUMMARY OF ARGUMENT

None of defendant's nine arguments justifies disturbing the jury's verdict.

I.  The district court correctly concluded it had federal-question jurisdiction over plaintiffs' TVPA claims because they arose under a federal statute.  Exercising jurisdiction extraterritorially is consistent with both the TVPA and the Constitution. The TVPA's text and legislative history make clear that Congress drafted the statute to apply extraterritorially.  That was a constitutional exercise of both Congress's power (1) under the Offenses Clause to define and punish offenses against the law of nations and (2) under the Necessary and Proper Clause to implement treaties. There is no dispute that torture and extrajudicial killing are among the most serious and universally condemned offenses against the law of nations and prohibited by multiple treaties ratified by the United States.

II.  The district court correctly concluded the TVPA permits secondary liability.  The TVPA's text and legislative history establish that it reaches anyone who "subjects" another to torture, not just those who directly commit torture.  28 U.S.C. §1350 note §2(a).  Other courts of appeals have consistently affirmed TVPA liability under secondary theories like conspiracy.

III.  This Court affords considerable deference to a jury's verdict after trial. Abundant evidence permitted the jury to find that defendant was secondarily liable for extrajudicial killing and attempted extrajudicial killing.  Witnesses testified that defendant gave Villeme Duclona the shotgun and ordered him to shoot Nissage and Juders, and that defendant led an armed group to David's house and either shot or ordered Hautefort Bajon to shoot David's brother.  Only by pretending this evidence does not exist can defendant falsely claim there is no evidence he agreed with or assisted in the attacks.

IV.  The district court correctly concluded defendant's evidentiary arguments about control provide no basis to overturn the jury's verdict because none of plaintiffs' theories require control.

V.  The district court correctly concluded the TVPA permits liability for attempted extrajudicial killing.  Congress incorporated international-law principles into its definitions of torture and extrajudicial killing, including recognition of attempt liability.  Courts have accordingly imposed TVPA liability for attempt.

VI.  Ample evidence supported the jury's finding that defendant acted under color of law.  Both attacks were retaliation for criticism of defendant's actions as mayor, and defendant ordered members of his mayoral staff to carry out the violence.

VII.  The district court did not abuse its discretion in admitting Professor Maguire's expert testimony.  Maguire's opinion was based on four decades of

experience concerning Haiti and extensive research on armed community-based groups. His testimony provided important context helping the jury to understand fact witnesses' testimony about defendant's relationship to his KOREGA crew and its violence.

VIII. The district court did not abuse its discretion in denying remittitur of compensatory damages. The award was supported by overwhelming evidence of lasting physical and mental injuries plaintiffs suffered due to defendant's torture.

IX. The district court did not abuse its discretion in denying remittitur of punitive damages. Courts have repeatedly imposed punitive damages under the TVPA, refuting defendant's assertion that the statute does not permit such damages. Torture and extrajudicial killing are precisely the kind of outrageous conduct that punitive damages were designed to deter. And the damages amount here was reasonable in light of the heinous nature of defendant's attacks.

## STANDARDS OF REVIEW

This Court reviews denials of motions for judgment notwithstanding the verdict de novo, but review is "weighted toward preservation of the jury verdict." *Rodowicz v. Mass. Mut. Life Ins. Co.*, 279 F.3d 36, 41 (1st Cir. 2001). It views the evidence "in the light most favorable to the verdict and may reverse only if no reasonable person could have reached the conclusion arrived at by the jury." *Alvarado-Santos v. Dep't Health of P.R.*, 619 F.3d 126, 132 (1st Cir. 2010). Legal

questions are reviewed de novo.  *Miller v. Nichols*, 586 F.3d 53, 58-59 (1st Cir. 2009).

The Court reviews denials of motions for new trial and remittitur for abuse of discretion.  *Marcano Rivera v. Turabo Med. Ctr. P'ship*, 415 F.3d 162, 171 (1st Cir. 2005).  "A district court should only grant such motions if the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice."  *Id.* (citation omitted).  The Court also reviews decisions to admit expert testimony for abuse of discretion.  *Id.* at 170-71.

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY CONCLUDED IT HAD JURISDICTION OVER PLAINTIFFS' TVPA CLAIMS

The district court's conclusion that it had jurisdiction over plaintiffs' TVPA claims is consistent with statutory text, legislative purpose and history, and the holdings of every court of appeals to consider the question.  Defendant makes no attempt to reconcile his position with these authorities.

### A. Federal Courts Have Federal-Question Jurisdiction Over TVPA Claims

#### 1. Statutory text, legislative history, and precedent establish that 28 U.S.C. §1331 confers jurisdiction over TVPA claims

As the district court correctly concluded (Add12), it had federal-question jurisdiction over plaintiffs' TVPA claims.  28 U.S.C. §1331 provides: "The district courts shall have original jurisdiction of all civil actions arising under the

Constitution, laws, or treaties of the United States." Plaintiffs' TVPA claims "arise under" the laws of the United States because the TVPA, a federal law, "creates the cause of action." *Merrell Dow Pharms. v. Thompson*, 478 U.S. 804, 808 (1986) ("suit arises under the law that creates the cause of action") (citation omitted). That straightforward application of §1331's text resolves the matter. *See FDIC v. Constructora Japimel*, 981 F.3d 66, 69 (1st Cir. 2020) ("When a statute's text is unambiguous, 'judicial inquiry is complete.'") (citation omitted).

This conclusion is confirmed by legislative history and unanimous appellate precedent. Congress stated courts would exercise jurisdiction over TVPA claims under their Article III authority to hear claims "'arising under' the 'law of the United States.'" S. Rep. 102-249, at 5-6; *id.* at 6 n.6 (noting intent to "provide[] Federal district courts jurisdiction over these suits").[5]

Courts have consistently followed that directive both before and after *Kiobel*. The Second, Fourth, and Eleventh Circuits have held that §1331 confers federal-question jurisdiction over TVPA claims, and no court of appeals has disagreed. *Doe v. Drummond*, 782 F.3d 576, 601 (11th Cir. 2015) ("Our jurisdiction to consider Plaintiffs' TVPA claims is grounded … in 28 U.S.C. §1331, the general federal

---

[5] Defendant's claim that this case does not satisfy Article III's diversity-jurisdiction requirements (Def.Br.14-15) is irrelevant. Jurisdiction under §1331 is constitutional under Article III's separate "Arising Under" Clause. U.S. Const. art. III, §2, cl.1.

question jurisdiction statute."); *Yousuf v. Samantar*, 552 F.3d 371, 375 (4th Cir. 2009), *aff'd*, 560 U.S. 305 (2010); *Arce v. Garcia*, 434 F.3d 1254, 1258 n.8 (11th Cir. 2006); *Kadic v. Karadžić*, 70 F.3d 232, 246 (2d Cir. 1995). District courts in this and other circuits have long exercised such jurisdiction. *E.g.*, *Xuncax v. Gramajo*, 886 F. Supp. 162, 178 (D. Mass. 1995). If this Court adopted an atextual interpretation to decline jurisdiction here, it would create a circuit split and upset longstanding practice.

### 2. Defendant's attempt to limit TVPA claims to ATS jurisdiction fails

Defendant offers no explanation how creating an exception to federal-question jurisdiction for TVPA claims could be reconciled with §1331's text. He dismisses as "tautology" the bedrock principle that statutory interpretation adheres to the text. Def.Br.9. And neither the legislative history nor sparse cases he cites suggest that the ATS must be the sole basis for jurisdiction over TVPA claims.

#### a. Defendant's incomplete recounting of the TVPA's legislative history contains no suggestion that TVPA claims are limited to ATS jurisdiction

Defendant paints an incomplete picture of the TVPA's legislative history. The TVPA's purpose was to "mak[e] sure that torturers and death squads will no longer have a safe haven in the United States." S. Rep. 102-249, at 3. One way Congress furthered that purpose was by creating an express cause of action for torture and extrajudicial killing, resolving the confusion created by a D.C. Circuit

judge's concurrence questioning whether such an action existed under the ATS. Def.Br.11-13. But that was only one of the ways the TVPA accomplished its purpose.

Congress also stated that the TVPA goes beyond the ATS in several respects. Congress intended the TVPA to extend relief to U.S. citizens. S. Rep. 102-249, at 5. It also intended the TVPA to reach extraterritorially to "torture committed abroad." *Id.* at 4; *id.* at 5 (remedy for "U.S. citizens who may have been tortured abroad"); H.R. Rep. 102-367, at 3 (1991); *see infra* p.26-28. And it intended the TVPA to implement the United States' international obligations under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture"), which was ratified a year before the TVPA's 1991 enactment. S. Rep. 102-249, at 3; H.R. Rep. 102-367, at 3. The Convention did not exist when the ATS was passed in 1789.

Defendant identifies no statement from Congress suggesting the ATS would be the sole basis for jurisdiction over TVPA claims. That would thwart the TVPA's broader purposes. For example, even though Congress created a remedy for U.S. citizens, it would be impossible for them to bring a TVPA claim if they had to establish jurisdiction under the ATS, which only allows claims by aliens. *Compare* 28 U.S.C. §1350 (ATS provides jurisdiction only over "civil action by an alien"), *with* S. Rep. 102-249, at 5; *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1263-64

(11th Cir. 2009) ("The TVPA is broader than the ATS in that the TVPA allows citizens, as well as aliens, to seek remedy in federal court for official torture."), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012). Congress cannot have intended such a nonsensical scheme. *See United States v. Articles of Drug Consisting of Following: 5,906 Boxes*, 745 F.2d 105, 116 (1st Cir. 1984) (refusing to "impute to Congress a purpose to paralyze with one hand what it sought to promote with the other") (citation omitted).

### b. Defendant identifies no case holding that TVPA claims cannot be brought under federal-question jurisdiction

Neither of the two cases defendant cites held that TVPA claims cannot invoke federal-question jurisdiction. In fact, both reinforce that such jurisdiction is proper.

Defendant quotes inapposite language from *Merrell Dow*, which addressed a different question at the "outer reaches of §1331"—whether federal-question jurisdiction extends to state-law claims that incorporate federal standards. 478 U.S. at 810; Def.Br. 9-10. That question has no bearing on plaintiffs' federal-law claims. Emphasizing this distinction, the Supreme Court stated the "vast majority" of federal-question-jurisdiction cases "are those in which federal law creates the cause of action"—like the TVPA here and unlike *Merrell Dow*. 478 U.S. at 808.

Defendant's citation to *Kadic* similarly fails. Def.Br.13. He quotes out of context the part of the Second Circuit's decision declining to decide a different question not at issue here—whether §1331 could establish jurisdiction over claims

24

"implied by international law" but "not specifically authorized by statute." 70 F.3d at 246. *Kadic* recognized the question was different for TVPA claims, which are authorized by statute. *Id.* It held TVPA plaintiffs could pursue their claims "under the jurisdiction conferred by the Alien Tort Act *and also under the general federal question jurisdiction of section 1331.*" *Id.* (emphasis added). Either sufficed.[6]

In sharp contrast to defendant's absence of authority limiting TVPA claims to the ATS, numerous courts have treated jurisdiction over TVPA claims and ATS claims independently. *E.g.*, *Drummond*, 782 F.3d at 601 ("even when claims brought under the ATS are unsuccessful, Plaintiffs' TVPA claims may potentially proceed on their own merit"); *Chowdhury v. Worldtel Bangl. Holding, Ltd.*, 746 F.3d 42, 45 (2d Cir. 2014) (finding no jurisdiction over ATS claim but affirming TVPA liability); *Warfaa v. Ali*, 811 F.3d 653, 661 (4th Cir. 2016) (finding no ATS jurisdiction but allowing TVPA claim to proceed).

---

[6] Defendant correctly abandons his reliance on an unpublished district court decision, which dismissed a TVPA claim for lack of jurisdiction under the ATS without considering whether federal-question jurisdiction was available. *Chen Gang v. Zhao Zhizhen*, No. 04-cv-1146, 2013 WL 5313411, at *4 (D. Conn. Sept. 20, 2013). That decision mistakenly cited *Kadic*, even though *Kadic* holds that TVPA claims can invoke federal-question jurisdiction. *Kadic*, 70 F.3d at 246. The *Chen Gang* court changed course in a subsequent decision in the same case. 2018 WL 4693949, at *2 (D. Conn. Sept. 30, 2018) ("Unlike the ATS, the TVPA confers jurisdiction on federal courts over wholly extraterritorial claims."), *aff'd*, 799 F. App'x 16, 18 (2d Cir. 2020).

## B. Jurisdiction Over TVPA Claims Applies Extraterritorially

### 1. *Statutory text, legislative history, and precedent establish that the TVPA applies extraterritorially*

Having established jurisdiction, the district court correctly held that the TVPA applies extraterritorially to plaintiffs' claims. Add12. Again, statutory text, legislative history, and precedent all compel that conclusion.

The TVPA's express textual references to foreign authority, foreign territory, and foreign conduct make clear that the statute reaches torture and extrajudicial killing abroad. The TVPA imposes liability on individuals acting "under actual or apparent authority, or color of law, *of any foreign nation*." 28 U.S.C. §1350 note §2(a) (emphasis added). It requires plaintiffs to exhaust remedies "in the place in which the conduct giving rise to the claim occurred" before suing here. *Id.* §2(b). That language is "more naturally understood to address primarily conduct occurring in the territory of foreign sovereigns." *Chowdhury*, 746 F.3d at 51.

Legislative history reinforces that Congress intended the TVPA to reach extraterritorially. *Drummond*, 782 F.3d at 602 ("Although the text of the TVPA alone is sufficient to illustrate the Act's intended extraterritoriality, the legislative history fully supports this conclusion."). Congress stated it was "providing a civil cause of action in U.S. courts for torture committed abroad." S. Rep. 102-249, at 3-4; *id.* at 5 (remedy for U.S. citizens "tortured abroad"). And it explained the need for such a remedy: "Judicial protection against flagrant human rights violations is

often least effective in those countries where such abuses are most prevalent." *Id.* at 3; H.R. Rep. 102-367, at 3. Unless the TVPA applied extraterritorially, many torture victims would receive no relief.

For these reasons, the Second and Eleventh Circuits held the TVPA applies extraterritorially. *Chowdhury*, 746 F.3d at 45-46 (Bangladeshi citizen tortured by Bangladeshi citizen in Bangladesh); *Drummond*, 782 F.3d at 580-81 (Colombian citizens killed in Colombia); *see Kiobel*, 569 U.S. at 125 (Kennedy, J., concurring) (TVPA addressed "human rights abuses committed abroad"). Other courts, without discussing the issue explicitly, have also exercised jurisdiction over extraterritorial TVPA claims. *E.g.*, *Warfaa*, 811 F.3d at 657 (foreign plaintiff tortured by foreign defendant in Somalia); *Xuncax*, 886 F. Supp. at 169-71 (Guatemalans tortured by Guatemalan military in Guatemala). No court of appeals has denied jurisdiction over TVPA claims due to extraterritoriality.

### 2. *No presumption against extraterritoriality applies because, as defendant concedes, Congress clearly indicated that the TVPA applies extraterritorially*

Defendant does not dispute any of the above analysis. In fact, he correctly concedes that Congress intended the TVPA to apply extraterritorially. Def.Br.16-17; Add25 (district court relying on defendant's concession). Defendant's discussions of *Kiobel*'s touch-and-concern standard and the presumption against extraterritoriality are thus irrelevant. Def.Br.16-18.

The presumption against extraterritoriality is an interpretive canon that assumes Congress did not intend a statute to reach foreign conduct unless there is "clear indication of an extraterritorial application." *Kiobel*, 569 U.S. at 115 (citation omitted). *Kiobel* and other cases defendant cites applied the presumption to statutes, like the ATS, which lack that "clear indication." *Kiobel*, 569 U.S. at 115-16; *United States v. Hayes*, 653 F.2d 8, 15 (1st Cir. 1981) (21 U.S.C. §841(a)(1) has "no such express statement"); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 443 (2d Cir. 1945) ("assum[ing]" Congress did not "cho[o]se to" reach foreign conduct); *United States v. Cafiero*, 242 F. Supp. 2d 49, 53-55 (D. Mass. 2003) (following *Hayes*).

But that presumption has no application to the TVPA, which—as defendant concedes (Def.Br.16-17)—reflects Congress's express intent to give the statute extraterritorial effect. *Drummond*, 782 F.3d at 602 (TVPA "itself gives 'clear indication of an extraterritorial application'") (citation omitted); *Chowdhury*, 746 F.3d at 50-51 (rejecting argument to extend *Kiobel*'s reasoning from ATS to TVPA).

## C. The TVPA Is Constitutional

Unable to dispute the TVPA's extraterritoriality, defendant attempts to turn a canon of statutory interpretation into a constitutional rule restricting Congress's ability to legislate. But nothing in the Constitution prohibited Congress from passing the TVPA nor prevents this Court from applying it as Congress intended.

### 1. Congress had authority to enact the TVPA under Article I's "Offenses" and "Necessary and Proper" Clauses

As the district court correctly concluded (Add26), the TVPA was a constitutional exercise of Congress's Article I power to "define and punish … Offences against the Law of Nations." U.S. Const. art I, §8, cl.10. "Offences against the Law of Nations" encompasses "conduct that the United States has an international obligation to prevent," including violations of treaties and customary international law. *Restatement (Fourth) of Foreign Relations Law* §403 (Am. L. Inst. 2018) ("*Restatement*"). Congress further has authority under the Necessary and Proper Clause to implement treaties entered into under Article II, even beyond its other Article I powers. U.S. Const. art. I, §8, cl.18; *see Missouri v. Holland*, 252 U.S. 416, 432 (1920); *United States v. Mikhel*, 889 F.3d 1003, 1024 (9th Cir. 2018).

Whatever the outer bounds of "Offences against the Law of Nations," defendant does not dispute that torture and extrajudicial killing are among such offenses—and thus within Congress's legislative authority. Def.Br.14. They are among the most heinous and universally condemned human rights abuses. As Congress recognized, quoting the Second Circuit in *Filartiga v. Pena-Irala*, 630 F.2d 876, 884 (2d Cir. 1980), "official torture is now prohibited by the law of nations." S. Rep. 102-249, at 3 (citation omitted); H.R. Rep. 102-367, at 2-3 ("The prohibition against summary executions has acquired a similar status.").

This universal consensus is reflected in multiple international treaties ratified by the United States that prohibit torture and extrajudicial killing. *See* Convention Against Torture, arts. 2, 14, G.A. Res. 39/46, Dec. 10, 1984, 1465 U.N.T.S. 85; Universal Declaration of Human Rights, art. 5, G.A. Res. 217A (III), Dec. 10, 1948, U.N. Doc. A/810 at 71; Int'l Covenant on Civil and Political Rights, arts. 6-7, G.A. Res. 2200A (XXI), Dec. 16, 1966, 999 U.N.T.S. 171. In particular, Article 14 of the Convention Against Torture requires states to "ensure in [their] legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation." Convention Against Torture, *supra*, art. 14. Congress intended the TVPA to fulfill this obligation to "adopt measures to ensure that torturers within their territories are held legally accountable for their acts." S. Rep. 102-249, at 3; *id.* at 5-6 (invoking Offenses Clause authority); H.R. Rep. 102-367, at 3.

In addition to these treaty obligations, torture and extrajudicial killing fall within a class of "the most serious offenses about which a consensus has arisen for the existence of universal jurisdiction." *Restatement* §407, Reporter's Note 2; *id.* §413 (including, *e.g.*, "genocide, crimes against humanity, war crimes, certain acts of terrorism, piracy, the slave trade, and torture"). International law recognizes that, over this category, "all states may exercise jurisdiction based on a universal concern in suppressing [these] offenses," "even if no specific connection exists between the

United States and the persons or conduct being regulated." *Id.* §407, Reporter's Note 2, §402(1)(f); *see Kiobel*, 569 U.S. at 136-39 (Breyer, J., concurring in judgment).

The TVPA is just one of many statutes Congress has passed condemning heinous offenses against the law of nations occurring abroad as long as the perpetrator—like defendant here—is later found in the United States. S. Rep. 102-249, at 5 & n.3 (TVPA); *e.g.*, 18 U.S.C. §1091(e)(2)(D) (genocide); 18 U.S.C. §1116(c)(3) (murder of foreign officials or internationally protected persons); 18 U.S.C. §1201(e)(3) (kidnapping of internationally protected persons); 18 U.S.C. §1596(a)(2) (slavery); 18 U.S.C. §1651 (piracy); 18 U.S.C. §2332f(b)(2)(C) (terrorist bombing); 18 U.S.C. §2332i(b)(4) (nuclear terrorism); 18 U.S.C. §2340A(b)(2) (torture); 49 U.S.C. §46502(b)(2)(C) (aircraft piracy); *see United States v. Smith*, 680 F.2d 255, 257-58 (1st Cir. 1982) ("universal" jurisdiction requires only physical custody of defendant).

### 2. *Defendant's constitutional challenge is baseless and threatens numerous statutes beyond the TVPA*

Defendant identifies no court that has held Congress violated the Constitution by enacting the TVPA with extraterritorial reach. Without supporting authority, he fails to root his argument in any recognized constitutional doctrine. And he fails to contend with the far-reaching consequences of adopting his position.

### a. Defendant fundamentally misunderstands comity, which is a prudential judicial doctrine, not a constitutional limit on Congress

Defendant primarily couches his argument in terms of "comity" (Def.Br.19-20), but comity has no constitutional status. It is a prudential judicial doctrine allowing courts to consider potential international conflicts when deciding whether, "*in [their] discretion*, [to] decline to exercise subject matter jurisdiction that [they] already possess[]." *McBee v. Delica Co.*, 417 F.3d 107, 111 (1st Cir. 2005) (emphasis added). Comity is not a binding rule that deprives courts of jurisdiction, let alone imposes constitutional limits on Congress. *Id.* at 121; *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 798 n.24 (1993); *United States v. Nippon Paper Indus. Co.*, 109 F.3d 1, 8 (1st Cir. 1997) ("Comity is more an aspiration than a fixed rule, more a matter of grace than a matter of obligation.").

Defendant disclaims any request that this Court exercise discretion to abstain under prudential comity principles. Def.Br.20. Instead, he asks the Court to create a new constitutional comity rule requiring courts to weigh U.S. and foreign interests in order to declare an act of Congress unconstitutional. Def.Br.18-20.

There is no constitutional basis or precedent for such a rule. Defendant cites Justice Scalia's *dissent* in *Hartford Fire Insurance Co. v. California*, but the majority rejected his view and held that comity did not preclude jurisdiction over foreign conduct alleged to violate the Sherman Act. 509 U.S. at 795-99 & n.24. Regardless,

even Justice Scalia's dissent offers defendant no support. Justice Scalia recognized that Congress has authority to legislate extraterritoriality, even beyond customary-international-law limits. *Id.* at 812-14. He viewed comity not as a restriction on Congress, but as another canon of statutory construction (akin to the presumption against extraterritoriality) to help courts determine whether Congress had used its authority to legislate extraterritorially. *Id.* at 814-15. As discussed above (*supra* pp.26-28), there is no dispute that Congress has done so in the TVPA, so no "comity" canon would apply even if Justice Scalia's dissent were the law.

The other cases defendant cites fare no better. One established the act-of-state doctrine, which is not at issue here. *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). The others, like Justice Scalia's dissent, addressed statutory construction, not constitutional limits on Congress's authority to legislate. *Am. Banana Co. v. United Fruit Co.*, 213 U.S. 347, 357 (1909); *see supra* p.28.

The absence of authority for a constitutional comity rule is unsurprising because such a rule would negate established comity-based doctrines. If extraterritoriality were unconstitutional, prudential rules like comity-based abstention and canons like the presumption against extraterritoriality would be superfluous. The very existence of such principles implicitly recognizes Congress's power to legislate extraterritorially and helps courts determine when Congress has used that power. *Kiobel*, 569 U.S. at 117 (Congress "can indicate that it intends

federal law to apply to conduct occurring abroad"); *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010) ("This principle represents a canon of construction, or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate[.]").

> **b.** **Defendant identifies no authority establishing that Congress's power is limited by international law**

Defendant's remaining arguments sound in the "law of nations" (Def.Br.14), but there is no free-floating constitutional requirement that Congress abide by international law.  To the contrary, "in enacting statutes, Congress is not bound by international law." *United States v. Pinto-Mejia*, 720 F.2d 248, 259 (2d Cir. 1983), *as amended on den. of reh'g en banc* (Feb. 15, 1984).  "If it chooses to do so, it may legislate with respect to conduct outside the United States, in excess of the limits posed by international law[,]" and "a United States court would be bound to follow the Congressional direction unless this would violate the due process clause[.]"  *Id.* (citation omitted); *Restatement* §402, cmt. b ("[A]n unambiguous federal statute that contravened customary-international-law limits on jurisdiction to prescribe would be controlling as a matter of federal law.").

Defendant appears to assume that international law's territorial requirements are implicit in the Offenses Clause, but he fails to explain why.  Def.Br.13-14. Nothing in the clause's text imposes any geographical limit.  Instead, it gives Congress power to "define" offenses against the law of nations, recognizing

Congress's primacy. *See United States v. Smith*, 18 U.S. (5 Wheat.) 153, 159 (1820) ("there is a peculiar fitness in giving the power to define as well as to punish" because offenses against the law of nations cannot "be completely ascertained and defined in any public code recognized by the common consent of nations").

Defendant cites only *The Federalist No. 42* (James Madison), which mentions no territorial limits on the Offenses Clause, and a student note, which acknowledged it was advocating for an approach not adopted by courts. Def.Br.13-14; Michael Morley, Note, *The Law of Nations and the Offenses Clause of the Constitution*, 112 Yale L.J. 109, 139-40, 142 (2002). Both were concerned with different issues. *The Federalist No. 42* addresses the relationship between the federal and state governments, not the United States and foreign sovereigns. The student note argues that the Offenses Clause cannot substitute for the Commerce Clause in permitting legislation over domestic activity of U.S. citizens. Morley, *supra*, at 111.

Moreover, even if international law somehow territorially limited Congress's Offenses Clause authority, it would not limit the President's Article II power to make treaties like the Convention Against Torture, or Congress's Necessary-and-Proper-Clause authority to implement those treaties, as the TVPA did. *Missouri*, 242 U.S. at 432-33.

### c.    The TVPA is fully consistent with the law of nations

Regardless, even if the Offenses Clause implied international law's territorial-jurisdiction requirements, the TVPA meets those requirements.  As explained above (*supra* pp.29-31), international law permits the TVPA's extraterritorial application under both treaty-based jurisdiction and universal jurisdiction over "offenses of universal concern"—like torture and extrajudicial killing.  *Restatement* §413 & cmt. b.

Defendant identifies no source of international law that is supposedly violated.  Def.Br.14.  That alone defeats his argument.  He quotes out of context *The Federalist No. 42*'s general language encompassing all of Congress's foreign-facing powers.  Def.Br.14.  Nowhere did Madison suggest that the law of nations only applies to "conduct of independent states towards each other."  *Contra* Def.Br.14.  That is plainly refuted by longstanding international law that states may universally punish piracy.  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 720 (2004); U.S. Const. art. I, §8, cl.10 ("Piracy" Clause).  Nor did Madison suggest that the law of nations was "unchanging and immutable"—a view inconsistent with the Supreme Court's prior reasoning.  *Contra* Def.Br.14; *see Sosa*, 542 U.S. at 732 ("the torturer has become—like the pirate and slave trader before him—*hostis humani generis*, an enemy of all mankind") (quoting *Filartiga*, 630 F.3d at 890); *id.* at 728-32.

In fact, Congress noted the TVPA's compliance with the law of nations by comparing it to other nations' "legislation allowing for civil suits against torture occurring abroad."  S. Rep. 102-249, at 5 (referencing cases from Germany, the Philippines, and Belgium) (citation omitted); *Kiobel* 569 U.S. at 136-38 (Breyer, J., concurring in judgment) (noting international prevalence of universal-jurisdiction statutes, both civil and criminal).  As of 2011, at least 85 U.N. member-states' laws permitted universal jurisdiction over torture, and that number has likely increased since.  Amnesty Int'l, *Universal Jurisdiction: A Preliminary Survey of Legislation Around the World* 13 (2011).[7]  The verdict here is thus consistent with international law and practice.  *E.g.*, *Ould Dah v. France*, App. No. 13113/03, European Court of Human Rights (Mar. 17, 2009) (affirming French court's exercise of universal jurisdiction over Mauritanian national who tortured Mauritanian victims in Mauritania).[8]

> **d.      Upholding the TVPA would not grant Congress limitless authority over foreign states' domestic affairs**

Defendant's exaggerated claim that affirmance would lead to limitless U.S. jurisdiction (Def.Br.19-20) is false.  Other limits prevent such far-fetched scenarios.

---

[7] https://www.amnesty.org/en/wp-content/uploads/2021/06/ior530042011en.pdf.

[8] https://hudoc.echr.coe.int/eng#{%22itemid%22:[%22001-113014%22]}.

TVPA claims are rare because the statute's requirements are satisfied only in egregious cases like this. *Drummond*, 782 F.3d at 608 n.43, 611. In addition to proving defendant committed torture or extrajudicial killing, TVPA plaintiffs must satisfy the color-of-law requirement, exhaustion of local remedies, and statute of limitations. 28 U.S.C. §1350 note §2(a)-(c).

Nor would affirmance allow Congress to open U.S. courts to any foreign-based lawsuits—*e.g.*, for "traffic safety in Haiti," the far-fetched scenario defendant posited below. RA170. Congress's powers are enumerated in Article I, which does not reach most foreign conduct (like traffic-law violations). Even when Congress's laws give rise to federal-question jurisdiction, courts must still have personal jurisdiction over defendants, which requires "minimum contacts" with the forum. S. Rep. 102-249, at 7 ("Thus, this legislation will not turn the U.S. courts into tribunals for torts having no connection to the United States whatsoever."). Defendant, for example, is subject to jurisdiction because he escaped to the United States. Finally, even when courts have jurisdiction, doctrines like prudential comity (*supra* p.32) and *forum non conveniens* allow dismissal to protect foreign-relations concerns.

Conversely, it is not plaintiffs' argument but defendant's that has far-reaching consequences. Defendant's argument, if accepted, would mean that, since the statute's enactment, courts have repeatedly violated international law and the

Constitution by hearing extraterritorial TVPA claims. *See supra* pp.25-27. It would mean not only that the TVPA is unconstitutional, but that numerous other statutes punishing genocide, slavery, terrorism, nuclear terrorism, etc. are too. *See supra* p.31. Without compelling authority, this Court should not upend so much of the U.S. Code.

> ### e. *Defendant ignores the United States' significant interest in fulfilling its international obligations and ensuring it does not become a safe haven for torturers*

Defendant ends by mischaracterizing this case as "a matter in which the United States has no interest." Def.Br.19-20 (emphasis omitted). His balancing of U.S. and Haitian interests is flawed and impermissibly substitutes his judgment for Congress's.

In enacting the TVPA, Congress determined that the United States has a significant interest in complying with its treaty obligations under the Convention Against Torture and ensuring it does not become a "safe haven" for torturers. S. Rep. 102-249, at 3. That interest is paramount here, where defendant fled to the United States to avoid Haitian judicial proceedings. He used Massachusetts as a "safe haven" to continue acting as mayor, directing his KOREGA crew, and threatening plaintiffs to prevent them from seeking justice. *See supra* pp.9-11. That is exactly what Congress intended to prevent.

Defendant's assessment of Haitian interests is also problematic. Plaintiffs presented abundant evidence demonstrating that retaliatory violence, corruption, and ineffective institutions have rendered judicial remedies in Haiti futile. RA616-635; RA247-251 (district court's summary-judgment determination of futility, which defendant does not challenge). Defendant's purported analogy to Haitian courts adjudicating torture of U.S. citizens in the United States (Def.Br.19) is thus inapt. Regardless, balancing U.S. and foreign interests is Congress's responsibility, not defendant's or this Court's.

## II. THE DISTRICT COURT CORRECTLY CONCLUDED THE TVPA PERMITS SECONDARY LIABILITY

### A. Statutory Text, Legislative History, And Precedent Establish That The TVPA Permits Secondary Liability

As the district court correctly concluded (Add14-15), the TVPA permits liability under both direct and secondary (indirect) theories, including those asserted by plaintiffs: conspiracy, aiding and abetting, solicitation, directing or ordering.

The Supreme Court recognized that "the TVPA contemplates liability against officers who do not personally execute the torture or extrajudicial killing." *Mohamad*, 566 U.S. at 458. Accordingly, the Second, Ninth, and Eleventh Circuits agree that secondary liability is available under the TVPA. *Drummond*, 782 F.3d at 605-06; *Chowdhury*, 746 F.3d at 52-53; *Doe I v. Cisco Sys.*, 73 F.4th 700, 741-44

(9th Cir. 2023); *Cabello v. Fernández-Larios*, 402 F.3d 1148, 1157-58 (11th Cir. 2005).  This Court should do the same.

The TVPA imposes liability on anyone who "subjects an individual to torture."  28 U.S.C. §1350 note §2(a).  "Subject" means "to cause or force to undergo or endure (something unpleasant, inconvenient, or trying)."  *Cisco*, 73 F.4th at 742 (quoting *Merriam-Webster* [9]).   If Congress intended to prohibit only directly committing torture, "it could have used the term 'tortures' or 'inflicts torture.'"  *Id.* Instead, "subjects" covers "not only individuals who directly torture another but also those who in some respect *cause* another to undergo torture."   *Id.* (emphasis in original).

This textual analysis is reinforced by the TVPA's purpose and legislative history.  Congress stated it intended to encompass "persons who ordered, abetted, or assisted in the torture."  S. Rep. 102-249, at 8.  That was necessary to fulfil the United States' treaty obligations because the Convention Against Torture imposes accomplice liability for "complicity or participation in torture."  Convention Against Torture, *supra*, art. 4; *Cisco*, 73 F.4th at 743.  Congress additionally recognized that international law extends liability for torture and killing to "anyone with higher authority who authorized, tolerated or knowingly ignored those acts."  S. Rep. 102-

---

[9] https://www.merriam-webster.com/dictionary/subject.

249, at 8-9.  By drawing from international-law definitions, Congress gave the TVPA the same reach.  *Id.* at 6; H.R. Rep. 102-367, at 4-5.

**B.  Defendant's Argument For A Presumption Against Secondary Liability Fails**

Defendant fails to address the above authority.  Instead, he seeks a default rule that secondary liability is precluded unless expressly authorized.  Def.Br.22-24.  The Ninth Circuit already rejected that argument, and rightly so.  *Cisco*, 73 F.4th at 744.

*Central Bank of Denver v. First Interstate Bank* created no default rule against secondary liability.  511 U.S. 164, 183-84 (1994).  The Supreme Court held §10(b) of the Securities Exchange Act does not permit aiding-and-abetting liability, where "nothing in the text or history of §10(b) even implies that aiding and abetting was covered by the statutory prohibition on manipulative and deceptive conduct."  *Id.* at 183.  The Court refused to "create a presumption favoring the inclusion of aiding and abetting liability in a civil statute, but it did not adopt the opposite presumption" either.  *Cisco*, 73 F.4th at 744.  *Central Bank* instructs courts to consider each statute's particular text and history.  511 U.S. at 182-84.  Here, unlike the Securities Exchange Act, the TVPA's text and history make secondary liability available.

Defendant cites no appellate court adopting his position, only a single district court that failed to consider the term "subjects" or Congress's express statements.  *Mastafa v. Chevron Corp.*, 759 F. Supp. 2d 297, 300 (S.D.N.Y. 2010).  The Second Circuit did not reach its erroneous reasoning and affirmed on different grounds.

*Mastafa v. Chevron Corp.*, 770 F.3d 170, 177-80 (2d Cir. 2014) (affirming dismissal because no TVPA liability against corporations).

## III. THE JURY'S VERDICT WAS SUPPORTED BY EVIDENCE OF DEFENDANT'S SECONDARY LIABILITY

Defendant's appeal does not challenge the jury instructions on secondary liability, only the evidence supporting the verdict. Def.Br.23-25. This Court's review of a jury verdict is deferential, especially after a 7-day trial with live testimony. The Court must view the evidence "in the light most favorable to the verdict and may reverse only if no reasonable person could have reached the conclusion arrived at by the jury." *Alvarado-Santos*, 619 F.3d at 132.

Here, the question is not close. The district court correctly concluded there was ample evidence for the jury to find defendant secondarily liable. Add49-50. Defendant's bald claim that there was "no evidence" (Def.Br.24) misstates the record and ignores the extensive evidence that defendant directed his associates to shoot Eclesiaste, Nissage, and Juders.

### A. Extensive Evidence Supports The Finding That Defendant Was Secondarily Liable For Attempted Extrajudicial Killings Of Nissage And Juders

The jury heard overwhelming evidence supporting a finding that defendant knowingly and substantially assisted (aiding-and-abetting liability) and/or agreed with (conspiracy) Villeme Duclona in the attempted extrajudicial killings of Nissage and Juders. *See Cabello*, 402 F.3d at 1158-59. Juders, Nissandère, Mers, Vilfranc,

Jean, and Franckel collectively and consistently testified that: (1) defendant opposed the radio station and threatened to destroy it; (2) defendant gathered 30 men from his KOREGA crew, including Villeme, to attack the radio station; (3) defendant obtained and distributed firearms to his crew, including Villeme; (4) defendant ordered and led his crew to attack the radio station; (5) defendant personally beat Nissage and Juders; (6) defendant ordered an associate to restrain Juders and threatened to hang him; (7) defendant ordered Villeme to shoot Juders and Nissage; and (8) Villeme obeyed and shot them. RA417-428; RA529-532; RA544-545; RA548-557; RA573-576; RA648-658; RA674-675.

Defendant's claim that he was merely present but had no knowledge of the acts or agreement with Villeme (Def.Br.23-24) flies in the face of overwhelming evidence. His only argument is that plaintiffs' counsel in closing described him as a "petty tyrant" (Def.Br.24), but that does not contradict his knowledge or participation in the attempted extrajudicial killing.

## B.  Extensive Evidence Supports The Finding That Defendant Was Liable For The Extrajudicial Killing Of Eclesiaste

Defendant's secondary-liability arguments are either non-specific or focused solely on the radio station attack (Def.Br.21-25), so any argument challenging his liability for the extrajudicial killing of Eclesiaste is waived. *Morales-Tañon v. P.R. Elec. Power Auth.*, 524 F.3d 15, 19 (1st Cir. 2008) (argument waived if "not accompanied by developed argumentation") (citation omitted).

44

Regardless, the jury heard ample evidence supporting a finding that defendant knowingly assisted and/or agreed to kill Eclesiaste. Collectively, David, Osephita, Mers, and Jean testified that: (1) defendant was angered by David's advocacy and threatened him, "Later on I'm coming for you"; (2) defendant agreed with Hautefort to "deal with [David] later"; (3) defendant brought his armed KOREGA crew to David's house to retaliate; and (4) they lured Eclesiaste outside and killed him. RA387-389; RA502-506; RA525-528; RA541-542; RA568-570. Mers testified that defendant ordered Hautefort to shoot Eclesiaste: defendant said, "As we don't find David, let's shoot Eclesiaste, like, in his place." RA527-528; RA541-542.

Alternatively, the jury could have found defendant directly liable. Osephita testified that defendant shot Eclesiaste (RA505-06), and, viewing the evidence "in the light most favorable to the verdict," the jury could have credited her testimony. *Alvarado-Santos*, 619 F.3d at 132. Either way, the evidence establishes that defendant was far more than just "presen[t] at the scene." *Contra* Def.Br.30-31.

Defendant does not challenge or discuss any of this evidence. Def.Br.21-25.

### C. Defendant does not dispute his direct liability or his secondary liability under a solicitation theory

Defendant challenges only aiding-and-abetting and conspiracy liability; he does not dispute that sufficient evidence supports at least one of plaintiffs' other secondary theories: solicitation. Def.Br.21-25. Nor does he dispute that evidence supports direct liability for the torture of Nissage and Juders and extrajudicial killing

of Eclesiaste.  Def.Br.21-25.  Where the evidence overwhelmingly supports liability regardless of the theory, this Court's "generous[]" harmless error standard applies. *See Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21, 30 (1st Cir. 2004) (this Court "generously applie[s]" harmless error where it is "reasonably sure that the jury in fact relied upon a theory with adequate evidentiary support") (emphasis omitted); *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics*, 552 F.3d 47, 73 (1st Cir. 2009).

## IV.  THE DISTRICT COURT CORRECTLY CONCLUDED CONTROL WAS NOT REQUIRED

Throughout this litigation, defendant has continually challenged a theory plaintiffs never raised.  Add14-15; Add48.  He argues he lacked "ability to control" Villeme Duclona, but control is not an element of any secondary-liability theory plaintiffs advanced.  *See Cabello*, 402 F.3d at 1157-59 (conspiracy and aiding-and-abetting liability, without command responsibility); *Jane W. v. Thomas*, 560 F. Supp. 3d 855, 889 (E.D. Pa. 2021) (directing or ordering).  Instead, defendant cites a case requiring control for command-responsibility liability, which plaintiffs have never asserted.  *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1290-92 (11th Cir. 2002).  The command-responsibility theory in that case differs from plaintiffs' four theories because it imposes liability on defendants for *failing to* control subordinates who commit human rights abuses, rather than *affirmatively* assisting, agreeing, ordering, or solicitating such abuses.  *Id.* at 1289.

Even if control were required, there was abundant evidence that defendant was able to control Villeme. As the district court correctly concluded, the jury could have found Villeme "was a member of KOREGA and under [defendant's] control" when he shot Juders and Nissage. Add48-49. The jury heard testimony that (1) defendant, as the mayor, "would do certain things affiliated to KOREGA and KOREGA would always support him" (RA487-488); (2) Villeme was a KOREGA member and "behind" defendant with a KOREGA shirt during the election (RA415; RA670); (3) KOREGA was typical of armed community-based groups, serving political patrons with violence in exchange for benefits (RA334-335; RA344-358); and (4) Villeme helped defendant intimidate voters during the election and attack the radio station (RA415; RA425-427). Moreover, evidence established that defendant in fact controlled Villeme: he ordered Villeme to shoot Juders and Nissage, and Villeme obeyed. RA428; RA530-531; RA657.[10]

## V. THE DISTRICT COURT CORRECTLY REFUSED TO DISTURB THE JUDGMENT FOR NISSAGE AND JUDERS

The judgment for Nissandère and Juders can be affirmed on two independent bases. The jury provided them each a single damages award for their torture and attempted extrajudicial killing claims because "[t]he same conduct underlay both." *Molloy v. Blanchard*, 115 F.3d 86, 90-91 (1st Cir. 1997); RA869 (instructing jury

---

[10] Defendant does not dispute his control over Hautefort. Def.Br.28-31.

not to award duplicative damages for same injury); RA952-954. Where "the jury's damages award would be the same under either or both liability theories," "the award stands, with no alteration in the amount of damages regardless of whether one or both claims are upheld." *Molloy*, 115 F.3d at 90-91; *Dahlgren v. First Nat'l Bank of Holdredge*, 533 F.3d 681, 692 (8th Cir. 2008). Defendant does not challenge the torture claims, so the awards can be affirmed on that basis alone.

The Court can also affirm on the attempted extrajudicial killing claims. The district court correctly rejected defendant's challenge to those claims because the TVPA permits attempt liability. Add15. Congress based the definition of torture and extrajudicial killing on the Convention Against Torture and the Geneva Convention for the Amelioration of the Wounded and Sick in Armed Forces in the Field. S. Rep. 102-249, at 6; H.R. Rep. 102-367, at 4-5. Congress cited Article 4 of the Convention Against Torture, which prohibits "attempt to commit torture." S. Rep. 102-249, at 9 n.16; Convention Against Torture, *supra*, art. 4(1); *see* 18 U.S.C. §2340A(a). Likewise, the International Criminal Court, which has jurisdiction over grave breaches of the Geneva Conventions such as killing, recognizes attempt liability. Rome Statute of the Int'l Crim. Court, arts. 8(2)(a)(i), 25(3)(f), July 1, 2002, 2187 U.N.T.S. 90; *see* 18 U.S.C. §2441(d)(1)(D) (recognizing *attempted* killing as grave breach of Geneva Conventions). And attempt is familiar in other areas of international law as well. *E.g.*, Convention on Prevention and Punishment

of Crime of Genocide, art. III(d), Dec. 9, 1948, 78 U.N.T.S. 277.  By basing the TVPA's definitions on international law, Congress incorporated these principles.

Courts have thus permitted TVPA claims for attempted extrajudicial killing. *E.g.*, *Doe v. Constant*, 354 F. App'x 543, 544, 547 (2d Cir. 2009) (affirming judgment including attempted-extrajudicial-killing claim); *Jane W.*, 560 F. Supp. 3d at 881 (granting plaintiffs summary judgment on attempted-extrajudicial-killing claim); *Warfaa v. Ali*, 33 F. Supp. 3d 653, 666 (S.D.N.Y. 2006) (denying motion to dismiss attempted-extrajudicial-killing claim), *aff'd*, 811 F.3d 653 (4th Cir. 2016); *see* Cal. Code Civ. Proc. §354.8(a)(1)(D) (relying on TVPA to define "attempted extrajudicial killing").

Defendant challenges this longstanding practice by relying on a single unpublished district court case.  Def.Br.25.  But even that court did not decide the question, concluding it was "not necessary" because the plaintiff failed to establish state action.  *Appel v. Hayut*, No. 20-6256, 2021 WL 2689059, at *10 (S.D.N.Y. June 30, 2021).  The Second Circuit did not reach the issue, assuming attempt was actionable and affirming dismissal on state-action grounds.  *Appel v. Cohen*, No. 22-170, 2023 WL 1431691, at *1 (2d Cir. Feb. 1, 2023).

## VI.	THE JURY'S FINDING THAT DEFENDANT ACTED UNDER COLOR OF LAW WAS SUPPORTED BY THE EVIDENCE

As noted above (*supra* p.43), this Court's evidentiary review is deferential to the jury's verdict.  The district court correctly concluded that the evidence supports

the jury's finding that defendant acted under color of law as mayor. Add52-54. Maguire testified it was typical for Haitian politicians to use armed community-based groups like KOREGA to secure power through violence. RA334-358. Witnesses testified that (1) defendant commanded a KOREGA crew, including Hautefort and Villeme; (2) many of his crew, including Hautefort, were his mayoral staff; and (3) defendant ordered his crew to commit both attacks. RA385; RA413-419; RA426; RA487-496; RA502-504; RA526-527; RA567-571.

Both attacks arose from incidents involving defendant's abuse of his power as mayor. Witnesses testified that defendant fought with Ostanie over a city sanitation dispute and abused his power by arresting her, bringing her to a judge, and demanding that David leave. RA385-386; RA497-503; RA524-526; RA671-673. They also testified that defendant opposed the radio station because it was founded by an opposing party's candidate and broadcast programs critical of him as mayor, so he tried to shut it down and destroy it. RA416-417; RA549-554; RA573-575; RA647-651; RA674-675; RA779. Based on this ample evidence, the jury could have found that defendant led the attacks in his capacity as mayor.

Defendant points only to irrelevant facts not inconsistent with this finding. *See Rodowicz*, 279 F.3d at 42 (this Court must affirm unless evidence is "'so strongly and overwhelmingly' inconsistent with the verdicts") (citations omitted). There is no requirement that plaintiffs be members of an opposing party. *Contra* Def.Br.26.

Defendant attacked David for opposing him as a human rights advocate, and Nissage and Juders because they were at a radio station critical of defendant and associated with the opposing party. Likewise, that defendant was petty and newly elected does not negate state action—pettiness and abuse of power often coincide. *Contra* Def.Br.26-28; *see supra* p.44. And the "mob of people" present at the attacks supports the verdict because, as defendant omits, that mob was principally composed of KOREGA members and defendant's mayoral staff, all under his command.

## VII. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING PROFESSOR MAGUIRE'S EXPERT TESTIMONY

This Court affords "broad deference" to a district court's decision to admit expert testimony. *United States v. Jordan*, 813 F.3d 442, 445 (1st Cir. 2016). It "will not second-guess such a discretionary determination unless it appears that the trial court 'committed a meaningful error in judgment'" or "material error of law." *Id.* (citations omitted). Defendant's argument falls far short of this standard. The district court appropriately denied his challenge to Professor Maguire's testimony as untimely (ECF 267, at 3), and that alone was sufficient. It also reasonably concluded Maguire's testimony was reliable, relevant, and not unduly prejudicial. *Id.*; Add56-57. Either justifies its exercise of discretion to allow Maguire's testimony.

### A. Defendant's Objection On The Eve Of Trial Was Untimely

Plaintiffs disclosed Professor Maguire as an expert over a year before trial, yet defendant never deposed him and waited until three days before trial to try to

exclude Maguire's testimony, offering no explanation for the delay.  ECF 133; ECF 210-1; RA255-257.  The district court denied the motion as untimely, in addition to denying it on the merits.  ECF 267, at 3.  The court was well within its discretion to enforce timeliness necessary for trial management.  Thus, this Court can affirm without reaching the merits.  *Feliciano-Hill v. Principi*, 439 F.3d 18, 24 (1st Cir. 2006) (objection untimely where proponent disclosed expert report five months before trial and opponent waited until trial to object).

### B. Professor Maguire's Testimony Was Reliable

Regardless, the district court did not abuse its discretion in admitting Professor Maguire's testimony.  Maguire served as Senior Advisor on Haiti to the U.S. Department of State; trained diplomats to Haiti for the Foreign Service Institute; taught on Haiti as a professor at Georgetown University and George Washington University's Elliot School of International Affairs; and visited Haiti over 125 times. RA262-264; RA329-334.  His testimony was reliably based on (1) four decades of experience concerning political conditions in Haiti; (2) interviews with individuals and organizations in Haiti, and (3) documents including U.S., U.N., and NGO reports, press coverage, academic research, and deposition transcripts.  RA265-267; RA335-336; RA354-358.  These are sources "reasonably relied upon by experts in the particular field."  Fed. R. Evid. 703; *Chavez v. Carranza*, 559 F.3d 486, 497 (6th

Cir. 2009) (accepting reliance on "interviews, commission reports … documentary research, and field research").

Defendant provides no explanation or authority supporting his assertion that newspaper reports and contacts in Haiti are unreliable. Def.Br.34. Experts routinely rely on newspapers and conversations with sources on the ground. *Chavez*, 559 F.3d at 497 ("interviews … and newspaper articles are the types of data reasonably relied upon by social science experts") (citing *Katt v. City of N.Y.*, 151 F. Supp. 2d 313, 356-57 (S.D.N.Y. 2001)); *United States v. Kantengwa*, 781 F.3d 545, 561-62 (1st Cir. 2015) (affirming admission of historical expert's testimony synthesizing "conversations with people he knew in Butare," interviews, and written sources). Maguire's contacts included individual and organizational relationships he developed through decades of work in Haiti (RA265-266; RA336), and defendant identifies no rule requiring him to name those contacts, particularly where defendant declined to depose Maguire and has threatened witnesses' safety (*supra* pp.10-11). Moreover, newspapers and contacts were only two of the many kinds of sources Maguire relied on—the rest of which defendant has not challenged.

Additionally, it is irrelevant that Maguire never went to Les Irois and did not personally know of defendant's ties to KOREGA. *Contra* Def.Br.32; *see Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592 (2009) (experts have "wide latitude to offer opinions, including those that are not based on firsthand knowledge or

53

observation"). Maguire did not testify to defendant's ties to KOREGA—he testified about KOREGA's characteristics as an armed community-based group, and fact witnesses connected KOREGA to defendant. *See supra* pp.4-5, 14.

## C. Professor Maguire's Testimony Was Relevant And Not Unfairly Prejudicial

Nor did the district court abuse its discretion in concluding that Maguire's testimony provided relevant context for fact witnesses' testimony and was not unfairly prejudicial. Add57. Witnesses testified that defendant commanded a KOREGA crew, and Maguire's testimony about the role of armed community-based groups in Haiti helped the jury understand those facts by "providing context that might prove counter-intuitive to a layperson" familiar only with American rule of law. *See United States v. Teganya*, 997 F.3d 424, 430 (1st Cir. 2021).

Defendant's claim of unfair prejudice mischaracterizes Maguire's testimony. Maguire never suggested defendant was guilty because he belonged to a particular party, so defendant's analogies are inapt. *Contra* Def.Br.33-34. Maguire never testified about defendant at all—he provided context for understanding fact witnesses' testimony about defendant.

## VIII. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING REMITTITUR OF COMPENSATORY DAMAGES

This Court reviews denial of remittitur for abuse of discretion and "will not upset a jury's damage award unless it 'exceeds any rational appraisal or estimate of

the damages that could be based on the evidence before the jury.'" *Sánchez v. Foley*, 972 F.3d 1, 17 (1st Cir. 2020) (citation omitted). Defendant "bears a heavy burden of showing that an award is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." *Id.* (citation omitted). The district court did not abuse its discretion in denying remittitur of compensatory damages. Add58-61.

The jury's award of $1.75 million to David, $1.25 million to Nissandère, and $1.5 million to Juders was reasonable given their severe injuries, as well as adjusted to each plaintiffs' harm. The jury heard overwhelming evidence about plaintiffs' physical and emotional suffering, including the murder of David's brother, the loss of Nissage's leg and Juders's eye, Juders's excruciating pain from shotgun pellets still embedded in his body, and plaintiffs' separation from their families and ongoing fear for their lives. RA402; RA432-434; RA455-457; RA532-534; RA676-677; SA25. The award is comparable to other compensatory damages awards in TVPA cases involving similarly brutal abuses. *E.g.*, *Cabello*, 402 F.3d at 1151 ($3 million); *Chowdhury*, 746 F.3d at 47 ($1.5 million); *Xuncax*, 886 F. Supp. at 199 ($3 million).

Defendant fails to show that the damages shock the conscience. First, defendant's myopic focus on economic injuries ignores plaintiffs' severe physical and emotional suffering, which defendant does not dispute. Def.Br.35-36. No economic evidence is required for such bodily injuries, whose value is "not

susceptible to proof by a dollar amount" and is instead determined by the jury's fairness. *Rodríguez-García v. Miranda-Marín*, 610 F.3d 756, 773 (1st Cir. 2010) (citation omitted).

Second, the amounts awarded in Haiti against defendant's associates are irrelevant and do not dictate the value of plaintiffs' suffering. *Contra* Def.Br.35. As explained above (*supra* pp.9-11), defendant and his associates interfered with the Haitian proceedings, where corruption and violence tainted the results. RA613-635.

Finally, defendant mischaracterizes Concannon's testimony. Concannon testified accurately that plaintiffs had not received the Haitian award. RA809-810. He never suggested the judgment here would be uncollectible nor "implor[ed]" the jury to award a "totemic amount" to send a message. *Contra* Def.Br.35-36.

## IX. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING REMITTITUR OF PUNITIVE DAMAGES

### A. Punitive Damages Are Available Under The TVPA

Defendant's two sentences challenging the availability of punitive damages (Def.Br.36) fail to preserve the argument. *Morales-Tañon*, 524 F.3d at 19 ("We have steadfastly deemed waived issues raised on appeal in a perfunctory manner, not accompanied by developed argumentation….") (citation omitted). Regardless, the district court correctly concluded the TVPA allows punitive damages. Add61-62.

Congress legislates against a common-law backdrop, which permits punitive damages where defendant's conduct is "outrageous, because of the defendant's evil

motive or his reckless indifference to the rights of others." *Restatement (Second) of Torts* §908(2) (Am. L. Inst. 1979). The purpose of punitive damages is to punish defendants and deter such conduct. *Id.* §908(1). Torture and extrajudicial killing are undeniably "outrageous" and "evil." Congress intended to deter such heinous human rights abuses and thus did not abrogate this common-law principle in the TVPA. S. Rep. 102-249, at 3; H.R. Rep. 102-367, at 2-3. The Ninth Circuit has stated that punitive damages are available under the TVPA. *Ditullio v. Boehm*, 662 F.3d 1091, 1096 n.3 (9th Cir. 2011); *see Smith v. Wade*, 461 U.S. 30, 33-37 (1983) (similar logic holding punitive damages available under Section 1983).

Courts have routinely allowed judgments awarding punitive damages on TVPA claims. *E.g.*, *Chowdhury*, 746 F.3d at 47; *Cabello*, 402 F.3d at 1151; *Constant*, 354 F. App'x at 544; *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1158 (E.D. Cal. 2004). In fact, in enacting the TVPA, Congress cited with approval the Second Circuit's ATS decision in *Filartiga*, which on remand resulted in $5-million punitive damage awards for each plaintiff. *Xuncax*, 886 F. Supp. at 199 (citing *Filartiga v. Pena-Irala*, 577 F. Supp. 860, 867 (E.D.N.Y. 1984)).

Defendant cites a single district court decision, which neither addresses the TVPA nor stands for the proposition defendant claims. Def.Br.36. That case stated punitive damages are not available against foreign states or their divisions, of which defendant is neither. *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 198-

99 (D.D.C. 2008). It nowhere suggests a clear-statement rule presuming punitive damages to be unavailable unless explicitly provided for in the statutory text. Such a rule would contravene precedents permitting punitive damages under statutes whose text is silent on the issue. *E.g.*, *Smith*, 461 U.S. at 33-37 (Section 1983); *Ditullio*, 662 F.3d at 1096-98 (Trafficking Victims Protection Act).

## B. The Jury's Punitive Damages Award Was Not Grossly Excessive

Defendant cursorily states the punitive damages were excessive, without addressing the required factors, so his argument is forfeited. Def.Br.36-37; *Morales-Tañon*, 524 F.3d at 19.

Regardless, the district court did not abuse its discretion in denying remittitur. Add62-63. Courts assessing whether punitive damages are grossly excessive must consider "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). All three factors confirm the reasonableness of the award here.

First, torture and extrajudicial killing are among the most reprehensible human rights abuses and international-law violations. It would be an understatement to say that "the harm caused was physical as opposed to economic," "the tortious

conduct evinced an indifference to or a reckless disregard of the health or safety of others," and "the harm was the result of intentional malice." *Id.* at 419.

Second, $11 million in punitive damages is roughly 2.5 times the total compensatory damages of $4.5 million. That is significantly less than the 4:1 ratio the Supreme Court has deemed generally acceptable. *Id.* at 425.

Finally, $11 million (about $3.7 million per plaintiff) is comparable to other TVPA punitive damages awards. *E.g.*, Findings of Fact and Conclusions of Law at 13, *Doe v. Constant*, No. 04-cv-10108 (S.D.N.Y. Oct. 24, 2006), ECF 71, *aff'd*, 354 F. App'x at 544 ($15 million); Amended Final Judgments, *Arce v. Garcia*, No. 99-cv-8364 (S.D. Fla. Aug. 1, 2002), ECF 257-259, *aff'd*, 434 F.3d at 1256 ($15 million); *Saravia*, 384 F. Supp. 2d at 1159 ($5 million each).

## CONCLUSION

This Court should affirm the judgment against defendant.

Dated:  October 9, 2024

Respectfully submitted,

/s/ Diana L. Kim

BONNIE LAU
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Tel: (415) 268-6511

DANIEL MCLAUGHLIN
CARMEN K. CHEUNG
CENTER FOR JUSTICE &
ACCOUNTABILITY
268 Bush Street #3432
San Francisco, CA 94104
Tel: (415) 544-0444

PHILIP A. O'CONNELL, JR.
DENTONS US LLP
101 Federal Street, Suite 1900
Boston, MA 02110
Tel: (617) 235-6802

DIANA L. KIM
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
Tel: (202) 887-8738
DKim@mofo.com

BRIAN R. MATSUI
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel: (202) 887-8784

*Counsel for David Boniface, Nissandère Martyr, and Juders Ysemé*

# ADDENDUM
# WITH STATUTORY EXCERPT

**BONIFACE ET AL. V. VILIENA**

**No. 24-1411**

**ADDENDUM WITH STATUTORY EXCERPT**

**TABLE OF CONTENTS**

**Statute or Regulation**                                                    **Page**

28 U.S.C. § 1350. Alien's action for tort. ....................................................... ADD-1

**28 U.S.C. § 1350. Alien's action for tort.**

The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

(June 25, 1948, ch. 646, 62 Stat. 934.)

## Statutory Notes and Related Subsidiaries

### TORTURE VICTIM PROTECTION

Pub. L. 102–256, Mar. 12, 1992, 106 Stat. 73, provided that:

**"SECTION 1. SHORT TITLE.**

"This Act may be cited as the 'Torture Victim Protection Act of 1991'.

**"SEC. 2. ESTABLISHMENT OF CIVIL ACTION.**

"**(a) LIABILITY.**—An individual who, under actual or apparent authority, or color of law, of any foreign nation—

"**(1)** subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or

"**(2)** subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

"**(b) EXHAUSTION OF REMEDIES.**—A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred.

"**(c) STATUTE OF LIMITATIONS.**—No action shall be maintained under this section unless it is commenced within 10 years after the cause of action arose.

**"SEC. 3. DEFINITIONS.**

"**(a) EXTRAJUDICIAL KILLING.**—For the purposes of this Act, the term 'extrajudicial killing' means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all

the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

"(b) TORTURE.—For the purposes of this Act—

"(1) the term 'torture' means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

"(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—

"(A) the intentional infliction or threatened infliction of severe physical pain or suffering;

"(B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

"(C) the threat of imminent death; or

"(D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality."

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume requirements of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,997 words, excluding those parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this answer has been prepared in a proportionally spaced typeface using Microsoft Office 365, in 14-point Times New Roman font.

Dated:  October 9, 2024                                    _____/s/ Diana L. Kim_____
                                                                              Diana L. Kim

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on October 9, 2024.

I hereby certify that all participants in the case are registered CM/ECF users and that services will be accomplished by the appellate CM/ECF system.

Dated:  October 9, 2024

                                    /s/ Diana L. Kim
                                       Diana L. Kim